# EXHIBIT A

City of Glendale, Building & Safety / 633 E. Broadway, Rm. 101
Glendale, CA 91206 (818) 548-3200

PZUC No. _2004 0528_

# APPLICATION FOR ZONING USE CERTIFICATE

**Instructions:** Please answer the following questions as completely and legibly as possible. Please draw a seating plan on the back of the application if the use is for a restaurant, delicatessen, church, classroom or theater.

1. **Business Address ( Include Suite No., City and Zip Code):**
   718 W. WILSON, GLENDALE, CA. 9120-

2. **Business Name:** REGENCY ESTATE PROPERTIES & PIONEER LENDING

3. **Describe in detail the business activities** GENERAL OFFICE

4. **Applicant's Title?** [X] Owner  [ ] President  [ ] Officer or CEO

   **Business Owner's Name:** DOLIN MARDIROSSIAN & ARO MAZMANI

   **Mailing Address** 718 W. WILSON

   **Phone No.** 818·822·6490   **Alt. Phone No.** 818·500·0858

5. **Property Owner's Name:** RAMY MAZMANIAN

   **Address:** 722 W. WILSON   **Phone No.:** 818.239.3900

6. **Existing Building Use:** [X] Gen. Office  [ ] Retail  [ ] Medical Office  [X] Manufacturing  [ ] Wholesale/Distribution
   [ ] Warehouse  [ ] Eating Establishment  [ ] Other _____

7. **Proposed Building Use:** [X] Gen. Office  [ ] Retail  [ ] Medical Office  [ ] Manufacturing  [ ] Wholesale/Distribution
   [ ] Warehouse  [ ] Eating Establishment **   [ ] Other _____

8. **Please fill in the following:**                    ** Draw seating plan on back of application

   Floor Area for Occupancy ( Square Feet ): 6/00

   No. of Employees: 6

   No. of Seats For Patrons: _____

   New Business:  [X] Yes  [ ] No

   First Time Business in Glendale:  [X] Yes  [ ] No

   Outdoor Storage ( M1/M2 Only):  [ ] Yes  [X] No

9. **Are You Sharing Space ( Subleasing )?**  [ ] Yes  [X] No

   If Yes, From Whom?  N/A

   Alcoholic Beverage Sales:  [ ] Yes  [X] No

   If Yes to Alcoholic Beverage Sales:  [ ] Existing  [ ] Proposed

   Primary Lessee's UO / PZUC No. _____

   * Attach Copy of Current ABC State License

*I DECLARE UNDER PENALTY FO PERJURY, THAT THE INFORMATION PROVIDED HEREIN IS TRUE AND CORRECT. I FURTHER ACKNOWLEDGE THE ISSUANCE OF THIS CERTIFICATE DOES NOT RELIEVE ME FROM LEGAL OBLIGATION TO OBTAIN ANY AND ALL NECESSARY PERMITS AND/OR COMPLYING WITH OTHER APPLICABLE LOCAL, STATE, AND FEDERAL REGULATIONS AS MAY APPLY TO THE USE AND /OR BUSINESS*

**Business Owner's Signature** _____   **ID/Driver's Lic.:** N5252676   **Date:** 8-9-0

Signature of this individual must be verified by personal identification. Any person signing this permit application as agent for the business owner shall have an original letter of authorization at the time of application. If a new Zoning Use Certificate has not been obtained within six months after the application fee is paid, a new application and respective fees shall be collected. Upon written request from the applicant, the Zoning Administrator may extend the period of the certificate application

## FOR STAFF USE ONLY ( DO NOT WRITE BELOW THIS LINE )

| Accepted By | Date | Receipt No. | Fee | Zoning Designation | SIC(Proposed) | Section Sheet |
|---|---|---|---|---|---|---|
| AG | 8-9-04 | C94626 | 125- | M2 | 6651 | 15 |

**Staff Comments, Conditions, Restrictions**
CONDUCT ALL SOIL SAMPLING & HAZ MAT REMEDIATION AS REQUIRED BY GFD. OFFICE
MAXIMUM 40% WAREHOUSE SPACE

| Zoning Case Number(s) | | Specify Type of Eating Establishment | |
|---|---|---|---|
| OK to Submit By: | | Inspection Required?  [ ] Yes  [X] No | Fire Review _____ 8/9/04 |

| 30-day Letter | Request for Service | Dental Letter | OK to Issue By: _____ |
|---|---|---|---|

**Page 23.**

**Exhibit A**

# EXHIBIT B

STATE OF CALIFORNIA
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES
REGION

Cleanup & Abatement Order No. R4-2002-0068
Requiring

DRILUBE COMPANY
To
Assess, Cleanup and Abate the Effects of Contaminants
Discharged to Soil and Groundwater

(FILE NO. 113.0165)

The California Regional Water Quality Control Board, Los Angeles Region (Regional Board)
herein finds that:

## BACKGROUND

1. **San Fernando Valley Groundwater Basin:** The alluvial basin underlying the San Fernando Valley (the San Fernando Basin) is an important source of groundwater, providing drinking water to over 1 million residents in the Los Angeles Region. As set forth in the *Water Quality Control Plan for the Los Angeles Region (Basin Plan)*, adopted on June 13, 1994, the Regional Board has designated beneficial uses for groundwater in the San Fernando Basin (among which include municipal and domestic drinking water supplies), and has established water quality objectives for the protection of beneficial uses.

2. **Water Quality in the San Fernando Basin:** Volatile organic compounds (VOCs) were first discovered in a San Fernando Basin well in 1979. Since then, all City of Burbank wells pumping groundwater for drinking water purposes have been impaired by VOC contamination. In 1986, the US Environmental Protection Agency (USEPA) placed four areas of groundwater contamination and adjacent areas where contamination has (or may have) migrated as one large site called the San Fernando Valley Superfund Site on the National Priorities List[1], pursuant to section 105 of CERCLA, 42 USC §9605. USEPA has divided the San Fernando Valley Superfund Site into five operable units (OUs). Each OU represents an interim containment remedy currently in progress in the eastern San Fernando Valley. Drilube Company is located within the Glendale South Operable Unit (GSOU). Information that has recently become available to the Regional Board demonstrates that some of the groundwater supply wells in the San Fernando Basin have been impacted by heavy metals, such as chromium. Chromium concentrations exceed current safe drinking water standards at some locations in the San Fernando Valley and chromium threatens the drinking water resources of the Basin. The Maximum Contaminant Level (MCL) for total chromium in California drinking water is 50 parts per billion (ppb). As a result, the Regional Board is currently investigating potential sources of chromium contamination.

3. **Discharger Responsibilities:** Drilube Company (hereinafter called Discharger) has been named a potentially responsible party by USEPA for discharging contaminants to the GSOU from its site described below. The results of subsurface investigations have detected soil and

---

[1] List of contaminated sites that poses a threat to human health and/or the environment, and are prioritized by USEPA and the public in terms of their relative risk to human health and/or the environment.

Order No. R4-2002-0068
Page 2

File No. 113.0165

groundwater contaminated with chlorinated solvents, petroleum hydrocarbons, PCBs, and heavy metals including chromium. The primary pollutants under investigation within the GSOU are chlorinated organic solvents.

4. **Location:** The Discharger's facilities are located at 711 Broadway and 718 Wilson Avenue, Glendale, California (Plate 1- the Site). Plating operations are performed in the building located at 711 Broadway and in the building located at 718 Wilson Avenue. As detailed in the findings below, the Discharger's activities at the Site has caused the release of wastes to the subsurface resulting in soil contamination and impairment of the beneficial uses of groundwater resources within the GSOU.

## SITE HISTORY

5. **Site Activities:** The real property at the Site is owned by Devine Industries, based in Japan. While the Discharger has only operated in the southern building (Plant 1) for 12 years, the northern building (Plant 2) has been operational for approximately 40 years (See Plates 1 through 5 for facility layout). The business is currently owned by the Fairfax Family Trust, which has been responsible for operations over the last fourteen years. Prior to about 1986, the Discharger's original facility (now Plant 2) was owned and operated by other members of the Fairfax family.

The Discharger's principal industrial activities involve metal plating and anodizing (painting/dyeing) of parts and equipment used by the U.S Department of Defense for various aerospace applications.

6. **Chemical Usage:** The Discharger has reportedly used volatile organic compounds (VOCs) at the Site, namely: perchloroethylene (PCE) and trichloroethylene (TCE). Numerous heavy metal alloys (e.g. chromium, nickel, cadmium, silver, copper, tin, manganese, zinc, etc.) and metal-containing paints and dyes are used and stored onsite to support site operations. Furthermore, acids, bases, and stripping/degreasing agents are commonly used throughout the Discharger's process lines. Sodium hydroxide, sulfuric and hydrochloric acids, and cyanide are a few of the additional chemicals associated with these processes.

## EVIDENCE OF CONTAMINATION AND
## BASIS FOR 13304 ORDER

7. **Waste Releases:** Under the direction of Regional Board staff, the Discharger conducted site investigations during the early 1990s to 1993, which documented the discharge of wastes to soil and groundwater beneath the Site.

Periodic groundwater monitoring and reporting have been conducted at the site since 1994. Maximum historical groundwater concentrations of trichloroethene (TCE), tetrachloroethene (PCE) and hexavalent chromium (Cr VI) were detected at 11,000 µg/L (micrograms per liter), 1,960 µg/L and 32,000 µg/L, respectively. During recent semi-annual groundwater monitoring, TCE, PCE, and Cr VI were detected in all five on-site monitoring wells (MW1-MW5). Maximum concentrations of TCE, PCE and Cr VI were detected at 1,480 µg/L, 262 µg/L, and 2,620 µg/L in MW3, located directly outside (east) of the Plant 1 plating operations and adjacent to the 4-stage clarifier/sewer outfall. Elevated concentrations of TCE, PCE and

**Page 26**

**Exhibit B**

Order No. R4-2002-0068
Page 3

File No. 113.0165

Cr VI were also detected at 112 µg/L, 180 µg/L, and 2,540 µg/L, respectively, in MW1 located downgradient from Plant 2 process areas (See Plates 2). Based on information obtained during site assessments conducted to date, the Discharger's past activities have contributed to VOC (solvents) contamination in soil and groundwater beneath the site. The soil beneath the site is primarily sand and silty sand with interbedded clayey silt. The depth to groundwater is approximately 60 feet below ground surface (bgs). The USEPA has named the Discharger as a primarily responsible party (PRP) in the GSOU and the Site is currently an active VOC case in the Well Investigation Program at the Regional Board. Analytical data collected regarding chromium and heavy metal contamination verified their presence in both soil and groundwater beneath the Site.

8. **Emerging Chemicals:** According to Regional Board records, the Discharger has not tested for the emerging chemical, 1,4-dioxane, a chemical often used as a stabilizer for TCE, PCE and 1,1,1-trichloroethane (TCA).

9. **Regulatory Status:** The Discharger has been instructed by Regional Board staff to complete the site assessment and remedial cleanup. Site investigations directed by the Regional Board, were done pursuant to section 13267 of the California Water Code. The purpose of this Order is to ensure that the Discharger completes site assessment, periodic monitoring and undertakes cleanup of contaminants in the soil that threaten to impair or further impair groundwater. This soil assessment and cleanup effort is being coordinated with USEPA efforts to remediate groundwater in the GSOU.

USEPA has named several responsible parties liable for remedial action costs in the GSOU. At the present time, USEPA has reached an agreement whereby responsible parties in the GSOU will share costs and implement the interim remedial action plan. The Discharger has been named a potentially responsible party for VOC cleanup of groundwater in the GSOU.

10. **Sources of Information:** The sources for the evidence summarized above include but are not limited to: "Chemical Storage and Use Questionnaire, dated August 23, 1990"; various technical reports submitted by the Discharger or its representatives to the Regional Board staff from 1989 through 1995; site inspections, meetings, written letters and telephone communications between Regional Board staff and the Discharger and/or its representatives from 1989 through 2001.

## CONCLUSION

11. **Pollution of Waters of the State:** The unauthorized discharge of wastes by the Discharger within the GSOU was not permitted and is in violation of water quality objectives established in the ***Basin Plan.*** The past activities of the Discharger have contaminated the underlying soils and polluted groundwater within the GSOU.

12. **Regional Board Authority:** Section 13304 of the California Water Code states, in part, that:

"Any person..., who has caused or permitted ..., any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the State and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the Regional Board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action."

Order No. R4-2002-0068                                              File No. 113.0165
Page 4

The purpose of this Order is to ensure that the Discharger mitigates soil and groundwater pollution by completing on-site/off-site assessment, conducting periodic monitoring and undertaking cleanup of contaminants in soil and groundwater that threaten to impair or further impair groundwater resources.

13. **Status of Site Assessment:** The Discharger has completed some assessment of contamination on-site beneath its facilities.

To complete subsurface assessments and begin appropriate cleanup, the Discharger must undertake the actions specified below, at a minimum:

   a. For VOCs in the saturated and unsaturated zones: Complete the assessment of the lateral and vertical extent of the contaminants.

   b. For emerging chemical (s) and heavy metals in the unsaturated and saturated zones: Complete the assessment, including any off-site contamination migration in the saturated zone.

14. **Cleanup Goals:**   Pending the completion of adequate assessment and monitoring of the lateral and vertical extent of soil contamination and risk of migration to groundwater, the following information shall be considered when establishing preliminary cleanup goals.

   a. Develop a remedial action plan as necessary to cleanup soil and groundwater contamination using, at a minimum, the criteria stated below in items b, c, and d.

   b. VOCs in the Unsaturated Zone:  Cleanup levels set forth in *the Regional Board's Interim Site Assessment and Cleanup Guidebook, May 1996,* which considers contaminant concentrations, depth to the water table, the nature of the chemicals, soil conditions and texture, and attenuation trends.

   c. Emerging Chemicals and Heavy Metals: Cleanup concentrations shall not exceed Action Levels and Maximum Contaminant Levels (MCLs) for drinking water as established by the State Department of Health Services for contaminants in the saturated zone. For emerging chemicals in the unsaturated zone, the Discharger will need to investigate the extent to which contaminants may attenuate through the soil in order to determine soil cleanup levels that will not impact the underlying groundwater resources, above Action Levels or MCLs.

   d. VOCs in the Saturated Zone:  Action Levels and MCLs for drinking water, as established by the State Department of Health Services.

Pending completion of contaminant assessments, Regional Board staff may consider revised cleanup goals in accordance with the following State Policies.

"Antidegradation Policy" (State Board Resolution No 68-16) which requires attainment of background levels of water quality, or the highest level of water quality that is reasonable in the event that background levels cannot be restored. Cleanup levels other than background must be consistent with the maximum benefit to the people of the State, not unreasonably affect present and anticipated beneficial uses of water, and not result in exceedance of water quality objectives in the *Basin Plan.*

**Page 28**

**Exhibit B**

Order No. R4-2002-0068
Page 5

File No. 113.0165

"Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304" (State Board Resolution No. 92-49) which sets forth criteria to consider for those cases of pollution wherein restoration of water quality to background levels may not be reasonable.

15. **Impairment of Drinking Water Wells:**  As noted above (Finding No. 2), some of the drinking water wells in San Fernando Valley have been impacted by chromium. For example, the Glendale Treatment Plant (Plant) extraction wells have been impacted by chromium and VOCs.  However, the Plant is only capable of treating the VOCs in groundwater.  Water purveyors particularly in the GSOU area, and their customers may have to bear a significant portion of the costs of cleaning up this contaminated groundwater and/or procuring alternative supplies of drinking water.

16. Pursuant to section 13304 of the California Water Code, regional boards may seek reimbursement for all reasonable costs to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial action.

17. This action is being taken for the protection of the environment and as such is exempt from the provisions of the California Environmental Quality Act (Public Resources Code section 21000 et seq.) in accordance with California Code of Regulations, title 14, section 15321.

**IT IS HEREBY ORDERED,** pursuant to section 13304 of the California Water Code, that the Discharger, DRILUBE COMPANY, shall cleanup and abate contaminated soil and groundwater emanating from the Discharger's Site at 711 Broadway and 718 Wilson Avenue, Glendale, California, in accordance with the following requirements:

1. **VOCs in the Unsaturated and Saturated Zones:** The Discharger shall prepare a workplan and upon approval from the Regional Board Executive Officer (Executive Officer), complete the assessment of VOCs in the unsaturated zone by conducting a multi-depth soil gas survey to adequately determine the lateral and vertical extent of the contaminants and current VOC levels in soil.

2. **Emerging Chemicals and Heavy Metals in the Unsaturated and Saturated Zones:** The Discharger shall prepare a workplan and upon approval from the Executive Officer, extend the investigation to include on-site assessment of the extent of contaminant migration and the presence of emerging chemicals and heavy metals, including, 1,4-dioxane, chromium and hexavalent chromium in soil and groundwater.  In addition, the workplan shall include an off-site groundwater investigation of all the aforementioned chemicals.

3. **Assessment Technical Reports\Remedial Action Plans:** Upon completion of the assessment reports (i.e., Requirements 1 and 2 above), the Discharger shall prepare a technical report that summarizes the results.  In the event that the results fail to confirm that:

    a. VOCs and emerging chemicals in the <u>unsaturated zone</u> are naturally attenuating to MCLs at the water table, the Discharger shall develop and implement a workplan subject to the Executive Officer's approval for cleanup of soil contaminants; and

    b. Emerging chemicals in the <u>saturated zone</u> off-site are not continuing to migrate, the Discharger shall develop and implement a workplan subject to the Executive Officer's approval for containment, control and cleanup of groundwater pollution.

**Page 29**

**Exhibit B**

Order No. R4-2002-0068                                   File No. 113.0165
Page 6

c.  **Groundwater Monitoring**: The Discharger shall monitor the groundwater for chemicals of concern, at a minimum including chromium and hexavalent chromium and the emerging chemical 1,4, dioxane on a quarterly basis (see Attachment B). Future groundwater monitoring frequency may be adjusted if a plan is proposed by the Discharger and subsequently approved by the Executive Officer. The Executive Officer may approve a change in the monitoring frequency if it is shown that other frequencies are adequate to monitor changes of contaminant concentrations, groundwater gradients, and the progress of any soil and groundwater remediation.

Abandonment of any groundwater wells installed during the required investigation and remediation for this project must be reported to and approved by the Executive Officer in advance. Any groundwater well removed must be replaced within three months at a location approved by the Executive Officer. With justification, the Executive Officer may approve the abandonment of groundwater wells without replacement. When a well is removed, all work shall be completed in accordance with all applicable well abandonment requirements.

4.  **Impairment of Drinking Water Wells**: The Regional Board reserves the right to require the Discharger and other dischargers to develop and implement a plan that will mitigate impaired resources of groundwater and/or compensate purveyors for past and current costs of replacing impaired water supplies. Such a directive would not duplicate requirements in the USEPA's consent decree.

5.  **Contractor/Consultant Qualification**: A California registered civil engineer, registered geologist or registered certified specialty geologist shall conduct or direct the subsurface investigation and cleanup program. All technical documents shall be signed by and stamped with the seal of the above-mentioned qualified professionals.

6.  **Cost Recovery**: The Discharger shall reimburse the Regional Board all reasonable costs incurred by the Regional Board to investigate the Discharger's unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial actions.

7.  **Time Schedule**: The Discharger shall submit all required work plans and reports in accordance with the time schedule in Attachment B.

8.  The Regional Board's authorized representative(s) shall be allowed:

    ⊙  Entry upon premises where a regulated facility or activity is located, conducted, or where records are stored, under the conditions of this Order;
    ⊙  Access to copy any records that are stored under the conditions of this Order;
    ⊙  Access to inspect any facility, equipment (including monitoring and control equipment), practices, or operations regulated or required under this Order; and
    ⊙  The right to photograph, sample, and monitor the Site for the purpose of ensuring compliance with this Order, or as otherwise authorized by the California Water Code.

9.  This Order is not intended to permit or allow the Discharger to cease any work required by any other order issued by the Regional Board, nor shall it be used as a reason to stop or redirect any investigation, monitoring, cleanup or remediation programs ordered by the Regional Board or any other agency. Furthermore, this Order does not exempt the Discharger from compliance with any other laws, regulations, or ordinances which may be

**Page 30**

**Exhibit B**

Order No. R4-2002-0068
Page 7

File No. 113.0165

applicable, nor does it legalize the waste treatment and disposal facilities, and it leaves unaffected any further restrictions on those facilities which may be contained in other statutes or required by other agencies.

10. The Discharger shall submit 30-day advance notice to the Regional Board of any planned changes in name, ownership, or control of the Site; and shall provide 30-day advance notice of any planned physical changes to the Site that may affect compliance with this Order. In the event of a change in ownership or operator, the Discharger also shall provide 30-day advance notice, by letter, to the succeeding owner/operator of the existence of this Order, and shall submit a copy of this advance notice to the Regional Board.

11. The Regional Board, through its Executive Officer, may revise this Order as additional information becomes available. Upon request by the Discharger, and for good cause shown, the Executive Officer may defer, delete or extend the date of compliance for any action required of the Discharger under this Order. The authority of the Regional Board, as contained in the California Water Code, to order investigation and cleanup in addition to that described herein is in no way limited by this Order.

12. Pursuant to California Water Code section 13320 the Discharger may seek review of this Order by filing a petition with the State Water Resources Control Board (State Board). Such a petition must be received by the State Board, located at P.O. Box 100, 1001 I Street, Sacramento, California, 95814, within 30 days of the date of this Order.

13. Failure to comply with the terms or conditions of this Order may result in imposition of civil liabilities, imposed either administratively by the Regional Board or judicially by the Superior Court in accordance with section 13350 et seq. of the California Water Code, and/or referral to the Attorney General of the State of California for such action as he/she may deem appropriate.

14. None of the obligations imposed by this Order on the Discharger is intended to constitute a debt, damage claim, penalty or other civil action which should be limited or discharged in a bankruptcy proceeding. All obligations are imposed pursuant to the police powers of the State of California intended to protect the public health, safety, welfare and environment.

Ordered by: _____          Date: March 29, 2002
              Dennis A. Dickerson, Executive Officer

Order No. R4-2002-0068
Page 8

File No. 113.0165

Attachment A  (map)

Order No. R4-2002-0068
Page 9

File No. 113.0165

## Attachment B:  Time Schedule

| Requirement | Completion/Due Date |
|---|---|
| **1.** **Assessment of VOCs, Emerging Chemicals and Heavy Metals in the Vadose and Saturated Zones**<br><br>    Submit a Workplan to complete site assessment<br><br>    Complete assessment<br><br>    Submit technical reports | June 7, 2002<br><br>To be determined<br><br>To be determined |
| **2.** **Groundwater Monitoring**<br><br>    Submit quarterly monitoring reports:<br><br>    January – March<br>    April – June<br>    July – September<br>    October - December | Reports due by the following dates:<br><br>April 15<br>July 15<br>October 15<br>January 15 |
| **3.** **Remedial Action Plan**<br><br>    Soil<br><br>    Groundwater | To be determined<br><br>To be determined |

# Response to Chromium Contamination

San Fernando Valley Chromium Workshop



Page 34
Exhibit B

Workshop

# Source Investigations & Cleanups

EPA has assisted RWQCB by...

- Began funding of groundwater ... roundwater
- Began funding a larger-scale chromium source investigation
- Began urgently monitoring ... cleanup programs
- Began funding a place-based collection at RWQCB to assist with chromium source investigations




Page 35
Exhibit B

Cleanup Workshop

# Source Investigations & Cleanups



- RWQCB has lead for 16 sites

- DTSC has lead for 6 sites

- EPA has lead for 3 sites

  – All Metals, Drilube, & Ubrascope

3

... Workshop

# Source Investigations & Cleanups

| Facility Name | Category (1 to 4) and Site Status | CAO | Operable Unit | Date of Last Action Taken | Last Action Completed/Status | Next Action Required | Anticipated Completion Date of Next Action |
|---|---|---|---|---|---|---|---|
| **Sites Managed by US EPA (Total = 3)** | | | | | | | |
| All Metals Plating | Removal action completed. | | N | Glendale South | Dec-07 | EPA demolished building and excavated 3 feet of soil below ground surface (bgs). Deeper soil excavations to 15 - 20 feet bgs in areas of concern. Site was backfilled, capped, and fenced in December. | Evaluate groundwater data | TBD |
| Drillube Company | 3 Soil and groundwater characterization. Additional characterization required. | Y | Glendale South | Dec-07 | EPA commented on Drillube (Wilson) investigation workplan in September and conducted October call with PRP consultant. Draft administrative order on consent (AOC) sent in November. Revised workplan and AOC comments overdue. Drillube (Broadway) PRP attorney stalled willingness to comply in November and selection of consultant in December. | PRP calls in December on Drillube (Wilson) workplan and AOC and on Drillube (Broadway) investigation workplan. Draft AOC to Avanessians (Broadway) in February. | Dec-07 |
| Former Lockheed Librascope | 1 Limited soil investigation data. | N | Glendale South | Dec-07 | EPA commented on investigation workplan in October and received revision in late November. | Investigation workplan approval or further revision in December. If approved, work will commence in January. Draft AOC to PRP in January | Dec-07 |
| **Sites Managed by RWQCB (Total = 16)** | | | | | | | |
| A.H. Plating | Soil characterization only. No monitoring wells. | N | Burbank | Oct-07 | RWQCB to issue case closure with a Deed Restriction covenant that prevents development of the site for residential or educational use unless soil remediation occurs. | PRP contacted in September and October to determine progress on deed restriction. Awaiting deed restriction form. | Feb-08 |
| Cal-Air Processing | 1 No soil investigation data. | N | Burbank | Sep-07 | Based upon a site inspection RWQCB determined site has no further requirements. RWQCB issued case closure in mid-September. | None. | N/A |
| Carter Plating | Soil characterization. No monitoring wells. | N | Burbank | Oct-07 | RWQCB to issue case closure with a Deed Restriction covenant that prevents development of the site for residential or educational use unless soil remediation occurs. | PRP contacted in September and October to determine progress on deed restriction. Awaiting deed restriction form. | Feb-08 |



Page 38
Exhibit B

Chromium Workshop                    Source Investigations & Cleanups

# Removal Action at All Metals



- Former plating facility in Burbank

- Hexavalent chromium, cadmium, and cyanide contamination

- EPA removed the drums and chemicals and demolished the contaminated building

- Soil excavated to at least 3 feet (up to 20 feet in highly contaminated areas)

- Backfilled with clean soil and asphalt cap and fence installed

- Materials removed include
  - 91 vats
  - 157 drums
  - 107 containers
  - subterranean clarifier

- Hazardous materials removed include acids, bases, oxidizers, heavy metals, combustibles, and cyanides

- Removal completed on December 5, 2007

6

**Page 39
Exhibit B**

Source Investigations & Cleanups

Ferrochromium Workshop

# Former Drilube Site

**Drilube Wilson property**

- EPA will issue an order for a soil and groundwater investigation
- EPA will perfect a lien to ensure that potentially responsible party (PRP) pays

**Drilube Broadway property**

- Investigation workplan received in late February & under review
- Draft consent order sent to PRP



©2007 Google    Map data ©2007 NAVTEQ™

8

Cr Chromium Workshop          Source Investigations & Cleanups

# Former Librascope Site

- Librascope
  - Investigation workplan approved
  - Draft consent order sent to responsible party
  - Expect investigation work to start and order signed in April



Librascope Buildings 1 & 18

Page 41
Exhibit B

Chromium Workshop

# Glendale Chromium OU activities

- Chromium Operable Unit established to focus on Glendale groundwater chromium investigation

- Notice and information request letters sent in November 2007

  – Responses from Cr6 PRPs received in February

  – Follow up letters will be sent in March

Page 42
Exhibit B

Premium Workshop

10

# Glendale Groundwater Cleanup

- Cr6 Treatment for Glendale System

  – Glendale plans to build 2 Cr6 demonstration treatment plants. (June & December 2008)

  – EPA provided > $800 K of this $3.5 M project.

  – EPA will support the City's Prop. 50 funding application.

  – PRPs have agreed to provide supplemental funding.





Page 43
Exhibit B

# SFV Chromium Workshop

Questions?
Observations?
Recommendations?



Please contact

Bob Fitzgerald
San Fernando Valley chromium project manager
213-244-1814 or fitzgerald.bob@epa.gov

Fred Schauffler
Chief, Site Cleanup Section 4
415-972-3174 or schauffler.frederick@epa.gov

Page 44
Exhibit B

ENVIRONMENTAL QUESTIONNAIRE
AND DISCLOSURE STATEMENT

LOAN # _____

The undersigned, as owner or buyer of the Property described on Exhibit "A" attached hereto, is familiar with the operations presently conducted on the Property, has made a reasonably diligent inquiry into the former uses of the Property and hereby declares and certifies that to the best of its knowledge the following information is true and correct.

A response is required for each item.  Please note and continue answers on a separate sheet, if necessary.

## COMMERCIAL REAL ESTATE

1.  Current/Former Uses of the Property:

   A.  Provide dates for construction of current improvements and any improvements which have been demolished or removed.

   _____
   _____

   B.  Description of current uses.

   _____
   _____

   C.  Names of all owners since 1940.

   _____
   _____

   D.  Names of previous occupants.

   _____
   _____

   E.  Description of all previous uses since 1940.

   _____
   _____

**Page 45**

**Exhibit B**

F.  Current and past uses of adjacent property.

_____

_____

G.  Was the Property ever parceled differently?

(_____) Yes                    (__X__) No

Were there ever different addresses for the site?

(_____) Yes                    (__X__) No

If yes, please give full details.

_____

_____

_____

H.  Are there, or have there ever been any disposal facilities, dump sites or facilities involving hazardous waste within 2,000 feet of the site?

(_____) Yes                    (__X__) No

If yes, describe.

_____

_____

_____

2.  Asbestos

A.  Is there asbestos currently in any of the construction materials contained in the building?

(_____) Yes                    (__X__) No

If so, Where?

_____

B.  If so, has a survey been conducted to assess the type, amount, location and condition of asbestos on the site?

(_____) Yes                           (__X__) No

If so, please attach a copy of any survey report.

C.  Have asbestos air samples been taken?

(_____) Yes                           (__X__) No

If so, what were the results?

_____
_____
_____

3.  Polychlorinated Biphenyls ("PCBs")

A.  Have PCBs been used in electrical transformers, capacitors or other equipment at the property?

(_____) Yes                           (__X__) No

B.  If so, please describe the use and quantity of PCBs used on the property.

_____
_____

4.  Fuel/Chemical Storage Tanks, Drums, and Pipelines.

A.  Are there any above ground or underground gasoline, diesel, fuel oil, chemical storage tanks, or other hazardous materials on the Property?

(_____) Yes                           (__X__) No

If so please describe substances stored and capacity of tank(s).

_____
_____

**Page 47**

**Exhibit B**

3

B.  Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes                    (___X___) No

When was the most recent test?

_____

Results?

_____
_____

Provide an inventory of materials, quantity, age, construction material, and leak protection systems on each tank.

C.  Are any other chemicals stored on the Property in drums or other containers?

(_____) Yes                    (___X___) No

If so, please describe the substances, quantities stored, and types and conditions of container.

_____
_____
_____

D.  Have there been any spills, leaks, or other releases of chemicals on the Property?

(_____) Yes                    (___X___) No

If so, please describe the chemicals and quantities released, any cleanup measures taken, and the results of any soil or ground water samples performed to detect the presence of the chemicals spilled, leaked, or released on the Property.

_____
_____
_____

E.  Please attach copies of any permits or licenses pertaining to the use, storage, handling, or disposal of chemicals on the Property.

F.  Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes                    (__X__) No

5.  Water Discharges

A.  List all sources of waste water discharges to surface waters, ground waters, septic systems, or holding ponds.

_____None_____

B.  List all sources of waste water discharges to public sewer systems and storm collection systems.

_____None_____

C.  Please attach copies of any water discharge permits, licenses, or registration pertaining to operations on the Property.

6.  Air Emissions

A.  Describe air emissions from each source of air pollutants, including fuel burning equipment.  Describe type of fuel burned.

_____N/A_____

B.  Describe air pollution control equipment used to reduce emissions for each source of air emissions.

_____N/A_____

C.  Are air emissions monitored?

(_____) Yes                    (__X__) No

If so, please indicate frequency of monitoring and attach results.

_____

D.  Please attach copies of any air permits, licenses, or registrations pertaining to operations on the Property.

7. <u>Waste Disposal</u>

   A.  Describe the types of liquid wastes, other than waste water described above, and solid wastes generated at the Property.

   _____

   _____

   B.  Describe how the liquid and solid wastes generated at the Property are disposed.

   _____

   _____

   C.  Please attach copies of any waste disposal permits or licenses pertaining to operations on the Property.

<u>SOIL CONTAMINATION</u>

   A.  Have there been any spills, leaks or other releases of hazardous materials on the Property?

   (_____) Yes                    (__X__) No

   If so, describe the materials and quantities released, any mitigation measures, and the results of soil or ground water samples performed.

   _____

   _____

   B.  Are there any known spills, leaks or other releases on adjacent sites?

   (_____) Yes                    (__X__) No

   Is there evidence of contamination plumes moving onto the site from adjacent sites?

   (_____) Yes                    (__X__) No

**Page 50**

**Exhibit B**

6

## AGRICULTURAL PROPERTY

If the property has been or is used for agricultural purposes, the following additional information should be provided.

A.  Have pesticides, herbicides, or other agricultural chemicals been applied to the Property?

(_____) Yes                    (___X___) No

If so, please describe the locations where such pesticides or chemicals were applied, the type of pesticides or chemicals applied in each area, and the results of any soil or ground water analyses performed to detect pesticides or chemicals used at the site.

_____

_____

B.  Have pesticides, herbicides or other agricultural chemicals been mixed, formulated, rinsed, or disposed of on the Property?

(_____) Yes                    (___X___) No

If so, please describe the locations where such pesticides were mixed, formulated, rinsed, or disposed, the type of pesticides or chemicals mixed, formulated, rinsed, or disposed of at each location, and the results of any soil or ground water analyses performed to detect pesticides or chemicals mixed, formulated, rinsed, or disposed at the site.

_____

_____

_____

## INDUSTRIAL PROPERTY

If the Property has been or is used for industrial purposes, the following additional information should be provided:

A.  Has the Property been used for disposal of any liquid or solid waste?

(_____) Yes                    (___X___) No

**Page 51**

**Exhibit B**

7

If so, describe the location of all disposal sites, the type of wastes disposed at each site, the results of any soil or groundwater samples taken in the vicinity of each site, and the manner in which each site not presently in use was closed.

_____
_____
_____

B. Have evaporation or storage ponds been located on the Property?

(_____) Yes                    (  X  ) No

If so, describe the location of all ponds, the type of wastes placed in each pond, the results of any soil or ground water samples taken in the vicinity of each pond, and the manner in which each pond not presently in use was closed.

_____
_____
_____

C. Have waste water treatment facilities, such as acid neutralization vaults, been located on the Property?

(_____) Yes                    (  X  ) No

If so, please describe the location of all facilities, the types of wastes treated in each facility, the results of any soil or ground water samples taken in the vicinity of each facility, and the manner in which each facility not presently in use was closed.

_____
_____
_____

D.  Are there raw chemicals or waste chemical storage areas on the Property?

(_____) Yes                    (___X___) No

If so, please describe the location of all such areas, the type of products or wastes stored in each area, the amount of products or wastes stored in each area, the results of any soil or ground water samples taken in the vicinity of each area, and the manner in which each are not presently in use was closed.

_____
_____
_____

## STUDIES, REPORTS, CITATIONS, ENFORCEMENT

A.  Attach a copy of each environmental study, report, or assessment which has been performed on the Property's soil, air, or water conditions.

B.  Have any federal, state, or local agencies ever investigated cited or been involved on the Property for violations of any environmental law?

(_____) Yes                    (___X___) No

If so, describe in full.

_____
_____
_____

C.  Has any public agency listed the Property as a site requiring or qualifying for cleanup under any environmental law?

(_____) Yes                    (___X___) No

If so, describe in full

_____
_____
_____

## ADJOINING PROPERTY

A.  Are there any of the above-referenced hazardous substances or pollutants present on adjoining properties or properties in the immediate area of the Property?

(_____) Yes                    ( X ) No

Dated: _05 — 29 — 08_

Buyer: _____

_____

_____

Seller: _____

_____

_____

Attachment:

Exhibit "A" - Legal Description

California Business Search   http://kepler.sos.c.   /corpdata/ShowAllList?QueryCorpNumber=C...

# California Business Portal

**Secretary of State DEBRA BOWEN**

**DISCLAIMER:** The information displayed here is current as of JAN 02, 2009 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| DEVIN INDUSTRIES INC. | | |
| **Number:** C1749754 | **Date Filed:** 8/26/1994 | **Status:** suspended |
| **Jurisdiction:** California | | |
| **Address** | | |
| 249 N BRAND BLVD #470 | | |
| GLENDALE, CA 91203 | | |
| **Agent for Service of Process** | | |
| A IRACI | | |
| 249 N BRAND BLVD #470 | | |
| GLENDALE, CA 91203 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

**Page 55**

**Exhibit B**

1/9/2009 10:38 AM

# Property Profile

## Cover Page

**Subject Property:**



**Site Address**

718 W WILSON AVE ,

GLENDALE, CA, 91203

**Mail Address**

718 W WILSON AVE ,

GLENDALE, CA, 91203

**Prepared By:**



**Richard Labowe**

Labowe, Labowe & Hoffman, Llp

T: 213-250-9800 x 103
E: LLHLAW1631@AOL.COM



---

**Document Contents**

- Property Overview Page
- Property History Page
- Cyberhomes.com Content

**Offered by**



---

**Courtesy of Chicago Title**
**Offered by Chicago Title**
All information produced is deemed reliable but is not guaranteed.

Powered By
cyberhomes.com
Find the right neighborhood. Find the right home.

**Page 56**

**Exhibit B**



## Property Overview

**Owner and Geographic Information**

718 W WILSON AVE, GLENDALE, CA, 91203- 2409



| Primary Owner: | Secondary Owner: |
|---|---|
| DERBOGHOSSIAN, HOVSEP | |

**Mail Address:** 718 W WILSON AVE GLENDALE CA 91203

**Site Address:** 718 W WILSON AVE GLENDALE CA 91203

**APN :** 5638-004-029   **Lot Number :** 17   **Census Tract :** 3017.02   **Page Grid :** 564-C4

**Housing Tract Number:** 4531   **Phone:**

**Legal Description :** Lot: 17  Tract No: 4531  Abbreviated Description: LOT:17 CITY:REGION/CLUSTER: 24/24855 TR#:4531 TRACT # 4531 LOT 17 City/Muni/Twp: REGION/CLUSTER: 24/24855

**Property Details**



| Bedrooms : | Year Built : 1936 | Square Feet : 6,100 SF |
|---|---|---|
| Bathrooms : | Garage : | Lot Size : 8,738 SF |
| Total Rooms : | Fireplace : | Number of Units : 0 |
| Zoning : GLM1* | Pool : | Use Code : Manufacturing (light) |

**Sale & Loan**



| Transfer Date : 06/27/2008 | Seller : MAZMANIAN, REMY | |
|---|---|---|
| Transfer Value : $1,725,000 | Document # : 08-1147426 | Cost/Sq Feet : $282 |
| First Loan Amt : $1,313,200 | Lender : US BANK NA | |

**Assessment & Taxes**

| Assessed Value : $891,921 | Percent Improvement : 15.05% | Homeowner Exemption : |
|---|---|---|
| Land Value : $757,701 | Tax Amount : $9,921.17 | Tax Rate Area : 11-689 |
| Improvement Value : $134,220 | Tax Status : Current | Tax Account ID : |
| Market Improvement Value : | Market Land Value : | Market Value : |

**Page 57**

**Exhibit B**

Cyberhomes.com Profile Report

http://ctt.si...  ...com/XSLT-Transformation-Report-View.aspx

**Courtosy of Chicago Title**
**Offered by Chicago Title**
All information produced is deemed reliable but is not guaranteed.

Powered By

cyberhomes.com

**Page 58**
**Exhibit B**

Cyberhomes.com Profile Report

http://ctt.site-data.com/XSLT-Transformation-Report-View.asp



Now with Cyberhomes.com content
powered by homes
chicagotitle.com
THE RIGHT NEIGHBORHOOD, FIND THE RIGHT HOME

 **Property History**

718 W WILSON AVE, GLENDALE, CA, 91203- 2409

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147426 BK-PG - |
| Price | $1,725,000 | Document Type | Grant Deed |
| First TD | $1,313,200 | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | 08-1147427 | Interest Rate | |
| Lender Name | US BANK NA | Buyer Vesting | Married Man as his sole and separate property |
| Buyer Name | DERBOGHOSSIAN, HOVSEP | Seller Name | MAZMANIAN, REMY |
| Legal Description : Lot: 17  Tract No: 4531  Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE | | | |

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147425 BK-PG - |
| Price | N/A | Document Type | Intrafamily Transfer or Dissolution |
| First TD | N/A | Type of Sale | Non-Arms Length Transfer |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | | Buyer Vesting | Married Man as his sole and separate property |
| Buyer Name | DER BOGHOSSIAN, HOVSEP | Seller Name | DER BOGHOSSIAN, BARBARA |
| Legal Description : Lot: 17  Tract No: 4531  Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE | | | |

### Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147428 BK-PG - |
| Loan Amount: | $38,736 | Loan Type | Unknown |
| TD Due Date | | Type of Financing | |
| Lender Name | US BANK NA | Buyer Vesting | N/A |
| Lender Type | Bank | Vesting | |
| Borrowers Name | DERBOGHOSSIAN,HOVSEP | | |

**Page 59**
**Exhibit B**

**Courtesy of Chicago Title**
**Offered by Chicago Title**
All information produced is deemed reliable but is not guaranteed.

**Powered By**

cyberhomes.com

Cyberhomes.com Profile Report

http://ctt.site~~data~~.com/XSLT-Transformation-Report-View.asp



## Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 02/15/2008 | Document # | 08-0275418 BK-PG - |
| Loan Amount: | $233,000 | Loan Type | Stand Alone Second |
| TD Due Date | | Type of Financing | |
| Lender Name | GAREGIN LUSIKIAN | Buyer Vesting | N/A |
| Lender Type | Private Party | Vesting | |
| Borrowers Name | MAZMANIAN,REMY | | |

## Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 07/22/2004 | Document # | 04-1872684 BK-PG - |
| Loan Amount: | $300,000 | Loan Type | Unknown |
| TD Due Date | | Type of Financing | |
| Lender Name | DAVID P GOODLAW | Buyer Vesting | N/A |
| Lender Type | Private Party | Vesting | |
| Borrowers Name | MAZMANIAN,REMY | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 05/28/2004 | Document # | 04-1379999 BK-PG - |
| Price | $150,000 Multiple Parcels Involved in this transaction | Document Type | Grant Deed |
| First TD | N/A | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | | Buyer Vesting | N/A |
| Buyer Name | MAZMANIAN, REMY | Seller Name | DEVIN INDUSTRIES INC, |
| Legal Description : Lot: 17  Tract No: 4531  Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE | | | |

Courtesy of Chicago Title
Offered by Chicago Title
All information produced is deemed reliable but is not guaranteed.

Powered By



**Page 61**
**Exhibit B**

1/9/2009 10:35 AN

http://ctt.sitevdata.com/XSLT-Transformation-Report-View.asp:



## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 02/01/1995 | Document # | |
| Price | $150,001 | Document Type | N/A |
| First TD | N/A | Type of Sale | Per Assessor Transaction History |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | N/A | Buyer Vesting | N/A |
| Buyer Name | | Seller Name | N/A |
| Legal Description : | | | |

Courtesy of Chicago Title
Offered by Chicago Title
All information produced is deemed reliable but is not guaranteed.

Powered By
cyberhomes.com

**Page 62**
**Exhibit B**

1/9/2009 10:35 AM

This address is not available from CyberHomes.com

# EXHIBIT C

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

NAME  MARIE RONGONE
      OFFICE OF REGIONAL
      COUNSEL
MAILING  U.S. E.P.A.
         75 HAWTHORNE ST
CITY, STATE  ORC-3
ZIP CODE  SAN FRANCISCO, CA 94105

03/07/08



20080401128

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

**TITLE(S)**

NOTICE OF LIEN

RECORDING REQUESTED BY:

   Kathleen Salyer, Chief, Site Cleanup Branch
   Superfund Division
   U.S. Environmental Protection Agency
   Region IX

AND WHEN RECORDED MAIL TO:

   Marie Rongone
   Office of Regional Counsel
   U.S. Environmental Protection Agency
   75 Hawthorne Street, ORC-3
   San Francisco, California 94105

NOTICE OF LIEN
UNDER
COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION & LIABILITY
ACT OF 1980, AS AMENDED
42 U.S.C. Section 9607(l)

NOTICE IS HEREBY GIVEN by the United States of America that it holds a lien on lands and premises described below situated in Los Angeles County, State of California, as provided by Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. Section 9607(l), to secure the payment to the United States of all costs and damages for which Remy Mazmanian is liable to the United States under Section 107 of CERCLA, 42 U.S.C. Section 9607. This lien exists in favor of the United States on all real property that belongs to Remy Mazmanian and which is, has been, or will be subject to, or affected by, removal actions, as defined by Federal Law, at the real property located 718 West Wilson Avenue, Glendale, California, and more particularly described as follows:

Legal Property Description

   Los Angeles County Parcel Number AP 5638-004-029

   In the county of Los Angeles, state of California, Lot 17 of Tract no. 4531, in the City of Glendale, County of Los Angeles, California, as per map recorded Book 52, page 18 of Parcel Maps, in the Office of the County Recorder of said County. (See Attachment A, Legal Description)

This statutory lien exists and continues until the liability for such costs and damages (or for any decree or judgment against such persons arising out of such liability) is satisfied or becomes unenforceable through the operation of the statute of limitations as provided by Section 113(g) of CERCLA, 42 U.S.C. § 9613(g).

The United States has caused this instrument to be executed through the United States Environmental Protection Agency, and the undersigned, in my official capacity as a Branch Chief within the Superfund Division of the United States Environmental Protection Agency, Region IX. I verify that response actions were undertaken by the United States at the above-described location pursuant to 42 U.S.C. § 9601 et seq.

Signed at San Francisco, California, this 4th day of _____March_____, 2008.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

Kathleen Salyer, Chief, Site Cleanup Branch
Superfund Division
U.S. EPA, Region IX

2

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF SAN FRANCISCO                )

On March 4, 2008, before me, Laura Hicks, Notary Public, personally appeared Kathleen Salyer, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Notary Signature _____
                          Notary Public

LAURA J. HICKS
Commission # 1647695
Notary Public - California
San Francisco County
My Comm. Expires May 16, 2010

## IMPORTANT RELEASE INFORMATION

With respect to the costs and damages for which the persons named in this notice are liable to the United States Environmental Protection Agency as set forth herein, unless a notice of lien is refiled, this Notice shall operate as a Certificate of Release on the expiration of the applicable statute of limitations.  Pursuant to 42 U.S.C. § 9613(g)(2)(A & B), the applicable limitation periods for actions for recovery of costs are as follows:

(A) for a removal action within 3 (three) years after completion of the removal action, except that such cost recovery action must be brought within 6 (six) years after a determination to grant a waiver under Section 104(c)(1)(C) of this title, for continued response action; and

(B) for a remedial action within 6 (six) years after the initiation of physical on-site construction of the remedial action . . . .

4

CERTIFIED COPY

## EXHIBIT "A"

All that certain real property situate in the County of Los Angeles, State of California, described as follows:

Lot 17 of Tract no. 4531, in the City of Glendale, County of Los Angeles, State of California, as per map recorded in book 52, page 18 of maps, in the office of the County Recorder of said County.

04  1379999

legal rev. (010698)

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

MAR   7   2006

Dean C. Logan

ACTING
REGISTRAR-RECORDER/COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

# EXHIBIT D



U.S. Small Business Administration

# NOTE

| SBA Loan # | PLP 312-651-5001 |
|---|---|
| SBA Loan Name | HOVSEP DERBOGHOSSIAN COMPUTER SERVICES |
| Date | June 20, 2008 |
| Loan Amount | 1,313,200.00 |
| Interest Rate | Variable |
| Borrower | Hovsep Derboghossian dba  HOVSEP DERBOGHOSSIAN COMPUTER SERVICES |
| Operating Company | N/A |
| Lender | U.S. Bank National Association |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

One Million Three Hundred Thirteen Thousand Two Hundred and 00/100        Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who

pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.



Wolters Kluwer Financial Services St. Cloud, MN

Exhibit D

3.  PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Note will mature in 25 years from date of Note.

The interest rate on this Note will fluctuate.  The initial interest rate is 6.58% per year.  This initial rate is the prime rate on the date SBA received the loan application, plus 1.58%.  The initial interest rate must remain in effect until the first change period begins.

Borrower must pay principal and interest payments of $8,933.00 every month, beginning one month from the month of initial disbursement on this Note; payments must be made on the same day as the date of initial disbursement on this Note in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted annually (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month in which an interest rate change occurs, as published in the Wall Street Journal on the next business day.

The adjusted interest rate will be 1.58% above the Prime Rate.  Lender will adjust the interest rate on the first calendar day of each change period.  The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default.  If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note.  Borrower may prepay 20% or less of the unpaid principal balance at any time without notice.  If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:
a.  Give Lender written notice;
b.  Pay all accrued interest; and
c.  If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Additional payment charges apply.  When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to

**Page 74**

**Exhibit D**

SBA 147:  Note Page 2 Continuation.

Continuation of "..."

Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;

b. During the second year after the date on which the loan is first disbursed, 3% of the total prepayment amount; and

c. During the third year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 25 years from date of Note.

Late Charge:  If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

Bankers Systems, Inc., St. Cloud, MN

**Page 75**

**Exhibit D**

4.  DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.  Fails to do anything required by this Note and other Loan Documents;

B.  Defaults on any other loan with Lender;

C.  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.  Fails to pay any taxes when due;

H.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.  Has a receiver or liquidator appointed for any part of their business or property;

J.  Makes an assignment for the benefit of creditors;

K.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.  LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.  Require immediate payment of all amounts owing under this Note;

B.  Collect all amounts owing from any Borrower or Guarantor;

C.  File suit and obtain judgment;

D.  Take possession of any Collateral; or

E.  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C.  Release anyone obligated to pay this Note;

D.  Compromise, release, renew, extend or substitute any of the Collateral; and

E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

SBA Form 147 (06/03/02) Version 4.1

**Page 76**
Page 3/6

Wolters Kluwer Financial Se..... ...uc....MN

**Exhibit D**

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

N/A

Wolters Kluwer Financial Services SB Cloud-IN

**Exhibit D**

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES

_____

Hovsep Derboghossian                                                    Date 6/25/08

_____

_____

_____

SBA Form 147 (06/03/02) Version 4.1