FILED

1  PETER J. SALMON (SBN 174386)
   LAUREL I. HANDLEY (SBN 231249)
2  GENAIL M. ANDERSON (236834)
   PITE DUNCAN, LLP
3  4375 JUTLAND DRIVE, SUITE 200
   P.O. BOX 17935
4  SAN DIEGO, CA 92177-0935
   TELEPHONE: (858) 750-7600
5  FACSIMILE: (619) 590-1385
   EMAIL: ganderson@piteduncan.com
6
   Attorneys for Plaintiff in Intervention U.S. BANK, NATIONAL ASSOCIATION
7

2011 MAR 28  PM 3: 25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

**UNITED STATES DISTRICT COURT OF CALIFORNIA**

8
   **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION - WESTERN**
9

| | |
|---|---|
| 10  UNITED STATES OF AMERICA, | Case No.  CV09-06487-JHN-VBKx |
| 11           Plaintiff, | U.S. BANK, NATIONAL ASSOCIATION'S FIRST AMENDED COMPLAINT IN INTERVENTION FOR: |
| 12      v. | |
| 13  718 West Wilson Avenue<br>Glendale, California 91203 | 1.     FRAUDULENT MISREPRESENTATION; |
| 14  Lot 17 of Tract no. 4531, in the County of<br>Los Angeles, California, as per map recorded | 2.     CONCEALMENT;<br>3.     FRAUD |
| 15  at Book 52, page 18 of Parcel Maps, Office of<br>the County Recorder; and | 4.     CONSPIRACY TO DEFRAUD (TWO COUNTS); |
| 16  Hovsep Boghossian, | 5.     BREACH OF CONTRACT (TWO COUNTS); |
| 17           Defendants. | 6.     UNJUST ENRICHMENT;<br>7.     NEGLIGENCE; and |
| 18 | |
| 19  U.S. BANK, NATIONAL ASSOCIATION, | 8.     BREACH OF FIDUCIARY DUTY. |
| 20           Plaintiff in Intervention,<br>     v. | |
| 21 | |
| 22  HOVSEP DERBOGHOSSIAN (a.k.a.<br>HOVSEP BOGHOSSIAN) an individual, | |
| 23  REMY MAZMANIAN, an individual, ART<br>MAZMANIAN (a.k.a. VARTEVAR | |
| 24  MAZMANIAN a,k.a. VARTO<br>MAZMANIAN), an individual, NATIONS | |
| 25  TITLE COMPANY OF CALIFORNIA,<br>REGENCY ESTATE PROPERTIES, INC., a | |
| 26  California corporation, TRANSUNION TITLE<br>INSURANCE COMPANY, and DOES 1 | |
| 27  through 100, Inclusive, | |
| 28           Defendants in Intervention. | |

FIRST AMENDED COMPLAINT IN INTERVENTION

**FIRST AMENDED COMPLAINT IN INTERVENTION**

Plaintiff in Intervention U.S. Bank, NATIONAL ASSOCIATION ("Plaintiff in Intervention" or "U.S. BANK"), by and through its counsel of record, and pursuant to 42 U.S.C. § 9613 (i) and Federal Rules of Civil Procedure Rule 24, alleges as follows:

**PARTIES AND JURISDICTION**

1.     At all times herein mentioned, U.S. BANK was and is now a corporation duly licensed as a national bank and authorized to do business in the State of California.

2.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned, Defendant in Intervention HOVSEP DERBOGHOSSIAN (a.k.a. HOVSEP BOGHOSSIAN) ("HOVSEP") was and is an individual residing in the County of Los Angeles, State of California.

3.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned, Defendant in Intervention REMY MAZMANIAN ("REMY") was and is an individual residing in the County of Los Angeles, State of California.

4.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned, Defendant in Intervention ART MAZMANIAN a.k.a. VARTEVAR MAZMANIAN a.k.a. VARTO MAZMANIAN ("ART") was and is an individual residing in the County of Los Angeles, State of California.

5.     U.S. BANK is informed and believes that ART is the father of REMY.

6.     U.S. BANK is informed and believes and thereon alleges that Defendant in Intervention REGENCY ESTATE PROPERTIES, INC. ("REGENCY") was and is a corporation existing under and by virtue of the laws of the State of California and authorized to do business in the State of California.

7.     U.S. BANK is further informed and believes and thereon alleges ART is the owner of REGENCY.

8.     U.S. BANK is further informed that REGENCY conducts business as both a professional real estate brokerage company and an escrow company.

/././

9.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned, Defendant in Intervention NATIONS TITLE COMPANY OF CALIFORNIA ("NATIONS TITLE") was and is a corporation existing under and by virtue of the laws of the State of California and authorized to do business in the State of California.

10.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned, Defendant in Intervention TRANSUNION TITLE INSURANCE COMPANY ("TRANSUNION") was and is a corporation existing under and by virtue of the laws of the State of California and authorized to do business in the State of California.

11.     U.S. BANK is informed and believes and thereon alleges that NATIONS TITLE is an agent for TRANSUNION.

12.     The true names of Defendants herein named as DOES 1 through 100, inclusive are unknown to Plaintiff.  Plaintiff will amend this Complaint to reflect the true names of said unknown Defendants when the same are ascertained.

13.     U.S. BANK is informed and believes and thereon alleges that at all times herein mentioned ART, REMY, HOVSEP, REGENCY and DOES 1 - 20 were the agents, employees and/or representatives of each other; and that each were acting within the course and scope of that agency, employment and/or representative capacity and with the permission and consent of each other.

14.     Jurisdiction is appropriate pursuant to Rule 24 of the Federal Rules of Civil Procedure.

### GENERAL ALLEGATIONS

15.     U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 14 above as though fully set forth herein.

16.     U.S. BANK is informed and believes and thereon alleges that REMY and ART are doing business in the County of Los Angeles, State of California under the fictitious firm name of Pioneer Lending Group.

17.     U.S. BANK is informed and believes and thereon alleges that on or about August 9, 2001, REGENCY and Pioneer Lending Group submitted a document entitled "Application for

1  Zoning Use Certificate" to the Glendale Building and Safety Department in connection with the real

2  property located at 716-718 W. Wilson, Glendale, California ("the Subject Property"). A true and

3  correct copy of the Application for Zoning Use Certificate is attached hereto as **Exhibit A**.

4        18.     U.S. BANK is informed and believes and thereon alleges that on or about March 29,

5  2002, the State of California Regional Water Quality Control Board, Los Angeles Region issued a

6  "Cleanup & Abatement Order No. R4-2002-0068 Requiring DRILUBE COMPANY to Assess,

7  Cleanup and Abate the Effects of Contaminants Discharged to Soil and Groundwater" concerning

8  the Subject Property ("Clean-up Order"), a true and correct copy of which is attached hereto as

9  **Exhibit B**.

10        19.     U.S. BANK is further informed and believes and thereon alleges that the actual owner

11  of Drilube Co., Inc. ("Drilube") at the time of the issuance of the Clean-up Order, and prior thereto,

12  was ART MAZMANIAN.

13        20.     ART thereafter sold the Subject Property, which was eventually purchased by REMY.

14        21.     U.S. BANK is informed and believes and thereon alleges that prior to March 7, 2008,

15  the United States Environmental Protection Agency was involved in a project to investigate certain

16  real property located in the San Fernando Valley, including the Subject Property, in connection with

17  ground water pollution and contamination.

18        22.     On or about March 7, 2008, a lien was recorded in the Official Records of the

19  Recorder's Office of Los Angeles County as Instrument No. 2008-0401128 in favor of the United

20  States Environmental Protection Agency (the "EPA") and against REMY in connection with the

21  Subject Property ("the EPA Lien"). A true and correct copy of the EPA Lien is attached hereto as

22  **Exhibit C**.

23        23.     Sometime in April or May of 2008, ART approached Craig Bittner, the Senior Vice

24  President and Business Development Officer of U.S. BANK, while he was performing a site visit

25  at a neighboring property located next to the Subject Property.

26        24.     ART introduced himself as "Art Mazmanian" and Craig Bittner believed ART was

27  the owner and seller of the Subject Property because ART spoke as if he owned the Subject Property

28  and indicated his tenant wanted to buy *his* property.

FIRST AMENDED COMPLAINT IN INTERVENTION

25.     Craig Bittner was later contacted by ART and HOVSEP to determine if HOVSEP could qualify or pre-qualify for and SBA loan to purchase the Subject Property.

26.     On or about March 28, 2008, Defendant HOVSEP and REMY entered into a Purchase and Sale Agreement and Joint Escrow Instructions whereby HOVSEP agreed to purchase from REMY and REMY agreed to sell to HOVSEP the Subject Property for the total sum of $1,725,000.00.

27.     The Subject Property is legally described as:

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per map recorded in Book 52, Page 18 of Maps, in the Office of th County Recorder of said County.

28.     Craig Bittner sole contact for the seller in the Subject Transaction was ART and it was Craig Bittner's belief that ART and REMY were the same person.

29.     On or about June 25, 2008, for good and valuable consideration, HOVSEP executed a U.S. Small Business Administration Note ("Note") in favor of U.S. BANK in the principal sum of $1,313,200.00.  A true and correct copy of the Note is attached hereto as **Exhibit D**.

30.     The Note was secured by a Deed of Trust in favor of U.S. BANK executed by HOVSEP on or about June 20, 2008 encumbering the Subject Property ("Deed of Trust").

31.     The Deed of Trust was recorded in the Official Records of Recorder's Office of Los Angeles County on June 27, 2008 as Instrument No. 20081147427.

32.     Attached to the Deed of Trust is a document entitled "Borrower's Certificate and indemnity Regarding Hazardous Substance" which HOVSEP executed on June 20, 2008.  A true and correct copy of the Deed of Trust together with the Borrower's Certificate and Indemnity is attached hereto as **Exhibit E.** The Note and Deed of Trust are collectively referred to herein as the "Loan".

33.     On or about May 7, 2008, during escrow on the Loan, U.S. BANK obtained a Preliminary Report dated May 7, 2008, from NATIONS TITLE and REGENCY concerning the Subject Property ("the May Preliminary Report").  A true and correct copy of the May Preliminary Report is attached hereto as **Exhibit F.**

34.     The May Preliminary Report identifies at paragraph 13 the EPA Lien as an exception

FIRST AMENDED COMPLAINT IN INTERVENTION

1 | to title.

2 | 35. On or about May 29, 2008, HOVSEP and REMY executed and delivered to U.S.
3 | BANK a document entitled "Environmental Questionnaire and Disclosure Statement"
4 | ("Environmental Questionnaire").

5 | 36. On the Environment Questionnaire HOVSEP and REMY represented to U.S. BANK
6 | that no federal, state or local agencies had ever investigated, cited or been involved on the Subject
7 | Property for violations of any environmental law. HOVSEP and REMY further represented that no
8 | public agency had listed the Subject Property as a site requiring cleanup under any environmental
9 | law. A true and correct copy of the Environmental Questionnaire is attached hereto as **Exhibit G**.

10 | 37. Upon learning of the existence of the EPA Lien on the May Preliminary Report, Craig
11 | Bittner contacted ART to determine whether he was aware of the EPA Lien.

12 | 38. ART indicated that the EPA Lien was a mistake and that it was actually for a property
13 | located behind his, which was a metal plating facility.

14 | 39. ART further indicated that he would talk to the title officer to have the EPA Lien
15 | removed and volunteered to provide a Phase I Environmental Report for the Subject Property.

16 | 40. On or about June 16, 2008, U.S. BANK received an updated and superceding
17 | Preliminary Report dated June 16, 2008, from NATIONS TITLE and REGENCY concerning the
18 | Subject Property ("the June Preliminary Report").

19 | 41. The June Preliminary Report does not in any way reference the existence of the EPA
20 | Lien. A true and correct copy of the June Preliminary Report is attached hereto as **Exhibit H**.

21 | 42. On or about June 17, 2008, U.S. BANK sent a document entitled "Lender's
22 | Instructions to Title and Escrow" ("Lender's Instructions") to NATIONS TITLE and REGENCY.
23 | A true and correct copy of the Lender's Instructions are attached hereto as **Exhibit I**.

24 | 43. The Lender's instructions provide in pertinent part that "funds will be wired in the
25 | amount of $1,313,200.00 to Nations Title Company of California for credit to buyer..."

26 | 44. The Lender's instructions further provide in pertinent part on page 2 that
27 | "Escrow/Title is authorized to record and/or use the above items for benefit of our borrower when
28 | escrow/title can insure the following:

-6-
FIRST AMENDED COMPLAINT IN INTERVENTION

1.   ALTA Title Policy in the amount of $1,313,200.00 to be forwarded to us by Nations Title Company reflecting said Deed of Trust in a First Lien Position. Subject only to items numbered: 1(Pay if assessed), 2 (Pay taxes due plus penalties), 3 (Pay if assessed), 4(Pay if assessed), 5 (Issue endorsement 103.5), 6, 8, 9, (please issue endorsement 1031.1) as shown on preliminary title Report dated June 16, 2008.  (*emphasis in original*)

45.   The Lender's Instructions further provides that "Any deviation of the terms set forth above is not acceptable without the prior written approval of U.S. BANK National Association."

46.   During escrow, HOVSEP, REMY and ART submitted to U.S. BANK a Phase I Environmental Site Assessment dated June 20, 2008 purportedly completed for the Subject Property by Conservation Consulting International ("Phase I ESA").  A true and correct copy of the Phase I ESA is attached hereto as **Exhibit J**.

47.   The Phase I ESA found that the environmental concerns with the Subject Property had been remediated and that "evidence was not found that the Property contributed to the heavy metal impacted groundwater beneath the Property."  Based on these findings, the Phase I ESA did not recommend additional assessment.

48.   U.S. BANK is informed and believes, and thereon alleges, that the Phase I ESA was a false and fraudulent document created by HOVSEP, REMY and ART.

49.   U.S. BANK is informed and believes, and thereon alleges, that the Phase I ESA was a misrepresentation of another environmental assessment completed on behalf of REMY or ART on February 15, 2008 for 722 West Wilson Avenue, Glendale, California, another property which, at the time the Phase I ESA was completed, was also owned by REMY.

50.   U.S. BANK is informed and believes, and thereon alleges, that HOVSEP, REMY and ART altered a Phase I ESA completed for 722 West Wilson Avenue, Glendale, California, to make it appear that it was completed for the Subject Property.

51.   On or about June 26, 2008, NATIONS TITLE sent U.S. BANK an e-mail inquiring as to whether "it was ok to show item 13 on Schedule B of the Title Policy".

52.   U.S. BANK responded via email and indicated "yes" because U.S. BANK was relying

1    upon the June Preliminary Report wherein item 13 reflects a Statement of Information.

2        53.    U.S. BANK did not agree, and would not have agreed, to the EPA Lien as an

3    exception to title.

4        54.    U.S. BANK is informed and believes, and thereon alleges, that the bank statements

5    from Wachovia Bank checking account number 1005901393742 for the periods February 8, 2008

6    through May 7, 2008 submitted by HOVSEP during escrow were altered to reflect an inaccurate and

7    false account balance which was higher than the actual balance of the account.

8        55.    U.S. BANK is informed and believes, and thereon alleges, that the bank statements

9    from Bank of America checking account number 01626-73253 for the periods February 1, 2008

10   through April 30, 2008 submitted by HOVSEP during escrow were altered to reflect an inaccurate

11   and false account balance which was higher than the actual balance of the account.

12       56.    Prior to funding the Loan, U.S. BANK required HOVSEP to tender a deposit to

13   escrow.

14       57.    A copy of a cashier's check no. 418835118 obtained from Bank of America in the

15   amount of $307,000.00 and made payable to REGENCY was submitted to U.S. BANK as proof that

16   HOVSEP had satisfied the deposit required by U.S. BANK.

17       58.    U.S. BANK is informed and believes, and thereon alleges, that the amount indicated

18   on the copy of cashier's check no. 418835118 obtained from Bank of America submitted to U.S.

19   BANK was altered to reflect an inaccurate and false amount.

20       59.    U.S. BANK is informed and believes, and thereon alleges, that the amount indicated

21   on the actual cashier's check no. 418835118 obtained from Bank of America was $3,700.00. Thus,

22   U.S. BANK is informed and believes, and thereon alleges that HOVSEP did not tender the required

23   deposit to escrow.

24       60.    The settlement statement also reflects a deposit by HOVSEP in the amount of

25   $307,000.00.

26       61.    U.S. BANK is informed and believes, and thereon alleges, that the settlement

27   statement contains inaccurate and false information.

28       62.    Escrow on the loan closed on June 26, 2008.

63. HOVSEP defaulted on his payment obligations under the Note and Deed of Trust by failing to pay the first installment which became due on July 26, 2008, plus all subsequent installments under the Loan.

64. On or about January 16, 2009, U.S. BANK for the first time received the final Title Policy of Insurance from NATIONS TITLE as issued by TRANSUNION ("Title Policy"). A true and correct copy of the Title Policy issued by TRANSUNION is attached hereto as **Exhibit K.**

65. Schedule B-1 of the Title Policy is entitled "EXCEPTIONS FROM COVERAGE". Section B-1 provides in pertinent part that "Except as provided in Schedule B-Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:...8. A lien for Notice of Lien in favor of United States Environment Protection Agency Against Remy Mazmanian..." (i.e., the EPA Lien.)

66. Immediately after discovering the EPA Lien as an exception from coverage, U.S. BANK submitted a claim against the Title Policy by letter dated January 29, 2009, to TRANSUNION ("Title Claim"). The Title Claim was based on the existence of the EPA Lien, which had been omitted from the June Preliminary Report, on which U.S. BANK relied. A true and correct copy of the Title Claim is attached hereto as **Exhibit L.**

67. The Title Claim was denied by TRANSUNION by letter dated June 8, 2009, which denies that NATIONS TITLE issued the June Preliminary Report and indicates the belief by TRANSUNION that the June Preliminary Report was the subject of "fraudulent alterations" made to the May Preliminary Report ("Claim Denial"). A true and correct copy of the Claim Denial is attached hereto as **Exhibit M.**

68. U.S. BANK is informed and believes and thereon alleges that REMY, ART and HOVSEP, and each of them, had knowledge of the Clean-Up Order.

69. REMY and ART approved a clean-up work plan proposed by the EPA prior to executing the Environmental Questionnaire.

70. U.S. BANK is further informed and believes and thereon alleges that soon after REMY and ART approved the work plan, he stopped paying the contractors who were engaged in the clean-up efforts of the Subject Property, thus leaving the Subject Property environmentally

1  impaired.

2      71.      U.S. BANK is informed and believes and thereon alleges that prior to May 29, 2008,

3  REMY and ART told the EPA that $50,000.00 of the proposed sale proceeds from the Subject

4  Property would be used in connection with clean-up efforts of the Subject Property.

5      72.      U.S. BANK is informed and believes and thereon alleges that no portion of the sale

6  proceeds were used to investigate and/or clean-up environmental conditions at the Subject Property.

7      73.      U.S. BANK is informed and believes and thereon alleges that on or about June 20,

8  2008, HOVSEP and REMY entered into a Lease agreement whereby HOVSEP agreed to lease the

9  Subject Property to REMY for a period of three (3) years commencing on July 15, 2008 in exchange

10  for REMY paying monthly rent in the sum of $4,500.00 to HOVSEP ("Lease").  A true and correct

11  copy of the Lease is attached hereto as **Exhibit N**.

12      74.      On or about June 20, 2008, U.S. BANK, as Lender, HOVSEP, as Owner, and REMY,

13  as Tenant, entered into a document entitled "Subordination, Attornment and Non-Disturbance

14  Agreement (No SubTenant)" ("Subordination Agreement").

15      75.      The Subordination Agreement was recorded in the Official Records of Recorder's

16  Office of Los Angels on June 27, 2008, as Instrument No. 20081147430.  A true and correct copy

17  of the Subordination Agreement is attached hereto as **Exhibit O**.

18      76.      U.S. BANK is informed and believes and thereon alleges that subsequent to HOVSEP

19  purchasing the Subject Property, the EPA contacted HOVSEP to request that he undertake clean-up

20  efforts and investigation of the Subject Property.

21      77.      U.S. BANK in informed and believes and thereon alleges that HOVSEP told the EPA

22  that he had an indemnification letter from REMY concerning the Clean-Up Order which he had

23  requested as a condition to the sale of the Subject Property.

24      78.      U.S. BANK is further informed and believes and thereon alleges that HOVSEP never

25  provided the EPA with a copy of the purported indemnification letter despite his promise to the

26  contrary.

27  /./.

28  /./.

-10-

FIRST AMENDED COMPLAINT IN INTERVENTION

**FIRST CAUSE OF ACTION**
**FRAUDULENT MISREPRESENTATION**
**(Against Defendants in Intervention REMY, HOVSEP, ART, REGENCY and DOES 1-10)**

79.      U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 78 above as though fully set forth herein.

80.      U.S. BANK is informed and believes and thereon alleges that HOVSEP, REMY, REGENCY and ART knew that the representations concerning the Environmental Questionnaire and Phase I ESA were false when they made them to U.S. BANK.

81.      U.S. BANK is informed and believes and thereon alleges that HOVSEP, REMY, REGENCY and ART knew that May Preliminary Report and June Preliminary Report were false documents when they submitted them to U.S. BANK.

82.      U.S. BANK is informed and believes and thereon alleges that HOVSEP, ART, REMY and REGENCY knew that  the account balances indicated on the Bank of America checking account statements, Wachovia Bank checking account statements and the $307,000.00 amount indicated on the copy of the cashier's check were false when those documents were submitted to U.S. BANK.

83.      HOVSEP, REMY, REGENCY and ART knew that U.S. BANK would, and did, rely upon their representations in its evaluation and agreement to loan the sum of $1,313,200.00 to HOVSEP.

84.      U.S. BANK is informed and believes and thereon alleges that the conduct of HOVSEP, REMY, REGENCY and ART was intentional.

85.      U.S. BANK is informed and believes and thereon alleges that the misrepresentations, deceit and/or concealment of material facts known to HOVSEP, REMY, REGENCY and ART included, without limitation, the ultimate non-disclosure of the EPA lien.

86.      U.S. BANK is informed and believes and thereon alleges that the misrepresentations, deceit and/or concealment of material facts were intended on the part of HOVSEP, REMY, REGENCY and ART, and each of them, to induce U.S. BANK to lend the funds to HOVSEP, to the economic injury of U.S. BANK.

/././

87.     At the time these misrepresentations, deceit and/or concealment of facts occurred and at the time U.S. BANK closed escrow on the Subject Transaction, U.S. BANK was ignorant of the falsity of the representations of HOVSEP, REMY, REGENCY and ART, and each of them, and believed them to be true.

88.     In reliance on the representations made by HOVSEP, REMY, REGENCY and ART, and each of them, as herein alleged, U.S. BANK loaned the sum of $1,313,200.00 to HOVSEP.

89.     U.S. BANK would not have loaned the sum of $1,313,200.00 to HOVSEP had U.S. BANK known the falsity of the statements or true state of the Subject Property.

90.     As a proximate result of the misrepresentations, deceit and/or concealment of material facts by HOVSEP, REMY, REGENCY and ART, and each of them, U.S. BANK has been damaged in an amount to be determined at the time of trial, but no less than the principal balance of the note secured by the trust deed plus accrued interest, late charges, expenses, prejudgment interest and attorney's fees and costs which remain due and owing under the note and trust deed.

91.     U.S. BANK has been required to retain counsel to prosecute this matter.

**SECOND CAUSE OF ACTION**
**CONCEALMENT**
**(Against Defendants in Intervention REMY, HOVSEP, ART, REGENCY and Does 1 - 20)**

92.     U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 91 above as though fully set forth herein.

93.     HOVSEP, REMY and ART, and each of them, falsely represented on the Environmental Questionnaire that no federal, state or local agencies had ever investigated, cited or been involved with the Subject Property for violations of any environmental law and that no public agency had listed the Subject Property as a site requiring cleanup under any environmental law.

94.     HOVSEP, REMY, ART, REGENCY, Does 1-20, and each of them, intentionally concealed from U.S. BANK the existence of the Clean-Up Order as well as the EPA Lien because HOVSEP, REMY, ART, REGENCY, and Does 1-20, and each of them, knew that if U.S. BANK discovered these facts, U.S. BANK would not have agreed to loan HOVSEP, the sum of $1,313,200.00 to finance HOVSEP's purchase of the Subject Property from REMY.

/././

95.     As a proximate result of the concealment of material facts by HOVSEP, REMY, ART, REGENCY, Does 1-20, and each of them, U.S. BANK has been damaged in an amount to be determined at the time of trial, but no less than the principal balance of the note secured by the trust deed plus accrued interest, late charges, expenses, prejudgment interest and attorney's fees and costs which remain due and owing under the note and trust deed.

96.     U.S. BANK has been required to retain counsel to prosecute this matter.

### THIRD CAUSE OF ACTION
### CONSPIRACY TO DEFRAUD
**(Against Defendants in Intervention REMY, HOVSEP, REGENCY and DOES 1- 50)**

97.     U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 96 above as though fully set forth herein.

98.      HOVSEP, REMY, ART, REGENCY and DOES 1-50, and each of them, had full knowledge that U.S. BANK would not have lent any money to HOVSEP had HOVSEP, REMY, ART, and each of them, submitted an accurate phase I environmental site assessment for the Subject Property.

99.     HOVSEP, REMY, ART, REGENCY and DOES 1-50, and each of them, had full knowledge that U.S. BANK would not have lent any money to HOVSEP had HOVSEP , REMY, ART, and each of them, truthfully responded to the Environmental Questionnaire.

100.     HOVSEP, REMY, ART, REGENCY and DOES 1-50, and each of them, had full knowledge that U.S. BANK would not have lent any money to HOVSEP unless HOVSEP tendered the required deposit amount into escrow.

101.     HOVSEP, REMY, ART, REGENCY and DOES 1through 50, and each of them, willfully, knowingly and maliciously conspired and agreed by and amongst themselves to defraud U.S. BANK by intentionally concealing and misrepresenting the environmental concerns and EPA Lien with the Subject Property and the amount of the deposit tendered to escrow by HOVSEP.

102.     In furtherance of their conspiracy, HOVSEP, REMY, ART, REGENCY and DOES 1 through 50, and each of them, intentionally misrepresented and concealed material facts, withheld important documents from U.S. BANK, prepared false and inaccurate documentation that substantially and adversely altered the parties' relative position, and ultimately manipulated the

1  process to effectuate a loan in the amount of $1,313,200.00 from U.S. BANK without U.S. BANK's

2  knowledge of the deceit, falsity of the representations, concealed material facts or true state of the

3  Subject Property.

4        103.    At the time HOVSEP, REMY, ART. REGENCY and DOES 1 through 50, and each

5  of them, made their misrepresentations and concealed material facts about the environmental

6  concerns of the Subject Property to U.S. BANK, HOVSEP, REMY, ART, REGENCY and DOES

7  1 through 50, and each of them, were aware that such misrepresentations and the concealment of

8  material facts had been made to U.S. BANK, and they each jointly collaborated to effectuate a

9  scheme to deprive U.S. BANK of its rights and remedies.

10        104.    At the time HOVSEP, REMY, ART. REGENCY and DOES 1 through 50, and each

11  of them, made their misrepresentations and concealed material facts about the environmental

12  concerns of the Subject Property to U.S. BANK, HOVSEP, REMY, ART, REGENCY and DOES

13  1 through 50, and each of them, were aware that U.S. BANK would not have lent money to

14  HOVSEP had U.S. BANK known of the existence of the EPA Lien or the true status of title to the

15  Subject Property.

16        105.    As a proximate result of the deceit, intentional misrepresentations and concealment

17  of HOVSEP, REMY, ART, REGENCY and DOES 1 through 50, and each of them, U.S. BANK has

18  been damaged in an amount to be determined at the time of trial, but no less than the principal

19  balance of the note secured by the trust deed plus accrued interest, late charges, expenses,

20  prejudgment interest and attorney's fees and costs which remain due and owing under the note and

21  trust deed.

22        106.    U.S. BANK has been required to retain counsel to prosecute this matter.

### FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against Defendant in Intervention REMY)

25        107.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through

26  106 above as though fully set forth herein.

27        108.    U.S. BANK has performed all conditions, covenants, and promises required of it to

28  be performed in accordance with the terms and conditions of the Subordination Agreement.

-14-

FIRST AMENDED COMPLAINT IN INTERVENTION

109.    The Subordination Agreement provides in pertinent part at paragraph 8 that "if [HOVSEP] defaults in its performance of the terms of the Deed of Trust/Mortgage, Tenant agrees to recognize the Assignment of Rents made by [HOVSEP] to U.S. BANK and shall pay to [U.S. BANK, as assignee]...the rents under the Lease..."

110.    HOVSEP is in default of his payment obligations under the Note and Deed of Trust by failing to pay the installment which became due on July 26, 2008, plus all subsequent installments under the Loan.

111.    U.S. BANK provided REMY with written notice of HOVSEP's default on or about December 2, 2008.

112.    REMY breached the terms of the Subordination Agreement by failing to tender his monthly payment obligation of $4,500.00 on January 1, 2009, and each monthly payment due thereafter, to U.S. BANK.

113.    The Subordination Agreement also provides that in the event of any litigation or other action to enforce the Subordination Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs.

114.    U.S. BANK has been required to retain counsel to prosecute this matter.

### FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(Against Defendants in Intervention REMY, HOVSEP and ART)**

115.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 114 above as though fully set forth herein.

116.    HOVSEP, REMY and ART, and each of them, have wrongly received the benefits of the loan transaction, including the transfer of money in regard thereto. HOVSEP, REMY and ART, and each of them, have been unjustly enriched at U.S. BANK's expense by virtue of their retention of such benefits.

117.    As a result thereof, U.S. BANK has been damaged in the sum of no less than $1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs related thereto, all in an amount according to proof.

118.    U.S. BANK has been required to retain counsel to prosecute this matter.

### SIXTH CAUSE OF ACTION
### NEGLIGENCE
**(Against Defendants in Intervention REGENCY, ART, NATIONS TITLE, TRANSUNION and DOES 51-100)**

119.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 118 above as though fully set forth herein.

120.    NATIONS TITLE, REGENCY and its owner ART, and each of them, had a duty to exercise ordinary skill and diligence in carrying out its contractual duties under the Lender's Instructions.

121.    NATIONS TITLE, REGENCY and its owner, ART, and each of them, breached their duty by failing to insure the issuance of an ALTA Title Policy reflecting U.S. BANK's Deed of Trust in a first lien position, "Subject only to items numbered: 1 (Pay if assessed), 2 (Pay taxes due plus penalties), 3 (Pay if assessed), 4 (Pay if assessed), 5 (Issue endorsement 103.5) 6, 8, 9 (Please issue endorsement 103.1) ***as shown on preliminary title report dated June 16, 2008***" (Emphasis added) prior to closing escrow as specifically and expressly instructed by U.S. BANK in the Lender's Instructions, or to otherwise communicate their belief that no such preliminary title report existed.

122.    As a proximate result of the breach by NATIONS TITLE, REGENCY and its owner ART, U.S. BANK closed escrow and funded the Loan to its detriment.

123.    NATIONS TITLE and TRANSUNION were the agents of each other and, at all relevant times herein, were acting in the course and scope of their agency, and authority and with the permission and consent of each co-defendant herein.

124.    As a result of said agency relationship, TRANSUNION is liable for the actions of NATIONS TITLE done within the course and scope thereof.

125.    As a result thereof, U.S. BANK has been damaged in the sum of no less than $1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs related thereto, all in an amount according to proof.

126.    U.S. BANK has been required to obtain counsel to prosecute this matter.

/./././

/./././

## SEVENTH CAUSE OF ACTION
### BREACH OF CONTRACT
**(Against Defendants in Intervention NATIONS TITLE, REGENCY, ART and
TRANSUNION)**

127.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through
127 above as though fully set forth herein.

128.    NATIONS TITLE, REGENCY and its owner ART, and each of them, had a duty to
strictly comply with the Lender's Instructions.

129.    REGENCY and its owner ART, as an escrow holder, also had a fiduciary duty to U.S.
BANK in connection with the Subject Transaction.

130.    NATIONS TITLE, REGENCY and its owner ART, and each of them, breached their
duties by failing to insure the issuance of an ALTA Title Policy reflecting U.S. BANK's Deed of
Trust in a first lien position, "Subject only to items numbered: 1 (Pay if assessed), 2 (Pay taxes due
plus penalties), 3 (Pay if assessed), 4 (Pay if assessed), 5 (Issue endorsement 103.5) 6, 8, 9 (Please
issue endorsement 103.1) *__as shown on preliminary title report dated June 16, 2008__*" (Emphasis
added) prior to closing escrow as specifically and expressly instructed by U.S. BANK in the Lender's
Instructions, or to otherwise communicate their belief that no such report existed.

131.    As a proximate result of the breach by NATIONS TITLE, REGENCY and its owner
ART, U.S. BANK closed escrow on the Loan to its detriment.

132.    NATIONS TITLE and TRANSUNION were the agents of each other and, at all
relevant times herein, were acting in the course and scope of their agency, and authority and with the
permission and consent of each co-defendant herein.

133.    As a result of said agency relationship, TRANSUNION is liable for the actions of
NATIONS TITLE done within the course and scope thereof.

134.    As a result thereof, U.S. BANK has been damaged in the sum of no less than
$1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs
related thereto, all in an amount according to proof.

135.    U.S. BANK has been required to obtain counsel to prosecute this matter.

/ . / . /

1

## EIGHTH CAUSE OF ACTION
### FRAUD
### (Against All Defendants)

2

3        136.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through

4    135 above as though fully set forth herein.

5        137.    U.S. BANK is informed and believes and thereon alleges that Defendants

6    intentionally forwarded to U.S. BANK the June Preliminary Report, which was inaccurate and false

7    in that it did not include any reference to the existence of the EPA Lien.

8        138.    U.S. BANK is informed and believes and thereon alleges that Defendants

9    intentionally forwarded to U.S. BANK the Phase I ESA, which was inaccurate and false in that it

10   was not prepared by Conservation Consulting International for the Subject Property.

11       139.    U.S. BANK is informed and believes and thereon alleges that HOVSEP, REMY and

12   ART intentionally submitted the copy of the cashier's check and the bank statements from Wachovia

13   Bank and Bank of America, which had all been altered to reflect amounts which were false and

14   inaccurate.

15       140.    U.S. BANK is informed and believes and thereon alleges that at the time Defendants

16   forwarded the June Preliminary Report, Phase I ESA, the copy of the cashier's check and the bank

17   statements from Wachovia Bank and Bank of America, Defendants knew that each of these

18   documents were inaccurate and false.

19       141.    U.S. BANK is informed and believes and thereon alleges that Defendants forwarded

20   the June Preliminary Report, Phase I ESA, the copy of the cashier's check and the bank statements

21   from Wachovia Bank and Bank of America to U.S. BANK with the intent to defraud U.S. BANK

22   as to the financial status of HOVSEP and by concealing the existence of the EPA Lien.

23       142.    U.S. BANK actually and justifiably relied on the June Preliminary Report, Phase I

24   ESA, the copy of the cashier's check and the bank statements from Wachovia Bank and Bank of

25   America in the evaluation and underwriting of the Loan.

26       143.    NATIONS TITLE and TRANSUNION were the agents of each other and, at all

27   relevant times herein, were acting in the course and scope of their agency, and authority and with the

28   permission and consent of each co-defendant herein.

FIRST AMENDED COMPLAINT IN INTERVENTION

144. As a result of said agency relationship, TRANSUNION is liable for the actions of NATIONS TITLE done within the course and scope thereof.

145. As a result of U.S. BANK'S reliance on the June Preliminary Report, Phase I ESA, the copy of the cashier's check and the bank statements from Wachovia Bank and Bank of America, U.S. BANK has been damaged in the sum of no less than $1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs related thereto, all in an amount according to proof.

146. U.S. BANK has been required to obtain counsel to prosecute this matter.

### NINTH CAUSE OF ACTION
### CONSPIRACY TO DEFRAUD
### (Against All Defendants)

147. U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 146 above as though fully set forth herein.

148. U.S. BANK is informed and believes and thereon alleges that Defendants had full knowledge that U.S. BANK would not have lent any money to HOVSEP if U.S. BANK was aware of the failure of the June Preliminary Report to reveal the EPA Lien.

149. U.S. BANK is informed and believes and thereon alleges that Defendants, and each of them, willfully, knowingly and maliciously conspired and agreed by and amongst themselves to defraud U.S. BANK by intentionally submitting an inaccurate and false preliminary report which concealed the existence of the EPA Lien to U.S. BANK.

150. In furtherance of their conspiracy, Defendants, and each of them, intentionally misrepresented and concealed material facts, withheld important documents from U.S. BANK, prepared inaccurate documentation that substantially and adversely altered the parties' relative position, and ultimately manipulated the process to effectuate a loan in the amount of $1,313,200.00 from U.S. BANK without U.S. BANK's knowledge of the deceit, falsity of the representations, concealed material facts or true state of the Subject Property.

151. At the time Defendants, and each of them, submitted the June Preliminary Report to U.S. BANK, Defendants, and each of them, were aware of its falsity, and they each jointly collaborated to effectuate a scheme to deprive U.S. BANK of its rights and remedies.

-19-

FIRST AMENDED COMPLAINT IN INTERVENTION

152.    As a proximate result of Defendants submittal of the inaccurate and false June Preliminary Report to U.S. BANK, U.S. BANK has been damaged in the sum of no less than $1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs related thereto, all in an amount according to proof.

153.    U.S. BANK has been required to retain counsel to prosecute this matter.

**TENTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendant in Intervention REGENCYand ART)**

154.    U.S. BANK hereby incorporates the allegations contained in Paragraphs 1 through 153 above as though fully set forth herein.

155.    REGENCY, and its owner ART, as an escrow holder, had a fiduciary duty to U.S. BANK in connection with the Subject Transaction.

156.    REGENCY, and its owner ART, had knowledge of the environmental concerns with the Subject Property prior to entering escrow on the Loan.

157.    REGENCY, and its owner ART, had knowledge of the actual amount of the cashier's check tendered by HOVSEP to satisfy U.S. BANK'S deposit requirement.

158.    REGENCY, and its owner ART, knew, or should have known, that the environmental concerns with the  Subject Property was material information that would affect U.S. BANK'S evaluation and underwriting of the Loan.

159.    REGENCY, and its owner ART, knew, or should have known, that the actual amount of the cashier's check tendered by HOVSEP was material information that would affect U.S. BANK'S evaluation and underwriting of the Loan.

160.    REGENCY, and its owner ART, breached its fiduciary duty by failing to disclose the actual amount of the cashier's check tendered by HOVSEP and the environmental concerns with the Subject Property.

161.    As a proximate result of the breach by REGENCY, and its owner ART, U.S. BANK closed escrow on the Loan to its detriment.

162.    As a result thereof, U.S. BANK has been damaged in the sum of no less than $1,313,200.00, together with interest, attorneys' fees and costs, as well as other charges and costs

1 | related thereto, all in an amount according to proof.

2 |     163.    U.S. BANK has been required to obtain counsel to prosecute this matter.

3 |     **WHEREFORE**, U.S. BANK prays for judgment as follows:

4 | <u>**AS TO THE FIRST THROUGH THIRD AND FIFTH THROUGH TENTH CAUSES OF**</u>

5 | <u>**ACTION**</u>

6 |     1.      For damages, all according to proof, in the sum of $1,313,200.00, plus interest, late

7 | charges, expenses, prejudgment interest which remain due and owing under the Note and Deed of

8 | Trust.

9 |     2.      For attorney's fees and costs.

10 |

11 | <u>**AS TO THE FOURTH CAUSE OF ACTION AGAINST REMY**</u>

12 |     1.      For damages, all according to proof, of $4,500 per month beginning from January 1,

13 | 2009 and continuing until the date of judgment and prejudgment interest.

14 |     2.      For attorney's fees and cost.

15 | <u>**AS TO EACH CAUSE OF ACTION AGAINST ALL DEFENDANTS IN**</u>

16 | <u>**INTERVENTION**</u>

17 |     1.      For costs of suit herein incurred.

18 |     2.      For such other and further relief as the Court deems just and proper.

19 | Dated: February 7, 2011                    PITE DUNCAN, LLP

20 |

21 |                                            /s/ Laurel I. Handley
   |                                            LAUREL I. HANDLEY

22 |                                            GENAIL M. ANDERSON
   |                                            Attorney for Plaintiff in Intervention

23 |                                            U.S. BANK, NATIONAL ASSOCIATION

24 |

25 |

26 |

27 |

28 |

FIRST AMENDED COMPLAINT IN INTERVENTION

## VERIFICATION

1

STATE OF CALIFORNIA          )
                             )
COUNTY OF SAN DIEGO          )

I, the undersigned, declare as follows:

At all relevant times herein, I was, and continue to be, an employee of the Plaintiff in Intervention, U.S. Bank, National Association, in the above-captioned matter and I am authorized by U.S. Bank to make this verification.  I have read the foregoing Complaint in Intervention and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein stated on my information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of the United States that the foregoing is true and correct.

Executed this _25th_ day of March, 2011, at San Diego, California.

_Leslie Boyer_
LESLIE BOYER
Compliance Officer
U.S. BANK NATIONAL ASSOCIATION

FIRST AMENDED COMPLAINT IN INTERVENTION

**CERTIFICATE OF SERVICE**

I, the undersigned, declare:  I am, and was at the time of service of the papers herein referred to, over the age of 18 years, and not a party to this action.  My business address is 4375 Jutland Drive, Suite 200, P.O. Box 17935, San Diego, CA 92177-0935.

I certify that on March 28, 2011, I served the attached documents by U.S. Mail on the following:

Davis H Forsythe

William A Weinischke

United States Department of Justice

PO Box 7611

Washington, DC 20044-7611

Email: davis.forsythe@usdoj.gov

Email: bill.weinischke@usdoj.gov

*Attorneys for Plaintiff*

Mark L Kiefer

Ericksen Arbuthnot

835 Wilshire Boulevard, Suite 500

Los Angeles, CA 90017-2603

Email: mkiefer@ericksenarbuthnot.com

*Attorney for Nations Title Company of California*

/./././

/./././

/./././

/./././

/./././

1  Eric M Schiffer

2  Leslie F Vandale

3  Schiffer & Buus APC

4  4675 MacArthur Court, Suite 590

5  Newport Beach, CA 92660

6  Email: eschiffer@schifferbuus.com

7  Email: lvandale@schifferbuus.com

8  *Attorneys for Transunion Title Insurance Company*

9

10

11  Jilbert Tahmazian

12  Jilbert Tahmazian Law Offices

13  1518 West Glenoaks Boulevard

14  Glendale, CA 91201

15  Email: jilbert@jilbertlaw.com

16  Attorney for 718 West Wilson Avenue Glendale, California 91203, *Hovsep Boghossian and Hovsep*

17  *Derboghossian*

18

19       I declare under penalty of perjury under the laws of the United States of America that the

20  foregoing is true and correct.

21       Executed this 28th day of March 2011, at San Diego, California.

22  _____

23  MARSHA L. JOHNSON

24

25

26

27

28

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

City of Glendale, Building & Safety / 633 E. Broadway, Rm. 101
Glendale, CA 91206 (818) 548-3200

PZUC No. _2004 05 28_

# APPLICATION FOR ZONING USE CERTIFICATE

**Instructions:** Please answer the following questions as completely and legibly as possible. Please draw a seating plan on the back of the application if the use is for a restaurant, delicatessen, church, classroom or theater.

1. Business Address ( Include Suite No., City and Zip Code): _718 W. WILSON, GLENDALE, CA. 9120_

2. Business Name: _REGENCY ESTATE PROPERTIES & PIONEER LENDING_

3. Describe in detail the business activities _GENERAL OFFICE_

4. Applicant's Title? [✗] Owner [ ] President [ ] Officer or CEO

Business Owner's Name: _DOLIN MARDIROSELIAN & ART MAZMANI_

Mailing Address _718 W. WILSON_

Phone No. _818.822.6490_   Alt. Phone No. _818.500.0858_

5. Property Owner's Name: _RAMI MAZMANIAN_

Address: _722 W. WILSON_   Phone No.: _818.239.3900_

6. Existing Building Use: [✗] Gen. Office [ ] Retail [ ] Medical Office [✗] Manufacturing [ ] Wholesale/Distribution
[ ] Warehouse [ ] Eating Establishment [ ] Other

7. Proposed Building Use: [✗] Gen. Office [ ] Retail [ ] Medical Office [ ] Manufacturing [ ] Wholesale/Distribution
[ ] Warehouse [ ] Eating Establishment ** [ ] Other

8. Please fill in the following:   ** Draw seating plan on back of application

| | |
|---|---|
| Floor Area for Occupancy ( Square Feet ): _6,00_ | New Business: [✗] Yes [ ] No |
| No. of Employees: _6_ | First Time Business in Glendale: [✗] Yes [ ] No |
| No. of Seats For Patrons: | Outdoor Storage ( M1/M2 Only): [ ] Yes [✗] No |

9. Are You Sharing Space ( Subleasing )? [ ] Yes [✗] No   Alcoholic Beverage Sales: [ ] Yes [✗] No

If Yes, From Whom? _N/A_   If Yes to Alcoholic Beverage Sales: [ ] Existing [ ] Proposed

Primary Lessee's UO / PZUC No. _____   * Attach Copy of Current ABC State License

_I DECLARE UNDER PENALTY FO PERJURY, THAT THE INFORMATION PROVIDED HEREIN IS TRUE AND CORRECT. I FURTHER ACKNOWLEDGE THE ISSUANCE OF THIS CERTIFICATE DOES NOT RELIEVE ME FROM LEGAL OBLIGATION TO OBTAIN ANY AND ALL NECESSARY PERMITS AND/OR COMPLY WITH OTHER APPLICABLE LOCAL, STATE, AND FEDERAL REGULATIONS AS MAY APPLY TO THE USE AND /OR BUSINESS_

Business Owner's Signature _____   ID/Driver's Lic.: _N525 2676_ Date: _8-9-0_

Signature of this individual must be verified by personal identification. Any person signing this permit application as agent for the business owner shall have an original letter of authorization at the time of application. If a new Zoning Use Certificate has not been obtained within six months after the application fee is paid, a new application and respective fees shall be collected. Upon written request from the applicant, the Zoning Administrator may extend the period of the certificate application

## FOR STAFF USE ONLY ( DO NOT WRITE BELOW THIS LINE )

| Accepted By AG | Date 8.9.04 | Receipt No. 69626 | Fee 125.- | Zoning Designation M2 | SIC(Proposed) U651 | Section Sheet 15 |
|---|---|---|---|---|---|---|

Staff Comments, Conditions, Restrictions

_CONDUCT ALL SOIL SAMPLING & HAZ MAT REMEDIATION AS REQUIRED BY GFD._
_OFFICE_
_MAXIMUM 40% WAREHOUSE SPACE_

| Zoning Case Number(s) | | Specify Type of Eating Establishment |
|---|---|---|

| OK to Submit By: | | Inspection Required? [ ] Yes [✗] No | Fire Review JG 00. 8/9/04 |
|---|---|---|---|

| 30-day Letter | Request for Service | Dental Letter | OK to Issue By: VBL ML |
|---|---|---|---|

**Exhibit A**

# EXHIBIT B

STATE OF CALIFORNIA
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES
REGION

Cleanup & Abatement Order No. R4-2002-0068
Requiring

DRILUBE COMPANY
To
Assess, Cleanup and Abate the Effects of Contaminants
Discharged to Soil and Groundwater

(FILE NO. 113.0165)

The California Regional Water Quality Control Board, Los Angeles Region (Regional Board) herein finds that:

## BACKGROUND

1. **San Fernando Valley Groundwater Basin:** The alluvial basin underlying the San Fernando Valley (the San Fernando Basin) is an important source of groundwater, providing drinking water to over 1 million residents in the Los Angeles Region. As set forth in the *Water Quality Control Plan for the Los Angeles Region (Basin Plan)*, adopted on June 13, 1994, the Regional Board has designated beneficial uses for groundwater in the San Fernando Basin (among which include municipal and domestic drinking water supplies), and has established water quality objectives for the protection of beneficial uses.

2. **Water Quality in the San Fernando Basin:** Volatile organic compounds (VOCs) were first discovered in a San Fernando Basin well in 1979. Since then, all City of Burbank wells pumping groundwater for drinking water purposes have been impaired by VOC contamination. In 1986, the US Environmental Protection Agency (USEPA) placed four areas of groundwater contamination and adjacent areas where contamination has (or may have) migrated as one large site called the San Fernando Valley Superfund Site on the National Priorities List[1], pursuant to section 105 of CERCLA, 42 USC §9605. USEPA has divided the San Fernando Valley Superfund Site into five operable units (OUs). Each OU represents an interim containment remedy currently in progress in the eastern San Fernando Valley. Drilube Company is located within the Glendale South Operable Unit (GSOU). Information that has recently become available to the Regional Board demonstrates that some of the groundwater supply wells in the San Fernando Basin have been impacted by heavy metals, such as chromium. Chromium concentrations exceed current safe drinking water standards at some locations in the San Fernando Valley and chromium threatens the drinking water resources of the Basin. The Maximum Contaminant Level (MCL) for total chromium in California drinking water is 50 parts per billion (ppb). As a result, the Regional Board is currently investigating potential sources of chromium contamination.

3. **Discharger Responsibilities:** Drilube Company (hereinafter called Discharger) has been named a potentially responsible party by USEPA for discharging contaminants to the GSOU from its site described below. The results of subsurface investigations have detected soil and

---

[1] List of contaminated sites that poses a threat to human health and/or the environment, and are prioritized by USEPA and the public in terms of their relative risk to human health and/or the environment.

Order No. R4-2002-0068
Page 2

File No. 113.0165

groundwater contaminated with chlorinated solvents, petroleum hydrocarbons, PCBs, and
heavy metals including chromium. The primary pollutants under investigation within the
GSOU are chlorinated organic solvents.

4. **Location:** The Discharger's facilities are located at 711 Broadway and 718 Wilson Avenue,
Glendale, California (Plate 1- the Site). Plating operations are performed in the building
located at 711 Broadway and in the building located at 718 Wilson Avenue. As detailed in the
findings below, the Discharger's activities at the Site has caused the release of wastes to the
subsurface resulting in soil contamination and impairment of the beneficial uses of
groundwater resources within the GSOU.

### SITE HISTORY

5. **Site Activities:** The real property at the Site is owned by Devine Industries, based in Japan.
While the Discharger has only operated in the southern building (Plant 1) for 12 years, the
northern building (Plant 2) has been operational for approximately 40 years (See Plates 1
through 5 for facility layout). The business is currently owned by the Fairfax Family Trust,
which has been responsible for operations over the last fourteen years. Prior to about 1986,
the Discharger's original facility (now Plant 2) was owned and operated by other members of
the Fairfax family.

The Discharger's principal industrial activities involve metal plating and anodizing
(painting/dyeing) of parts and equipment used by the U.S Department of Defense for various
aerospace applications.

6. **Chemical Usage:** The Discharger has reportedly used volatile organic compounds (VOCs)
at the Site, namely: perchloroethylene (PCE) and trichloroethylene (TCE). Numerous heavy
metal alloys (e.g. chromium, nickel, cadmium, silver, copper, tin, manganese, zinc, etc.) and
metal-containing paints and dyes are used and stored onsite to support site operations.
Furthermore, acids, bases, and stripping/degreasing agents are commonly used throughout the
Discharger's process lines. Sodium hydroxide, sulfuric and hydrochloric acids, and cyanide
are a few of the additional chemicals associated with these processes.

### EVIDENCE OF CONTAMINATION AND
### BASIS FOR 13304 ORDER

7. **Waste Releases:** Under the direction of Regional Board staff, the Discharger conducted site
investigations during the early 1990s to 1993, which documented the discharge of wastes to
soil and groundwater beneath the Site.

Periodic groundwater monitoring and reporting have been conducted at the site since 1994.
Maximum historical groundwater concentrations of trichloroethene (TCE), tetrachloroethene
(PCE) and hexavalent chromium (Cr VI) were detected at 11,000 $\mu g/L$ (micrograms per
liter), 1,960 $\mu g/L$ and 32,000 $\mu g/L$, respectively. During recent semi-annual groundwater
monitoring, TCE, PCE, and Cr VI were detected in all five on-site monitoring wells (MW1-
MW5). Maximum concentrations of TCE, PCE and Cr VI were detected at 1,480 $\mu g/L$, 262
$\mu g/L$, and 2,620 $\mu g/L$ in MW3, located directly outside (east) of the Plant 1 plating operations
and adjacent to the 4-stage clarifier/sewer outfall. Elevated concentrations of TCE, PCE and

Order No. R4-2002-0068
Page 3

File No. 113.0165

Cr VI were also detected at 112 µg/L, 180 µg/L, and 2,540 µg/L, respectively, in MW1 located downgradient from Plant 2 process areas (See Plates 2). Based on information obtained during site assessments conducted to date, the Discharger's past activities have contributed to VOC (solvents) contamination in soil and groundwater beneath the site. The soil beneath the site is primarily sand and silty sand with interbedded clayey silt.  The depth to groundwater is approximately 60 feet below ground surface (bgs). The USEPA has named the Discharger as a primarily responsible party (PRP) in the GSOU and the Site is currently an active VOC case in the Well Investigation Program at the Regional Board. Analytical data collected regarding chromium and heavy metal contamination verified their presence in both soil and groundwater beneath the Site.

8. **Emerging Chemicals:** According to Regional Board records, the Discharger has not tested for the emerging chemical, 1,4-dioxane, a chemical often used as a stabilizer for TCE, PCE and 1,1,1-trichloroethane (TCA).

9. **Regulatory Status:** The Discharger has been instructed by Regional Board staff to complete the site assessment and remedial cleanup. Site investigations directed by the Regional Board, were done pursuant to section 13267 of the California Water Code. The purpose of this Order is to ensure that the Discharger completes site assessment, periodic monitoring and undertakes cleanup of contaminants in the soil that threaten to impair or further impair groundwater.  This soil assessment and cleanup effort is being coordinated with USEPA efforts to remediate groundwater in the GSOU.

USEPA has named several responsible parties liable for remedial action costs in the GSOU. At the present time, USEPA has reached an agreement whereby responsible parties in the GSOU will share costs and implement the interim remedial action plan. The Discharger has been named a potentially responsible party for VOC cleanup of groundwater in the GSOU.

10. **Sources of Information:** The sources for the evidence summarized above include but are not limited to:  "Chemical Storage and Use Questionnaire, dated August 23, 1990"; various technical reports submitted by the Discharger or its representatives to the Regional Board staff from 1989 through 1995; site inspections, meetings, written letters and telephone communications between Regional Board staff and the Discharger and/or its representatives from 1989 through 2001.

## CONCLUSION

11. **Pollution of Waters of the State:** The unauthorized discharge of wastes by the Discharger within the GSOU was not permitted and is in violation of water quality objectives established in the *Basin Plan*.  The past activities of the Discharger have contaminated the underlying soils and polluted groundwater within the GSOU.

12. **Regional Board Authority:**  Section 13304 of the California Water Code states, in part, that:

"Any person..., who has caused or permitted ..., any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the State and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the Regional Board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action."

**Exhibit B** Page 31

Order No. R4-2002-0068
Page 4

File No. 113.0165

The purpose of this Order is to ensure that the Discharger mitigates soil and groundwater pollution by completing on-site/off-site assessment, conducting periodic monitoring and undertaking cleanup of contaminants in soil and groundwater that threaten to impair or further impair groundwater resources.

13. **Status of Site Assessment:** The Discharger has completed some assessment of contamination on-site beneath its facilities.

To complete subsurface assessments and begin appropriate cleanup, the Discharger must undertake the actions specified below, at a minimum:

    a. For VOCs in the saturated and unsaturated zones: Complete the assessment of the lateral and vertical extent of the contaminants.

    b. For emerging chemical (s) and heavy metals in the unsaturated and saturated zones: Complete the assessment, including any off-site contamination migration in the saturated zone.

14. **Cleanup Goals:** Pending the completion of adequate assessment and monitoring of the lateral and vertical extent of soil contamination and risk of migration to groundwater, the following information shall be considered when establishing preliminary cleanup goals.

    a. Develop a remedial action plan as necessary to cleanup soil and groundwater contamination using, at a minimum, the criteria stated below in items b, c, and d.

    b. <u>VOCs in the Unsaturated Zone</u>: Cleanup levels set forth in *the Regional Board's Interim Site Assessment and Cleanup Guidebook, May 1996,* which considers contaminant concentrations, depth to the water table, the nature of the chemicals, soil conditions and texture, and attenuation trends.

    c. <u>Emerging Chemicals and Heavy Metals</u>: Cleanup concentrations shall not exceed Action Levels and Maximum Contaminant Levels (MCLs) for drinking water as established by the State Department of Health Services for contaminants in the saturated zone. For emerging chemicals in the unsaturated zone, the Discharger will need to investigate the extent to which contaminants may attenuate through the soil in order to determine soil cleanup levels that will not impact the underlying groundwater resources, above Action Levels or MCLs.

    d. <u>VOCs in the Saturated Zone</u>: Action Levels and MCLs for drinking water, as established by the State Department of Health Services.

Pending completion of contaminant assessments, Regional Board staff may consider revised cleanup goals in accordance with the following State Policies.

"Antidegradation Policy" (State Board Resolution No 68-16) which requires attainment of background levels of water quality, or the highest level of water quality that is reasonable in the event that background levels cannot be restored. Cleanup levels other than background must be consistent with the maximum benefit to the people of the State, not unreasonably affect present and anticipated beneficial uses of water, and not result in exceedance of water quality objectives in the *Basin Plan.*

**Exhibit B** Page 32

Order No. R4-2002-0068                                    File No. 113.0165
Page 5

"Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304" (State Board Resolution No. 92-49) which sets forth criteria to consider for those cases of pollution wherein restoration of water quality to background levels may not be reasonable.

15. **Impairment of Drinking Water Wells:** As noted above (Finding No. 2), some of the drinking water wells in San Fernando Valley have been impacted by chromium. For example, the Glendale Treatment Plant (Plant) extraction wells have been impacted by chromium and VOCs. However, the Plant is only capable of treating the VOCs in groundwater. Water purveyors particularly in the GSOU area, and their customers may have to bear a significant portion of the costs of cleaning up this contaminated groundwater and/or procuring alternative supplies of drinking water.

16. Pursuant to section 13304 of the California Water Code, regional boards may seek reimbursement for all reasonable costs to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial action.

17. This action is being taken for the protection of the environment and as such is exempt from the provisions of the California Environmental Quality Act (Public Resources Code section 21000 et seq.) in accordance with California Code of Regulations, title 14, section 15321.

**IT IS HEREBY ORDERED,** pursuant to section 13304 of the California Water Code, that the Discharger, DRILUBE COMPANY, shall cleanup and abate contaminated soil and groundwater emanating from the Discharger's Site at 711 Broadway and 718 Wilson Avenue, Glendale, California, in accordance with the following requirements:

1. **VOCs in the Unsaturated and Saturated Zones:** The Discharger shall prepare a workplan and upon approval from the Regional Board Executive Officer (Executive Officer), complete the assessment of VOCs in the unsaturated zone by conducting a multi-depth soil gas survey to adequately determine the lateral and vertical extent of the contaminants and current VOC levels in soil.

2. **Emerging Chemicals and Heavy Metals in the Unsaturated and Saturated Zones:** The Discharger shall prepare a workplan and upon approval from the Executive Officer, extend the investigation to include on-site assessment of the extent of contaminant migration and the presence of emerging chemicals and heavy metals, including, 1,4-dioxane, chromium and hexavalent chromium in soil and groundwater. In addition, the workplan shall include an off-site groundwater investigation of all the aforementioned chemicals.

3. **Assessment Technical Reports\Remedial Action Plans:** Upon completion of the assessment reports (i.e., Requirements 1 and 2 above), the Discharger shall prepare a technical report that summarizes the results. In the event that the results fail to confirm that:

   a. VOCs and emerging chemicals in the <u>unsaturated zone</u> are naturally attenuating to MCLs at the water table, the Discharger shall develop and implement a workplan subject to the Executive Officer's approval for cleanup of soil contaminants; and

   b. Emerging chemicals in the <u>saturated zone</u> off-site are not continuing to migrate, the Discharger shall develop and implement a workplan subject to the Executive Officer's approval for containment, control and cleanup of groundwater pollution.

**Exhibit B** Page 33

Order No. R4-2002-0068                                    File No. 113.0165
Page 6

c. **Groundwater Monitoring:** The Discharger shall monitor the groundwater for chemicals of concern, at a minimum including chromium and hexavalent chromium and the emerging chemical 1,4, dioxane on a quarterly basis (see Attachment B). Future groundwater monitoring frequency may be adjusted if a plan is proposed by the Discharger and subsequently approved by the Executive Officer. The Executive Officer may approve a change in the monitoring frequency if it is shown that other frequencies are adequate to monitor changes of contaminant concentrations, groundwater gradients, and the progress of any soil and groundwater remediation.

Abandonment of any groundwater wells installed during the required investigation and remediation for this project must be reported to and approved by the Executive Officer in advance. Any groundwater well removed must be replaced within three months at a location approved by the Executive Officer. With justification, the Executive Officer may approve the abandonment of groundwater wells without replacement. When a well is removed, all work shall be completed in accordance with all applicable well abandonment requirements.

4. **Impairment of Drinking Water Wells:** The Regional Board reserves the right to require the Discharger and other dischargers to develop and implement a plan that will mitigate impaired resources of groundwater and/or compensate purveyors for past and current costs of replacing impaired water supplies. Such a directive would not duplicate requirements in the USEPA's consent decree.

5. **Contractor/Consultant Qualification:** A California registered civil engineer, registered geologist or registered certified specialty geologist shall conduct or direct the subsurface investigation and cleanup program. All technical documents shall be signed by and stamped with the seal of the above-mentioned qualified professionals.

6. **Cost Recovery:** The Discharger shall reimburse the Regional Board all reasonable costs incurred by the Regional Board to investigate the Discharger's unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial actions.

7. **Time Schedule:** The Discharger shall submit all required work plans and reports in accordance with the time schedule in Attachment B.

8. The Regional Board's authorized representative(s) shall be allowed:

   - Entry upon premises where a regulated facility or activity is located, conducted, or where records are stored, under the conditions of this Order;
   - Access to copy any records that are stored under the conditions of this Order;
   - Access to inspect any facility, equipment (including monitoring and control equipment), practices, or operations regulated or required under this Order; and
   - The right to photograph, sample, and monitor the Site for the purpose of ensuring compliance with this Order, or as otherwise authorized by the California Water Code.

9. This Order is not intended to permit or allow the Discharger to cease any work required by any other order issued by the Regional Board, nor shall it be used as a reason to stop or redirect any investigation, monitoring, cleanup or remediation programs ordered by the Regional Board or any other agency. Furthermore, this Order does not exempt the Discharger from compliance with any other laws, regulations, or ordinances which may be

**Exhibit B** Page 34

Order No. R4-2002-0068
Page 7

File No. 113.0165

applicable, nor does it legalize the waste treatment and disposal facilities, and it leaves
unaffected any further restrictions on those facilities which may be contained in other statutes
or required by other agencies.

10. The Discharger shall submit 30-day advance notice to the Regional Board of any planned
changes in name, ownership, or control of the Site; and shall provide 30-day advance notice
of any planned physical changes to the Site that may affect compliance with this Order. In
the event of a change in ownership or operator, the Discharger also shall provide 30-day
advance notice, by letter, to the succeeding owner/operator of the existence of this Order, and
shall submit a copy of this advance notice to the Regional Board.

11. The Regional Board, through its Executive Officer, may revise this Order as additional
information becomes available. Upon request by the Discharger, and for good cause shown,
the Executive Officer may defer, delete or extend the date of compliance for any action
required of the Discharger under this Order. The authority of the Regional Board, as
contained in the California Water Code, to order investigation and cleanup in addition to that
described herein is in no way limited by this Order.

12. Pursuant to California Water Code section 13320 the Discharger may seek review of this
Order by filing a petition with the State Water Resources Control Board (State Board). Such
a petition must be received by the State Board, located at P.O. Box 100, 1001 I Street,
Sacramento, California, 95814, within 30 days of the date of this Order.

13. Failure to comply with the terms or conditions of this Order may result in imposition of civil
liabilities, imposed either administratively by the Regional Board or judicially by the
Superior Court in accordance with section 13350 et seq. of the California Water Code, and/or
referral to the Attorney General of the State of California for such action as he/she may deem
appropriate.

14. None of the obligations imposed by this Order on the Discharger is intended to constitute a
debt, damage claim, penalty or other civil action which should be limited or discharged in a
bankruptcy proceeding. All obligations are imposed pursuant to the police powers of the
State of California intended to protect the public health, safety, welfare and environment.

Ordered by: _____          Date: March 29, 2002
                  Dennis A. Dickerson, Executive Officer

Order No. R4-2002-0068
Page 8

File No. 113.0165

Attachment A  (map)

**Exhibit B** Page 36

Order No. R4-2002-0068
Page 9

File No. 113.0165

## Attachment B:  Time Schedule

| | Requirement | Completion/Due Date |
|---|---|---|
| 1. | **Assessment of VOCs, Emerging Chemicals and Heavy Metals in the Vadose and Saturated Zones**<br><br>Submit a Workplan to complete site assessment<br><br>Complete assessment<br><br>Submit technical reports | <br><br>June 7, 2002<br><br>To be determined<br><br>To be determined |
| 2. | **Groundwater Monitoring**<br><br>Submit quarterly monitoring reports:<br><br>January – March<br>April – June<br>July – September<br>October - December | <br><br>Reports due by the following dates:<br><br>April 15<br>July 15<br>October 15<br>January 15 |
| 3. | **Remedial Action Plan**<br><br>Soil<br><br>Groundwater | <br><br>To be determined<br><br>To be determined |



Exhibit B







Exhibit B

39





# Source Investigations & Cleanups

- RWQCB has lead for 10 sites
- DTSC has lead for 6 sites
- EPA has lead for 3 sites

All Metals  Drilube  &  Lubra-Seal

**Exhibit B**

# Source Investigations & Cleanups

| Facility Name | Category (1 to 4) and Site Status | | CAO | Operable Unit | Date of Last Action Taken | Last Action Completed/Status | Next Action Required | Anticipated Completion Date of Next Action |
|---|---|---|---|---|---|---|---|---|
| **Sites Managed by US EPA (Total = 3)** | | | | | | | | |
| All Metals Plating | | Removal action completed. | N | Glendale South | Dec-07 | EPA demolished building and excavated 3 feet of soil below ground surface (bgs). Deeper soil excavations to 15 - 20 feet bgs in areas of concern. Site was backfilled, capped, and fenced in December. | Evaluate groundwater data | TBD |
| Dritube Company | | Soil and groundwater characterization. Additional characterization required. | Y | Glendale South | Dec-07 | EPA commented on Dritube (Wilson) investigation workplan in September and conducted October call with PRP consultant. Draft administrative order on consent (AOC) sent in November. Revised workplan and AOC comments overdue. Dritube (Broadway) PRP attorney stated willingness to comply in November and selection of consultant in December. | PRP calls in December on Dritube (Wilson) workplan and AOC and on Dritube (Broadway) investigation workplan. Draft AOC to Avanessians (Broadway) in February. | Dec-07 |
| Former Lockheed Librascope | 1 | Limited soil investigation data. | N | Glendale South | Dec-07 | EPA commented on investigation workplan in October and received revision in late November. | Investigation workplan approval or further revision in December. If approved, work will commence in January. Draft AOC to PRP in January. | Dec-07 |
| **Sites Managed by RWQCB (Total = 16)** | | | | | | | | |
| A.H. Plating | | Soil characterization only. No monitoring wells. | N | Burbank | Oct-07 | RWQCB to issue case closure with a Deed Restriction covenant that prevents development of the site for residential or educational use unless soil remediation occurs. | PRP contacted in September and October to determine progress on deed restriction. Awaiting deed restriction form. | Feb-08 |
| Cal-Air Processing | 1 | No soil investigation data. | N | Burbank | Sep-07 | Based upon a site inspection, RWQCB determined site has no further requirements. RWQCB issued case closure in mid-September. | None. | N/A |
| Carter Plating | | Soil characterization No monitoring wells. | N | Burbank | Oct-07 | RWQCB to issue case closure with a Deed Restriction covenant that prevents development of the site for residential or educational use unless soil remediation occurs. | PRP contacted in September and October to determine progress on deed restriction. Awaiting deed restriction form. | Feb-08 |

**Exhibit B**



**Exhibit B**










# Removal Action at All Metals

**Exhibit B**

# Former Drilube Site

Southwest Cleanup & Cleanups

CERCLA

**Drilube Wilson property**

EPA will issue an order for a soil and groundwater investigation

EPA will perfect a lien to ensure that potentially responsible party (PRP) pays

**Drilube Broadway property**

Investigation workplan received in late February & under review

Draft consent order sent to PRP



**Exhibit B**

**Page 44**



# Former Librascope Site

**Exhibit B**

workshop

# Glendale Chromium OU activities

- Chromium Operable Unit established to focus on Glendale groundwater chromium investigation

- Notice and information request letters sent in November 2007

  - Responses from Cr6 PRPs received in February

  - Follow up letters will be sent in March

Exhibit B

# Glendale Groundwater Cleanup

## Cr6 Treatment for Glendale System

- Glendale plans to build 2 Cr6 demonstration treatment plants. (June & December 2008)

- EPA provided > $800 K of this $3.5 M project

- EPA will support the City's Prop 50 funding application.

- PRPs have agreed to provide supplemental funding.





**Exhibit B**

47

ENVIRONMENTAL QUESTIONNAIRE
AND DISCLOSURE STATEMENT

LOAN # _____

The undersigned, as owner or buyer of the Property described on Exhibit "A" attached hereto, is familiar with the operations presently conducted on the Property, has made a reasonably diligent inquiry into the former uses of the Property and hereby declares and certifies that to the best of its knowledge the following information is true and correct.

A response is required for each item.  Please note and continue answers on a separate sheet, if necessary.

## COMMERCIAL REAL ESTATE

1.  Current/Former Uses of the Property:

    A.  Provide dates for construction of current improvements and any improvements which have been demolished or removed.

    B.  Description of current uses.

    C.  Names of all owners since 1940.

    D.  Names of previous occupants.

    E.  Description of all previous uses since 1940.

**Exhibit B** Page 49

F.  Current and past uses of adjacent property.

_____

_____

G.  Was the Property ever parceled differently?

     (_____) Yes          (✗) No

Were there ever different addresses for the site?

     (_____) Yes          (✗) No

If yes, please give full details.

_____

_____

H.  Are there, or have there ever been any disposal facilities, dump sites or facilities involving hazardous waste within 2,000 feet of the site?

     (_____) Yes          (✗) No

If yes, describe.

_____

_____

2.  <u>Asbestos</u>

A.  Is there asbestos currently in any of the construction materials contained in the building?

     (_____) Yes          (✗) No

If so, Where?

_____

**Exhibit B**
2
Page 50

B.  If so, has a survey been conducted to assess the type, amount, location and condition of asbestos on the site?

(_____) Yes                    (_____) No

If so, please attach a copy of any survey report.

C.  Have asbestos air samples been taken?

(_____) Yes                    (_____) No

If so, what were the results?

_____
_____
_____

3.  Polychlorinated Biphenyls ("PCBs")

A.  Have PCBs been used in electrical transformers, capacitors or other equipment at the property?

(_____) Yes                    (X_____) No

B.  If so, please describe the use and quantity of PCBs used on the property.

_____
_____

4.  Fuel/Chemical Storage Tanks, Drums, and Pipelines.

A.  Are there any above ground or underground gasoline, diesel, fuel oil, chemical storage tanks, or other hazardous materials on the Property?

(_____) Yes                    (_____) No

If so please describe substances stored and capacity of tank(s).

_____
_____

B.  Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes          ( ✗ ) No

When was the most recent test?

_____

Results?

_____

_____

Provide an inventory of materials, quantity, age, construction material, and leak protection systems on each tank.

C.  Are any other chemicals stored on the Property in drums or other containers?

(_____) Yes          ( ✗ ) No

If so, please describe the substances, quantities stored, and types and conditions of container.

_____

_____

_____

D.  Have there been any spills, leaks, or other releases of chemicals on the Property?

(_____) Yes          ( ✗ ) No

If so, please describe the chemicals and quantities released, any cleanup measures taken, and the results of any soil or ground water samples performed to detect the presence of the chemicals spilled, leaked, or released on the Property.

_____

_____

_____

E.  Please attach copies of any permits or licenses pertaining to the use, storage, handling, or disposal of chemicals on the Property.

F.  Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes                    (✗) No

5.  Water Discharges

A.  List all sources of waste water discharges to surface waters, ground waters, septic systems, or holding ponds.

_____ none _____

B.  List all sources of waste water discharges to public sewer systems and storm collection systems.

_____ none _____

C.  Please attach copies of any water discharge permits, licenses, or registration pertaining to operations on the Property.

6.  Air Emissions

A.  Describe air emissions from each source of air pollutants, including fuel burning equipment.  Describe type of fuel burned.

_____ N/A _____

B.  Describe air pollution control equipment used to reduce emissions for each source of air emissions.

_____ N/A _____

C.  Are air emissions monitored?

(_____) Yes                    (✗) No

If so, please indicate frequency of monitoring and attach results.

_____

D.  Please attach copies of any air permits, licenses, or registrations pertaining to operations on the Property.

7. <u>Waste Disposal</u>

    A.  Describe the types of liquid wastes, other than waste water described above, and solid wastes generated at the Property.

    B.  Describe how the liquid and solid wastes generated at the Property are disposed.

    C.  Please attach copies of any waste disposal permits or licenses pertaining to operations on the Property.

<u>SOIL CONTAMINATION</u>

    A.  Have there been any spills, leaks or other releases of hazardous materials on the Property?

    (_____) Yes                (___X___) No

    If so, describe the materials and quantities released, any mitigation measures, and the results of soil or ground water samples performed.

    B.  Are there any known spills, leaks or other releases on adjacent sites?

    (_____) Yes                (___X___) No

    Is there evidence of contamination plumes moving onto the site from adjacent sites?

    (_____) Yes                (___X___) No

## AGRICULTURAL PROPERTY

If the property has been or is used for agricultural purposes, the following additional information should be provided.

    A.  Have pesticides, herbicides, or other agricultural chemicals been applied to the Property?

        (_____) Yes               (__✗__) No

    If so, please describe the locations where such pesticides or chemicals were applied, the type of pesticides or chemicals applied in each area, and the results of any soil or ground water analyses performed to detect pesticides or chemicals used at the site.

_____
_____

    B.  Have pesticides, herbicides or other agricultural chemicals been mixed, formulated, rinsed, or disposed of on the Property?

        (_____) Yes               (__✗__) No

    If so, please describe the locations where such pesticides were mixed, formulated, rinsed, or disposed, the type of pesticides or chemicals mixed, formulated, rinsed, or disposed of at each location, and the results of any soil or ground water analyses performed to detect pesticides or chemicals mixed, formulated, rinsed, or disposed at the site.

_____
_____
_____

## INDUSTRIAL PROPERTY

If the Property has been or is used for industrial purposes, the following additional information should be provided:

    A.  Has the Property been used for disposal of any liquid or solid waste?

        (_____) Yes               (__✗__) No

If so, describe the location of all disposal sites, the type of wastes disposed at each site, the results of any soil or groundwater samples taken in the vicinity of each site, and the manner in which each site not presently in use was closed.

_____

_____

_____

B.  Have evaporation or storage ponds been located on the Property?

(_____) Yes                    (  X  ) No

If so, describe the location of all ponds, the type of wastes placed in each pond, the results of any soil or ground water samples taken in the vicinity of each pond, and the manner in which each pond not presently in use was closed.

_____

_____

_____

C.  Have waste water treatment facilities, such as acid neutralization vaults, been located on the Property?

(_____) Yes                    (  X  ) No

If so, please describe the location of all facilities, the types of wastes treated in each facility, the results of any soil or ground water samples taken in the vicinity of each facility, and the manner in which each facility not presently in use was closed.

_____

_____

_____

D.  Are there raw chemicals or waste chemical storage areas on the Property?

(_____) Yes                    (__X__) No

If so, please describe the location of all such areas, the type of products or wastes stored in each area, the amount of products or wastes stored in each area, the results of any soil or ground water samples taken in the vicinity of each area, and the manner in which each are not presently in use was closed.

_____
_____
_____

### STUDIES, REPORTS, CITATIONS, ENFORCEMENT

A.  Attach a copy of each environmental study, report, or assessment which has been performed on the Property's soil, air, or water conditions.

B.  Have any federal, state, or local agencies ever investigated cited or been involved on the Property for violations of any environmental law?

(_____) Yes                    (__X__) No

If so, describe in full.

_____
_____
_____

C.  Has any public agency listed the Property as a site requiring or qualifying for cleanup under any environmental law?

(_____) Yes                    (__X__) No

If so, describe in full

_____
_____
_____

**Exhibit B**
9
**Page 57**

## ADJOINING PROPERTY

A.  Are there any of the above-referenced hazardous substances or pollutants present on adjoining properties or properties in the immediate area of the Property?

(_____) Yes                    (  X  ) No

Dated: ___05 — 29 — 08___

Buyer: _____

_____

_____

Seller: _____

_____

_____

Attachment:

Exhibit "A" - Legal Description

http://kepler.sos.c...   //corpdata/ShowAllList?QueryCorpNumber=C...

# California Business Portal

Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of JAN 02, 2009 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| DEVIN INDUSTRIES INC. | | |
| **Number:** C1749754 | **Date Filed:** 8/26/1994 | **Status:** suspended |
| **Jurisdiction:** California | | |
| Address | | |
| 249 N BRAND BLVD #470 | | |
| GLENDALE, CA 91203 | | |
| Agent for Service of Process | | |
| A IRACI | | |
| 249 N BRAND BLVD #470 | | |
| GLENDALE, CA 91203 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

1 of 1

**Exhibit B** Page 59

1/9/2009 10:38 AM

Cyberhomes.com Profile Report                    http://ctt.s. ....ata.com/XSLT-Transformation-Report-View.asp

# Property Profile

## Cover Page

**Subject Property:**



**Site Address**

718 W WILSON AVE ,

GLENDALE, CA, 91203



**Mail Address**

718 W WILSON AVE ,

GLENDALE, CA, 91203

**Prepared By:**



**Richard Labowe**

Labowe, Labowe & Hoffman, Llp

T: 213-250-9800 x 103
E: LLHLAW1631@AOL.COM



**Document Contents**

- Property Overview Page
- Property History Page
- Cyberhomes.com Content

**Offered by**


Chicago Title

**Courtesy of Chicago Title**
**Offered by Chicago Title**
All information produced is deemed reliable but is not guaranteed.

Powered By
cyberhomes.com
Find the right neighborhood, Find the right home

Cyberhomes.com Profile Report                http://ctt.site   i  .com/XSLT-Transformation-Report-View.aspx



## Property Overview

718 W WILSON AVE, GLENDALE, CA, 91203- 2409

### Owner and Geographic Information



| | |
|---|---|
| **Primary Owner:** | **Secondary Owner:** |
| DERBOGHOSSIAN, HOVSEP | |
| **Mail Address:** | 718 W WILSON AVE GLENDALE CA 91203 |
| **Site Address:** | 718 W WILSON AVE GLENDALE CA 91203 |
| **APN :** 5638-004-029 | **Lot Number :** 17   **Census Tract :** 3017.02   **Page Grid :** 564-C4 |
| **Housing Tract Number :** 4531 | **Phone :** |

**Legal Description :** Lot: 17 Tract No: 4531  Abbreviated Description: LOT:17 CITY:REGION/CLUSTER: 24/24855 TR#:4531 TRACT # 4531 LOT 17 City/Muni/Twp: REGION/CLUSTER: 24/24855

### Property Details



| | | |
|---|---|---|
| **Bedrooms :** | **Year Built :** 1936 | **Square Feet :** 6,100 SF |
| **Bathrooms :** | **Garage :** | **Lot Size :** 8,738 SF |
| **Total Rooms :** | **Fireplace :** | **Number of Units :** 0 |
| **Zoning :** GLM1* | **Pool :** | **Use Code :** Manufacturing (light) |

### Sale & Loan



| | | |
|---|---|---|
| **Transfer Date :** 06/27/2008 | **Seller :** MAZMANIAN, REMY | |
| **Transfer Value :** $1,725,000 | **Document # :** 08-1147426 | **Cost/Sq Feet :** $282 |
| **First Loan Amt :** $1,313,200 | **Lender :** US BANK NA | |

### Assessment & Taxes



| | | |
|---|---|---|
| **Assessed Value :** $891,921 | **Percent Improvement :** 15.05% | **Homeowner Exemption :** |
| **Land Value :** $757,701 | **Tax Amount :** $9,921.17 | **Tax Rate Area :** 11-689 |
| **Improvement Value :** $134,220 | **Tax Status :** Current | **Tax Account ID :** |
| **Market Improvement Value :** | **Market Land Value :** | **Market Value :** |

http://ctt.si... com/XSLT-Transformation-Report-View.asp:

**Courtesy of Chicago Title**
**Offered by Chicago Title**
All information produced is deemed reliable but is not guaranteed.

Powered By

cyberhomes.com

**Exhibit B** **Page 62**
1/9/2009 10:35 AM

Cyberhomes.com Profile Report

http://ctt.site-data.com/XSLT-Transformation-Report-View.asp





## Property History

718 W WILSON AVE, GLENDALE, CA, 91203- 2409

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147426 BK-PG - |
| Price | $1,725,000 | Document Type | Grant Deed |
| First TD | $1,313,200 | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | 08-1147427 | Interest Rate | |
| Lender Name | US BANK NA | Buyer Vesting | Married Man as his sole and separate property |
| Buyer Name | DERBOGHOSSIAN, HOVSEP | Seller Name | MAZMANIAN, REMY |

Legal Description : Lot: 17  Tract No: 4531  Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147425 BK-PG - |
| Price | N/A | Document Type | Intrafamily Transfer or Dissolution |
| First TD | N/A | Type of Sale | Non-Arms Length Transfer |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | | Buyer Vesting | Married Man as his sole and separate property |
| Buyer Name | DER BOGHOSSIAN, HOVSEP | Seller Name | DER BOGHOSSIAN, BARBARA |

Legal Description : Lot: 17  Tract No: 4531  Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE

### Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 06/27/2008 | Document # | 08-1147428 BK-PG - |
| Loan Amount | $38,736 | Loan Type | Unknown |
| TD Due Date | | Type of Financing | |
| Lender Name | US BANK NA | Buyer Vesting | N/A |
| Lender Type | Bank | Vesting | |
| Borrowers Name | DERBOGHOSSIAN, HOVSEP | | |

**Exhibit B** Page 63

1/9/2009 10:35 AM

Cyberhomes.com Profile Report

http://ctt.site·.data.com/XSLT-Transformation-Report-View.asp:

Courtesy of Chicago Title
Offered by Chicago Title
All information produced is deemed reliable but is not guaranteed.

Powered By

cyberhomes.com

**Exhibit B**
**Page 64**

1/9/2009 10:35 AM

Cyberhomes.com Profile Report

http://ctt.sitexdata.com/XSLT-Transformation-Report-View.asp



## Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 02/15/2008 | Document # | 08-0275418 BK-PG - |
| Loan Amount: | $233,000 | Loan Type | Stand Alone Second |
| TD Due Date | | Type of Financing | |
| Lender Name | GAREGIN LUSIKIAN | Buyer Vesting | N/A |
| Lender Type | Private Party | Vesting | |
| Borrowers Name | MAZMANIAN, REMY | | |

## Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 07/22/2004 | Document # | 04-1872684 BK-PG - |
| Loan Amount: | $300,000 | Loan Type | Unknown |
| TD Due Date | | Type of Financing | |
| Lender Name | DAVID P GOODLAW | Buyer Vesting | N/A |
| Lender Type | Private Party | Vesting | |
| Borrowers Name | MAZMANIAN, REMY | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 05/28/2004 | Document # | 04-1379999 BK-PG - |
| Price | $150,000 Multiple Parcels Involved in this transaction | Document Type | Grant Deed |
| First TD | N/A | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | | Buyer Vesting | N/A |
| Buyer Name | MAZMANIAN, REMY | Seller Name | DEVIN INDUSTRIES INC. |
| Legal Description : Lot: 17 Tract No: 4531 Map Ref: MB52 PG18 City/Muni/Twp: GLENDALE | | | |

Courtesy of Chicago Title
Offered by Chicago Title
All information produced is deemed reliable but is not guaranteed.

Powered By


Find the right neighborhood.Find the right home

**Exhibit B** Page 65

1/9/2009 10:35 AM

Cyberhomes.com Profile Report

http://ctt.sitexdata.com/XSLT-Transformation-Report-View.asp:



## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 02/01/1995 | Document # | |
| Price | $150,001 | Document Type | N/A |
| First TD | N/A | Type of Sale | Per Assessor Transaction History |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | N/A | Buyer Vesting | N/A |
| Buyer Name | N/A | Seller Name | N/A |
| Legal Description : | | | |

Courtesy of Chicago Title
Offered by Chicago Title
All Information produced is deemed reliable but is not guaranteed.

Powered By
**cyberhomes**.com

**Exhibit B** Page 66

1/9/2009 10:35 AM

Cyberhomes.com Profile Report        http://ctt.sit   .ía.com/XSLT-Transformation-Report-View.asp:

**This address is not available from CyberHomes.com**

# EXHIBIT C

Exhibit C   Page 68

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

NAME  MARIE RONGONE
      OFFICE OF REGIONAL
      COUNSEL
MAILING   U.S. E.P.A.
      78 HAWTHORNE ST
CITY, STATE   ORC-3
ZIP CODE SAN FRANCISCO, CA 94105

03/07/08

20080401128

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

**TITLE(S)**

NOTICE OF LIEN

**Exhibit C**   Page 69

RECORDING REQUESTED BY:

    Kathleen Salyer, Chief, Site Cleanup Branch
    Superfund Division
    U.S. Environmental Protection Agency
    Region IX

AND WHEN RECORDED MAIL TO:

    Marie Rongone
    Office of Regional Counsel
    U.S. Environmental Protection Agency
    75 Hawthorne Street, ORC-3
    San Francisco, California 94105

NOTICE OF LIEN
UNDER
COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION & LIABILITY
ACT OF 1980, AS AMENDED
42 U.S.C. Section 9607(l)

    NOTICE IS HEREBY GIVEN by the United States of America that it holds a lien on lands and premises described below situated in Los Angeles County, State of California, as provided by Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. Section 9607(l), to secure the payment to the United States of all costs and damages for which Remy Mazmanian is liable to the United States under Section 107 of CERCLA, 42 U.S.C. Section 9607. This lien exists in favor of the United States on all real property that belongs to Remy Mazmanian and which is, has been, or will be subject to, or affected by, removal actions, as defined by Federal Law, at the real property located 718 West Wilson Avenue, Glendale, California, and more particularly described as follows:

Legal Property Description

    Los Angeles County Parcel Number AP 5638-004-029

    In the county of Los Angeles, state of California, Lot 17 of Tract no. 4531, in the City of Glendale, County of Los Angeles, California, as per map recorded Book 52, page 18 of Parcel Maps, in the Office of the County Recorder of said County. (See Attachment A, Legal Description)

**Exhibit C** Page 70

This statutory lien exists and continues until the liability for such costs and damages (or for any decree or judgment against such persons arising out of such liability) is satisfied or becomes unenforceable through the operation of the statute of limitations as provided by Section 113(g) of CERCLA, 42 U.S.C. § 9613(g).

The United States has caused this instrument to be executed through the United States Environmental Protection Agency, and the undersigned, in my official capacity as a Branch Chief within the Superfund Division of the United States Environmental Protection Agency, Region IX. I verify that response actions were undertaken by the United States at the above-described location pursuant to 42 U.S.C. § 9601 et seq.

Signed at San Francisco, California, this 4th day of ___March___, 2008.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

Kathleen Salyer, Chief, Site Cleanup Branch
Superfund Division
U.S. EPA, Region IX

2

Exhibit C   Page 71

STATE OF CALIFORNIA                               )
                                                 )
COUNTY OF SAN FRANCISCO                           )

On March 4, 2008, before me, Laura Hicks, Notary Public, personally appeared Kathleen Salyer,
who proved to me on the basis of satisfactory evidence to be the person whose name is
subscribed to the within instrument and acknowledged to me that she executed the same in her
authorized capacity, and that by her signature on the instrument the person, or the entity upon
behalf of which the person acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Notary Signature _____
                        Notary Public

LAURA J. HICKS
Commission # 1667695
Notary Public - California
San Francisco County
My Comm. Expires May 16, 2010

**Exhibit C** Page 72

## IMPORTANT RELEASE INFORMATION

With respect to the costs and damages for which the persons named in this notice are liable to the United States Environmental Protection Agency as set forth herein, unless a notice of lien is refiled, this Notice shall operate as a Certificate of Release on the expiration of the applicable statute of limitations.  Pursuant to 42 U.S.C. § 9613(g)(2)(A & B), the applicable limitation periods for actions for recovery of costs are as follows:

(A) for a removal action within 3 (three) years after completion of the removal action, except that such cost recovery action must be brought within 6 (six) years after a determination to grant a waiver under Section 104(c)(1)(C) of this title, for continued response action; and

(B) for a remedial action within 6 (six) years after the initiation of physical on-site construction of the remedial action . . . .

4

**Exhibit C** Page 73

CERTIFIED COPY

EXHIBIT "A"

*3*

All that certain real property situate in the County of Los Angeles, State of California, described as follows:

Lot 17 of Tract no. 4531, in the City of Glendale, County of Los Angeles, State of California, as per map recorded in book 52, page 18 of maps, in the office of the County Recorder of said County.

04 1379999

legal rev. (010698)

Exhibit C   Page 74

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

MAR 7 2008

Dean C. Logan   ACTING
REGISTRAR-RECORDER/COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

**Exhibit C** Page 75

# EXHIBIT D



U.S. Small Business Administration

# NOTE

| SBA Loan # | PLP 312-651-5001 |
| --- | --- |
| SBA Loan Name | HOVSEP DERBOGHOSSIAN COMPUTER SERVICES |
| Date | June 20, 2008 |
| Loan Amount | 1,313,200.00 |
| Interest Rate | Variable |
| Borrower | Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES |
| Operating Company | N/A |
| Lender | U.S. Bank National Association |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of
One Million Three Hundred Thirteen Thousand Two Hundred and 00/100 _____ Dollars,
interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Note will mature in 25 years from date of Note.

The interest rate on this Note will fluctuate. The initial interest rate is 6.58% per year. This initial rate is the prime rate on the date SBA received the loan application, plus 1.58%. The initial interest rate must remain in effect until the first change period begins,

Borrower must pay principal and interest payments of $8,933.00 every month, beginning one month from the month of initial disbursement on this Note; payments must be made on the same day as the date of initial disbursement on this Note in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted annually (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month in which an interest rate change occurs, as published in the Wall Street Journal on the next business day.

The adjusted interest rate will be 1.58% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Additional payment charges apply. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to

SBA 147:  Note Page 2 Continuation

---

Continuation of "..."

Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;

b. During the second year after the date on which the loan is first disbursed, 3% of the total prepayment amount; and

c. During the third year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 25 years from date of Note.

Late Charge:  If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

**Exhibit D** Page 79

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

   A. Fails to do anything required by this Note and other Loan Documents;
   B. Defaults on any other loan with Lender;
   C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
   D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
   E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
   F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
   G. Fails to pay any taxes when due;
   H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;
   I. Has a receiver or liquidator appointed for any part of their business or property;
   J. Makes an assignment for the benefit of creditors;
   K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
   L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
   M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

   A. Require immediate payment of all amounts owing under this Note;
   B. Collect all amounts owing from any Borrower or Guarantor;
   C. File suit and obtain judgment;
   D. Take possession of any Collateral; or
   E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

   A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
   B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
   C. Release anyone obligated to pay this Note;
   D. Compromise, release, renew, extend or substitute any of the Collateral; and
   E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

N/A

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES

Hovsep Derboghossian                                                      Date 6/25/08

# EXHIBIT E



This page is part of your document - DO NOT DISCARD







**20081147427**   Pages: 015

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

06/27/08 AT 08:00AM

Fee: 83.00
Tax: 0.00
Other: 0.00

Total: 83.00

Title Company

TITLE(S) :



L E A D    S H E E T

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.      Number of AIN's Shown



THIS FORM IS NOT TO BE DUPLICATED

**Exhibit E**

Page 84

Njations

Recording requested by and after
recording return to:

Jenine Mason
U.S. BANK N.A.
LM CA HB-2  CLOSING AUDIT DEPT.
9918 HIBERT ST.
SAN DIEGO CA 92131
3006309
5638-4-29
Check as applicable:



06/27/08

20081147427

[X]  **THE PROMISSORY NOTE(S) SECURED BY THIS DEED OF TRUST MAY PROVIDE FOR A VARIABLE RATE OF INTEREST.**

1st-CRE


Five Star Service Guaranteed

### TRUST DEED, SECURITY AGREEMENT
### AND ASSIGNMENT OF RENTS AND LEASES
### (INCLUDING FIXTURE FILING UNDER UNIFORM COMMERCIAL CODE)

### CALIFORNIA REAL ESTATE

This California Trust Deed, Security Agreement and Assignment of Rents and Leases (Including Fixture Filing Under Uniform Commercial Code) ("**Deed of Trust**") is made and entered into by the undersigned borrower(s), guarantor(s) and/or other obligor(s)/pledgor(s)  (collectively the "**Trustor**") in favor of U.S. Bank N.A. _____, having a mailing address of 9918 HIBERT ST., SAN DIEGO, CA 92131 _____ (the "**Trustee**"), for the benefit of U.S. BANK N.A. (the "**Beneficiary**"), as of the date set forth below.

### ARTICLE I. CONVEYANCE/MORTGAGED PROPERTY

**1.1  Grant of Deed of Trust/Security Interest.** Trustor, in consideration of the acceptance by Trustee of the trust hereunder, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the Obligations described in Section 1.3 below, irrevocably grants, bargains, sells, and conveys to Trustee and its successors in trust and assigns, forever, in trust, with power of sale, all of Trustor's estate, right, title, interest, claim and demand in and to the Mortgaged Property described in Section 1.2 below, whether now existing or hereafter acquired. To the extent any of the Mortgaged Property is personal property, Trustor, as debtor, grants to Beneficiary, as secured party, a security interest therein together with a security interest in all other personal property of whatsoever nature which is located on or used or to be used in connection with any of the Mortgaged Property, and any products or proceeds of any thereof, pursuant to the Uniform Commercial Code of the State of California (the "UCC"), on the terms and conditions contained herein. Beneficiary hereby assigns such security interest to Trustee, in trust, for the benefit of Beneficiary to be dealt with as a portion of the "Mortgaged Property" except as otherwise specified herein.

**1.2  "Mortgaged Property"** means all of the following, whether now owned or existing or hereafter acquired by the Trustor, wherever located:  all the land described below or in Exhibit A attached hereto and all tenements, hereditaments, rights-of-way, easements, appendages, licenses, privileges and appurtenances thereto belonging or in any way appertaining, including without limitation all of the right, title and interest of Trustor in and to any avenues, streets, ways, alleys, vaults, strips or gores of land adjoining that property, all rights to water, water stock, drains, drainage and air rights relating to that property, and all claims or demands of Trustor either in law or in equity in possession or expectancy of, in and to that property (the "**Land**"), together with all buildings, structures, standing timber, timber to be cut, fixtures, equipment, inventory and furnishings used in connection with the Land and improvements; all materials, contracts, drawings and personal property relating to any construction on the Land; and all other improvements now or hereafter constructed, affixed or located thereon (the "**Improvements**") (the Land and the Improvements collectively the "**Premises**"); TOGETHER with any and all leases or other agreements for the use or occupancy of the Premises, all the rents, issues, royalties and profits (including mineral, oil and gas rights and profits) or any proceeds therefrom and all security deposits and any guaranty of a tenant's obligations thereunder; all awards as a result of condemnation, eminent domain or other decrease in value of the Premises and all insurance and other proceeds of the Premises; and any and all rights of Trustor in any and all accounts, rights to payment, contract rights, chattel paper, docun....  ....ments, licenses, contracts, agreements and general intangibles relating to any of the Mortgaged Property, including without

**Exhibit E**

**Page 85**

there are not now, nor to the Trustor's knowledge after reasonable investigation, have there ever been, any Hazardous Substances (or tanks or other facilities for the storage of Hazardous Substances) stored, deposited, recycled or disposed of on, under or at any real estate owned or occupied by the Trustor during the periods that the Trustor owned or occupied such real estate, which if present on the real estate or in soils or ground water, could require Remedial Action. To the Trustor's knowledge, there are no proposed or pending changes in Environmental Laws which would adversely affect the Trustor or its business, and there are no conditions existing currently or likely to exist while the Loan Documents are in effect which would subject the Trustor to Remedial Action or other liability. The Trustor currently complies with and will continue to timely comply with all applicable Environmental Laws; and will provide the Beneficiary, immediately upon receipt, copies of any correspondence, notice, complaint, order or other document from any source asserting or alleging any circumstance or condition which requires or may require a financial contribution by the Trustor or Remedial Action or other response by or on the part of the Trustor under Environmental Laws, or which seeks damages or civil, criminal or punitive penalties from the Trustor for an alleged violation of Environmental Laws. In the event of any such circumstance or condition, the Trustor agrees, at its expense and at the request of the Beneficiary, to permit an environmental audit solely for the benefit of the Beneficiary, to be conducted by the Beneficiary or an independent agent selected by the Beneficiary and which may not be relied on by the Trustor for any purpose. This provision shall not relieve the Trustor from conducting its own environmental audits or taking any other steps necessary to comply with Environmental Laws. Any provision of this Deed of Trust to the contrary notwithstanding, if Trustor fails to perform its obligations under this subsection 2.8, any funds advanced by Beneficiary to pay for any and all remedial and removal action to clean up the Mortgaged Property and mitigate exposure to liability from any Hazardous Substance shall not be secured by the lien of this Deed of Trust but rather shall be covered by the separate Indemnity Agreement regarding hazardous substances executed concurrently herewith.

**2.9 Assignments.** The Trustor will not assign, in whole or in part, without the Beneficiary's prior written consent, the rents, issues or profits arising from the Premises.

**2.10 Right of Inspection.** The Beneficiary may at all reasonable times enter and inspect the Premises.

**2.11 Waivers by Trustor.** To the greatest extent that such rights may then be lawfully waived, the Trustor hereby agrees for itself and any persons claiming under the Deed of Trust that it will waive and will not, at any time, insist upon or plead or in any manner whatsoever claim or take any benefit or advantage of (a) any exemption, stay, extension or moratorium law now or at any time hereafter in force; (b) any law now or hereafter in force providing for the valuation or appraisement of the Premises or any part thereof prior to any sale or sales thereof to be made pursuant to any provision herein contained or pursuant to the decree, judgment or order of any court of competent jurisdiction; (c) to the extent permitted by law, any law now or at any time hereafter made or enacted granting a right to redeem from foreclosure or any other rights of redemption in connection with foreclosure of, or exercise of any power of sale under, this Deed of Trust; (d) any statute of limitations now or at any time hereafter in force; or (e) any right to require marshalling of assets by the Beneficiary.

**2.12 Assignment of Rents and Leases.** Trustor hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Beneficiary all of Trustor's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises or other agreements, either oral or written, now existing and hereafter arising which affect the Premises, Trustor's interest therein and any improvements located thereon, together with any and all security deposits, guarantees of the lessees' obligations (including any and all security thereunder) and other security under any such leases, subleases, concessions, licenses, franchises or other agreements (all of the foregoing, and any and all extensions, modifications and renewals thereof, shall be collectively referred to herein as the "Leases"), and hereby gives to and confers upon Beneficiary the right to collect all the income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Premises and any and all prepaid rent and security deposits thereunder (collectively, the "Rents"). This Deed of Trust is intended by Beneficiary and Trustor to create and Leases and shall not be deemed to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents. Trustor irrevocably appoints Beneficiary its true and lawful attorney at the option of Beneficiary at any time to demand, receive and enforce payment, to give receipts, releases and satisfactions and to sue, either in the name of Trustor or in the name of Beneficiary, for all such Rents and apply the same to the Obligations. Notwithstanding the foregoing assignment of Rents, so long as no default hereunder (as described in Article III) has occurred and remains uncured, Trustor shall have a revocable license, to collect all Rents, and to retain the same. Upon the occurrence and during the continuance of any such default, Trustor's license to collect and retain Rents shall terminate automatically. While any such default remains uncured, (a) Beneficiary may at any time, without notice, in person, by agent or by court-appointed receiver, and without regard to the adequacy of any security for the obligations secured by this Deed of Trust, enter upon any portion of the Premises and/or, with or without taking possession thereof, in its own name sue for or otherwise collect Rents (including past due amounts), and (b) without demand by Beneficiary therefor, Trustor shall promptly deliver to Beneficiary all prepaid rents, deposits relating to Rents, and all other Rents then held by or thereafter collected by Trustor, whether prior to or during the continuance of any default. Any Rents collected by or delivered to Beneficiary may be applied by Beneficiary against the obligations secured by this D_____ ____ less all expenses, including attorneys' fees and disbursements, in such order as Beneficiary shall deter____ __ __ __ sole and absolute discretion. No application of Rents against any obligation secured by this Deed of Trust or o_____ ___n b__

reconveyance, for cancellation ᴄ. .ention), Trustee may: (a)consent to the m... .ng of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Mortgaged Property.

4.2   **Reconveyance.** Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon payment of its fees, Trustee shall reconvey, without warranty, the Mortgaged Property then held hereunder. The recitals in any reconveyance executed under this Deed of Trust of any matters of fact shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

4.3   **Powers and Duties on Default.** Upon written request therefor by Beneficiary specifying the nature of the default, or the nature of the several defaults, and the amount or amounts due and owing, Trustee shall execute a written notice of default and of its election to cause the Mortgaged Property to be sold to satisfy the Obligations, and shall cause such notice to be recorded and otherwise given according to law. Thereafter, Trustee shall execute a written notice of sale, and shall cause such notice to be recorded and otherwise given as required by law. Notice of sale having been given as then required by law and not less than the time then required by law having elapsed after recordation of such notice of breach, Trustee, without demand on Trustor, shall sell the Mortgaged Property at the time and place of sale specified in the notice, as provided by statute, either as a whole or in separate parcels and in such order as it may determine, at public auction to the highest and best bidder for cash in lawful money of the United States, payable at time of sale. Trustor agrees that such a sale (or a sheriff's sale pursuant to judicial foreclosure) of all the Mortgaged Property as real estate constitutes a commercially reasonable disposition thereof, but that with respect to all or any part of the Mortgaged Property which may be personal property Trustee shall have and exercise, at Beneficiary's sole election, all the rights and remedies of a secured party under the UCC. Whenever notice is permitted or required hereunder or under the UCC, ten (10) days shall be deemed reasonable. Trustee may postpone sale of all or any portion of the Mortgaged Property, and from time to time thereafter may postpone such sale, as provided by statute. Trustee shall deliver to the purchaser its deed and bill of sale conveying the Mortgaged Property so sold, but without any covenant or warranty, express or implied. The recital in such deed and bill of sale of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person other than Trustee, including Trustor or Beneficiary, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this trust, including the cost of evidence of title search and title insurance and reasonable counsel fees in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums secured hereby in such order as Beneficiary may determine; and the remainder, if any, may be deposited by Trustee with the clerk of the superior court or municipal court, as applicable, of the county in which the sale took place, as provided in California Civil Code § 2924j.

4.4   **Reassignment of Security Interest.** At the request of Beneficiary, Trustee shall reassign to Beneficiary the security interest created hereby and after such reassignment Beneficiary shall have the right, upon the occurrence or continuance of any default, to realize upon the personal property subject to this Deed of Trust, independent of any action of Trustee, pursuant to the UCC.

4.5   **Acceptance of Trust.** Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto except Beneficiary of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

4.6   **Reliance.** Trustee, upon presentation to it of an affidavit signed by Beneficiary setting forth facts showing a default by Trustor under this Deed of Trust, is authorized to accept as true and conclusive all facts and statements therein, and to act thereon hereunder.

4.7   **Replacement of Trustee.** Beneficiary may, from time to time, as provided by statute, appoint another trustee in place and stead of Trustee herein named, and thereupon Trustee herein named shall be discharged and the trustee so appointed shall be substituted as Trustee hereunder, with the same effect as if originally named Trustee herein.

## ARTICLE V. MISCELLANEOUS

In addition to all other miscellaneous provisions under the Loan Documents which are expressly incorporated as a part of this Deed of Trust, the following provisions will also apply:

5.1   **Trustor's Right to Possession.** Trustor may be and remain in possession of the Mortgaged Property for so long as it is not in default hereunder or under the terms of the Note and Trustor may, while it is entitled to possession of the Mortgaged Property, use the same.

5.2   **Maximum Interest.** No provision of this Deed of Trust or of the Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any excess of interest in such respect is herein or in the Note provided for, neither Trustor nor its successors or assigns shall be obligated to pay that portion of such interest which is in excess of the maximum permitted by law, and the right to demand the payment of any s... shall be and is hereby waived and this Section 5.2 shall control any provision of this Deed of Trust or the Note which is inconsistent herewith.

5.15  Riders. The rider(s) attached hereto and recorded together with this Deed of Trust are hereby fully incorporated into this Deed of Trust. [Check applicable box(es)]  ☐ Condominium Rider  ☐ Second Deed of Trust Rider  ☐ Construction Loan Rider  ☒ Other(s) (Specify) BORROWER'S CERTIFICATE AND INDEMNITY REGARDING HAZARDOUS SUBSTANCES; Small Business Administration Program Rider

IN WITNESS WHEREOF, the undersigned has/have executed this Deed of Trust as of June 20, 2008

(Individual Trustor)

Printed Name Hovsep Derboghossian

Trustor Name (Organization) _____ N/A _____

a _____

By _____

(Individual Trustor)

Printed Name _____

Name and Title _____ N/A _____

By _____

Name and Title _____ N/A _____

(Beneficiary Address)

9918 HIBERT ST.
SAN DIEGO, CA  92131

(Trustor Address)

718 West Wilson Avenue
Glendale, CA  91203

State of _____ )
County of _____ )

On _____ before me, _____
personally appeared Hovsep Derboghossian _____ (here insert name and title of the officer)
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they  executed the same in his/her/their  authorized capacity(ies), and that by his/her/their  signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

1714CA

**Exhibit E** Page 88

## Exhibit "A"

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 52, Page 18 of Maps in the Office of the County Recorder of said County.

Asssesor's Parcel No. 5638-004-029

## TO BE ATTACHED TO THE DEED OF TRUST OR MORTGAGE:

### BORROWER'S CERTIFICATE AND INDEMNITY REGARDING HAZARDOUS SUBSTANCES

In connection with and as partial consideration for the making of a conditional commitment to lend (the "Commitment") of $1,313,200.00 by, U.S. Bank National Association ("Lender"), to Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES ("Borrower"), Borrower hereby certifies to Lender and agrees as follows:

1A.     Except as disclosed in Section 1B below, Borrower has no knowledge after due investigation of (a) the presence of any "Hazardous Substances" (as defined below) on that certain real property situated in Los Angeles County, State of California, located at 718 West Wilson Avenue, Glendale, CA 91203, legally described in Exhibit A attached hereto (the "Property"), or (b) any spills, releases, discharges, disposal, storage or manufacture of Hazardous Substances that have occurred or are presently occurring on or onto the Property or any adjacent properties, or (c) any spills or disposal of Hazardous Substances that have occurred or are presently occurring off the Property as a result of any construction on or operation and use of the Property.

1B.     Information pertaining to Hazardous Substances:_____

_____

2.     In connection with the construction on or operation and use of the Property, Borrower represents for itself, its contractors, subcontractors and any other of its agents, that, as of the date of this Certificate, it has no knowledge after due investigation of any failure to comply with all applicable local, state and federal environmental laws, regulations, ordinances and administrative and judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport and disposal of any Hazardous Substances.

3.     Borrower represents and warrants to Lender that it has duly investigated the present and past uses of the Property and has made due inquiry of the appropriate governmental agencies and offices having jurisdiction over the Property and the laws regulating the environment, as to whether the Property or any property in the immediate vicinity of the Property is or has been the site of storage of or contamination by any Hazardous Substances. Borrower will provide Lender with a written summary of its investigations and copies of all inquiries and responses.

4.     Borrower agrees to immediately notify Lender if Borrower becomes aware of (a) any Hazardous Substances or other environmental problem or liability with respect to the Property, or any adjacent property, or (b) any lien, action or notice of the nature described in paragraph 2 above. At its own cost, Borrower will take all actions which are necessary or desirable to clean up any Hazardous Substances affecting the Property, including removal, containment or any other remedial action required by applicable governmental authorities.

5.     Borrower agrees to indemnify and hold Lender harmless from and against any and all claims, demands, damages, losses, liens, liabilities, penalties, fines lawsuits and other proceedings and costs and expenses (including attorneys' fees), arising directly or indirectly from or out of, or in any way connected with (a) the inaccuracy of the certifications contained herein, (b) any activities on the Property during Borrower's ownership, possession or control of the Property which directly or indirectly result in the Property or any other property becoming contaminated with Hazardous Substances (c) the discovery of Hazardous Substances on the Property or any other property, and (d) the cleanup of Hazardous Substances from the Property or any other properties. Borrower acknowledges that it will be solely responsible for all costs and expenses relating to the cleanup of Hazardous Substances from the Property or from any other properties which become contaminated with Hazardous Substances as a result of activities on or the contamination of the Property.

**Exhibit E** Page 90

6.  Borrower's obligations under this Certificate are unconditional and shall not be limited by any nonrecourse or other limitations of liability provided for in any document relating to the Loan ("Loan Documents"). The representations, warranties and covenants of Borrower set forth in this Certificate (including without limitation the indemnity provided for in paragraph 5 above) shall continue in effect and, to the extent permitted by law, shall survive the transfer of the Property pursuant to foreclosure proceedings (whether judicial or nonjudicial), by deed in lieu of foreclosure or otherwise. Borrower acknowledges and agrees that its covenants and obligations hereunder are separate and distinct from its obligations under the Loan and the Loan Documents.

7.  Borrower also agrees to pay all costs and expenses incurred in any examination of the property that is required by Lender to determine the presence, nature and extent of any Hazardous Substances. Any such required examination shall be made by a qualified environmental auditor acceptable to Lender.

8.  As used in this Certificate, "Hazardous Substances" shall mean: any substance or material defined or designated as hazardous or toxic waste, hazardous or toxic material, or hazardous, toxic or radioactive substance, (or designated by any other similar term), by any applicable federal, state or local statute, regulation or ordinance now in effect or in effect at any time during either the term of the Loan Documents or the period of time Borrower remains in possession, custody or control of the Property following foreclosure of the Loan Documents or acceptance by Lender of a deed in lieu of foreclosure.

9.  This certificate shall be binding upon and inure to the benefit of Lender and Borrower and their respective heirs, representatives, successors and assigns.

**IN WITNESS WHEREOF**, Borrower has executed this Certificate and Indemnity as of **June 20, 2008**

**BORROWER: Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES**

By: _____
      Hovsep Derboghossian

## SMALL BUSINESS ADMINISTRATION PROGRAM RIDER

THE LOAN SECURED BY THIS LIEN WAS MADE UNDER A SMALL BUSINESS ADMINISTRATION PROGRAM.  The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this document, then under SBA regulations:

a)  When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b)  Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**Exhibit E** Page 92

## ACKNOWLEDGMENT

State of California
County of _LOS Angeles_

On _June 25, 2008_ before me, _Arleen Bedrossian, A Notary public_
personally appeared _Husep Derbaghossian_
(here insert name and title of the officer)

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Arleen Bedrossian_                              (Seal)

**Exhibit E** Page 93

## ACKNOWLEDGMENT

State of California
County of LOS Angeles

On June 25, 2008 before me, Arleen Bedrossian (Notary Public)

(here insert name and title of the officer)

personally appeared Housep Derboghossian

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Arleen Bedrossian_

ARLEEN BEDROSSIAN
Commission # 1769482
Notary Public - California
Los Angeles County
My Comm. Expires Jul 22, 2011

(Seal)

**Exhibit E** Page 94

# EXHIBIT F

# NATIONS TITLE COMPANY
## —of California—
2001 East Glndstone, Unit F
Glendora, CA 91740 ● (888) 881-8850 ● Fax: (909) 542-3397

as Agent for
TransUnion Title Insurance Company

## PRELIMINARY REPORT

Regency Estates
718 West Wilson
Glendale, CA

*escrow officer*

Attn: ~~Arleen~~ Dan → *Title Officer*

Title Order No.:      03006309-DB1
Reference No.:        0-735

Property Address:     718 West Wilson Avenue, Glendale, CA 91203
Borrower/Buyer:       Hovsep ~~Baghoussian~~      vesting: *Hovset Derboghossian*
                      *Derbogh osian*                      *a married man as his sole and*
                                                           *Seperate Property   per Arleen*

Nations Title Company of California hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in Exhibit "B" attached. Copies of the Policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the Exceptions and Exclusions set forth in the attached Exhibit "B" of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this Preliminary Report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of May 7, 2008 at 7:30 A.M.

Daniel Bruno
TITLE OFFICER

Page 1 of 17
**Exhibit F** Page 96

Order No.: 03006309-DB1

# NOTICE

## TO BUYERS/SELLERS/BORROWERS

**ALL MONIES/FUNDS WHICH YOU ARE REQUIRED TO DEPOSIT IN CONJUNCTION WITH AN ESCROW CLOSING MUST BY CALIFORNIA LAW\*, BE DEPOSITED/HELD PRIOR TO DISBURSEMENT AS FOLLOWS:**

1. WIRED FUNDS MAY BE DISBURSED ON THE SAME DAY AS THOSE FUNDS ARE DEPOSITED.

2. CASHIERS OR TELLER'S CHECKS MUST BE RECEIVED AND DEPOSITED ONE (1) BUSINESS DAY PRIOR TO THE DATE OF DISBURSEMENT.

3. ALL OTHER CHECKS, INDIVIDUAL, PARTNERSHIP, CORPORATE, AND OTHERWISE, MUST BE DEPOSITED AND HELD FOR A PERIOD OF THREE (3) TO SEVEN (7) BUSINESS DAYS PRIOR TO THE DATE OF DISBURSEMENT, DEPENDING ON ORIGIN.

4. "OFFICIAL CHECKS" IN AN AMOUNT LESS THAN $10,000.00 MAY NOT BE CONSIDERED GOOD FUNDS AND MAY BE SUBJECT TO THE SAME REQUIREMENTS IN ITEM 3 ABOVE.

Page 2 of 17

**Exhibit F**   Page 97

Order No.: 03006309-DR1

# Privacy Policy Notice

Privacy Notice (15 U.S.C. 6801 and 16 CFR Part 313):

We collect nonpublic personal information about you from information you provide on forms and documents and from other people such as your lender, real estate agent, attorney, etc.  We do not disclose any nonpublic personal information about our customers to anyone, except as permitted by law. We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you.  We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**Exhibit F  Page 98**

Order No.: 03006309-OB1

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A Fee

Title to said estate or interest at the date hereof is vested in:

Remy Mazmanian, a Single Man

The land referred to in this Report is situated in the State of CALIFORNIA, County of Los Angeles and is described as follows:

**(See "Legal Description" Exhibit A Attached)**

**Exhibit F** Page

Order No.: 03006309-DBI

# Exhibit "A"
# Legal Description

All that certain real property situated in the City of Glendale, County of Los Angeles, State of California, described as follows:

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 52, Page 18 of Maps in the Office of the County Recorder of said County.

**Assessor Parcel No(s).:**       5638-004-029

**Exhibit F** Page 100

Order No.: 03006309-DB1

# SCHEDULE B

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy would be those as shown on the following pages.

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2008 - 2009 which are a lien not yet payable.

2.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2007 – 2008:

    | | |
    |---|---|
    | 1st Installment: | $4,890.62 Delinquent |
    | Penalty: | $489.06 |
    | Delinquent: | December 10, 2007 |
    | 2nd Installment: | $4,890.62 Delinquent |
    | Penalty: | $499.06 |
    | Delinquent: | April 10, 2008 |
    | Exemption: | None Shown |
    | Code Area: | 0011689 |
    | Assessor Parcel No.: | 5638-004-029 |

3.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

4.  Assessments, if any, for community facility districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts. Said assessments are collected with the county taxes.

5.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

6.  Covenants, conditions, and restrictions as set forth in an instrument recorded in Book 3547, Page 193, of Official Records, but omitting any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title 42 of the United States Code, of (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: Section 12956.1 of the Government Code provides the following: If this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.1 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Order No.:  03006309-DB1

## SCHEDULE B (CONTINUED)

Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

7.   An unrecorded lease, affecting the premises herein stated, executed by and between the parties named herein, for the term and upon the terms, covenants, conditions and provisions therein contained.

|  |  |
|---|---|
| Type of Lease: | Unrecorded Lease |
| Dated: | November 3, 1994 |
| Lessor: | Robert L. Hoskins and Devin Industries Inc., a California Corporation |
| Lessee: | Drilube Company, a California Corporation and Walter J. Fairfax, Jr. |
| Disclosed by: | Subordination Agreement |

8.   The Effect of an Instrument:

Recorded:        February 1, 1995 as Instrument No. 95-168692 of Official Records

9.   An easement or lesser right,

|  |  |
|---|---|
| For: | Pole lines |
| Affects: | The Southerly portion of said land |

10.   Rights of tenants in possession.

11.   Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

|  |  |
|---|---|
| Amount: | $1,400,000.00 |
| Dated: | August 31, 2007 |
| Trustor: | Remy Mazmanian |
| Trustee: | Asset Foreclosure Services, a California Corporation |
| Beneficiary: | Bridgelock Capital, a California Corporation |
| Recorded: | September 5, 2007 as Instrument No. 2007-2060211 of Official Records |
| Loan No.: | None Shown |

Order No.: 03006309-DItI

## SCHEDULE B (CONTINUED)

12. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $233,000.00 |
| Dated: | February 11, 2008 |
| Trustor: | Remy Mazmanian, a Single Man |
| Trustee: | JLC Investments, Inc., a California Corporation |
| Beneficiary: | Garegin Lusikian |
| Recorded: | February 15, 2008 as Instrument No. 2008-025418 of Official Records |
| Loan No.: | None Shown |

13. A lien for Notice of Lien in favor of United States Environmental Protection Agency

| | |
|---|---|
| Against: | Remy Mazmanian |
| Amount: | None Shown |
| Recorded: | March 7, 2008 |
| Instrument No.: | 2008-0401128, of Official Records |

14. We will require a Statement of Information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matter which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

Parties:          All Parties

(Note: The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file. Please be sure said Statements are as complete as possible and signed by the respective parties. Unsigned Statements will not be acceptable.

Order No.: 03006309-DB1

# NATIONS TITLE COMPANY
## —of California—
2001 East Gladstone, Unit F
Glendora, CA 91740 ● (888) 881-8850 ● Fax: (909) 542-3397

WIRING INFORMATION REPORT

PLEASE DIRECT WIRES TO:

COMERICA BANK – CALIFORNIA
2015 MANHATTAN BEACH BLVD.
REDONDO BEACH, CALIFORNIA 90278-1205

ACCOUNT NUMBER:        1893985315
ROUTING NUMBER:        121137522

TO CREDIT:             NATIONS TITLE COMPANY OF CALIFORNIA

PLEASE REFERENCE:      TITLE OFFICER: DANIEL BRUNO

TITLE ORDER NUMBER:    03006309

NO POLICY WILL BE ISSUED UNDER THIS ORDER UNTIL WE ARE FURNISHED WITH A STATEMENT OF INFORMATION FROM ALL PARTIES SHOWN IN THIS REPORT AND ALL NEW OWNERS, IF ANY.

DISBURSEMENT LAW:
ASSEMBLY BILL 512 (CHAPTER 598, STATUES OF 1989), WHICH ADDED SECTION 12413.1 TO THE INSURANCE CODE OF THE STATE OF CALIFORNIA WAS EFFECTIVE JANUARY 1, 1990. EXCEPT FOR FUNDS DEPOSITED BY WIRE TRANSFER, OTHER ELECTRONIC PAYMENT, OR CASH, THIS LAW PROHIBITS ALL TITLE INSURANCE COMPANIES, CONTROLLED ESCROW COMPANIES, AND UNDERWRITTEN TITLE COMPANIES FROM DISBURSING FUNDS FROM AND ESCROW OF SUB-ESCROW ACCOUNT, UNTIL THE DAY THESE FUNDS ARE MADE AVAILABLE TO THE DEPOSITOR PURSUANT TO PART 229 OF TITLE 12 OF THE CODE OF FEDERAL REGULATIONS, (REG. CC). UNDER REG. CC, ITEMS SUCH AS CASHIERS, CERTIFIED, OR TELLER'S CHECKS MAY BE AVAILABLE FOR DISBURSEMENT ON THE BUSINESS DAY FOLLOWING THE BUSINESS DAY OF DEPOSIT; HOWEVER, OTHER FORMS OF DEPOSITS MAY CAUSE EXTENTED DELAYS IN THE CLOSING OF THE ESCROW.

NATIONS TITLE COMPANY OF CALIFORNIA WILL NOT BE RESPONSIBLE FOR ACCRUALS OF INTEREST RESULTING FROM COMPLIANCE WITH THE DISBURSEMENT RESTRICTIONS MANDATED BY THIS LAW.

**Exhibit F** Page 104

EXHIBIT B

## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS

### 1. CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or of area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land had been recorded in the public records at date of policy.

    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from coverage any taking which has occurred prior to date of policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a)  whether or not recorded in the public records at date of policy, but created, suffered, assumed or agreed to by the insured claimant;
    (b)  not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy.;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to date of policy; or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at date of policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6   Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.  Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a)  Unpatented mining claims;
    (b)  reservations or exceptions in patents or in Acts authorizing the issuance thereof;
    (c)  water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

REV. 10/92

Exhibit F

EXHIBIT B (Continued)

## 2. AMERICAN LAND TITLE ASSOCIATION (ALTA) RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)

### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental policy power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   * land use
   * improvements on the land
   * land divisions
   * environmental protection
   This Exclusion does not apply to violations or enforcement of these matters which appear in the Public Records at the Policy date. This Exclusion does not limit the zoning coverage described in Items 12 and 13 of the Covered Risks.

2. The right to take the land by condemning it, unless:
   * a notice of exercising the right appears in the Public Records at the Policy Date.
   * the taking happened before the Policy Date and is binding on you if You bought the land without knowing of the taking.

3. Title Risks:
   * that are created, allowed, or agreed to by you
   * that are Known to You, but not to Us, on the Policy Date - unless they appear in the Public Records
   * that result in no loss to You
   * that first occur after the Policy Date - this does not limit the coverage the labor or material lien coverage in Item 8 of Covered Title Risks.
4. Failure to pay value for Your Title.

5. Lack of a right:
   * to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A, or
   * in streets, alleys, or waterways that touch your Land,
   This Exclusion does not limit the access coverage described in Item 5 of Covered Title Risks.

### EXCEPTIONS FROM COVERAGE

In addition to the Exclusions, you are not insured against loss, costs, attorneys' fees and expenses resulting from:

1. Someone claiming an interest in your land by reason of:

   A. Easements not shown in the public records
   B. Boundary disputes not shown in the public records
   C. Improvements owned by your neighbor placed on your land

2. If, in addition to a single family residence, your existing structure consists of one or more Additional Dwelling Units, Item 12 of Covered Title Risks does not insure you against loss, costs, attorneys' fees, and expenses resulting from:

   A. The forced removal of any Additional Dwelling Unit, or,
   B. The forced conversion of any Additional Dwelling Unit back to its original use,

   If said Additional Dwelling Unit was either constructed or converted to use as a dwelling unit in violation of any law or government regulation.

REV. 10/92

**Exhibit F** Page 106

EXHIBIT B (Continued)

3.   AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92) WITH ALTA ENDORSEMENT - FORM 1
COVERAGE

**and**

**AMERICAN LAND TITLE ASSOCIATION LEASEHOLD LOAN POLICY (10-17-92)
WITH ALTA ENDORSEMENT - FORM 1 COVERAGE**

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or
expenses which arise by reason of:

1.   (a)   Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting,
regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or locations of any
improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel
of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental
regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or
alleged violation affecting the land had been recorded in the public records at Date of policy.
(b)   Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or
encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2.   Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from
coverage any taking which has occurred prior to Date of policy which would be binding on the rights of a purchaser for value without knowledge.

3.   Defects, liens, encumbrances, adverse claims or other matters:
(a)   created, suffered, assumed or agreed to by the insured claimant;
(b)   not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to
the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
(c)   resulting in no loss or damage to the insured claimant;
(d)   attaching or created subsequent to date of policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over
any statutory liens for services, labor or materials, or to the extent insurance is afforded herein as to assessments for street improvements under
construction or completed at date of policy); or
(e)   resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4.   Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at date of policy, or the inability or failure of any
subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5.   Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction  evidenced by the insured
mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.   Any statutory lien for services, labor or materials (or the claim or priority of any statutory lien for services, labor or materials over the lien of the insured
mortgage) arising from the improvement or work related to the land which is contracted for and commenced subsequent to date of policy and is not
financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at date of policy the insured has advanced or is
obligated to advance.

7.   Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal
bankruptcy, state insolvency or similar creditors' rights laws, that is based on:
(i)   the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
(ii)   the subordination of the interest of the insured mortgagee as the result of the application of the doctrine of equitable subordination; or
(iii)   the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results
from the failure:
(a)   to timely record the instrument of transfer; or
(b)   of such recordation to impart notice to purchaser for value or a judgment or lien creditor.
The above Policy forms may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage,
the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.   Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or
by the public records.
Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of
such agency or by the public records.

2.   Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which
may be asserted by persons in possession thereof.

3.   Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.   Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are
not shown by the public records.

5.   (a)   Unpatented mining claims;
(b)   reservations or exceptions in patents or in Acts authorizing the issuance thereof;
(c)   water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

REV. 10/92

**Exhibit F** Page 107

EXHIBIT B (Continued)

## 4. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
### and
### AMERICAN LAND TITLE ASSOCIATION LEASEHOLD OWNER'S POLICY (10-17-92)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation  (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions of or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land had been recorded in the public records at date of policy.

    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from coverage any taking which has occurred prior to date of policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a)  whether or not recorded in the public records at date of policy, but created, suffered, assumed or agreed to by the insured claimant;
    (b)  not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy.;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to date of policy; or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or the estate of interest insured by this policy.

4.  Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws, that is based on:
    (a)  the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
    (b)  the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
        (i)  to timely record the instrument or transfer; or
        (ii)  of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

The above Policy forms may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exception from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.  Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a)  Unpatented mining claims;
    (b)  reservations or exceptions in patents or in Acts authorizing the issuance thereof;
    (c)  water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

**Exhibit F** Page 108

EXHIBIT B (Continued)

## 5. CALIFORNIA LAND TITLE ASSOCIATION HOMEOWNERS'S POLICY OF TITLE INSURANCE (6-2-98)

### EXCLUSIONS

In Addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:

   (a) building
   (b) zoning
   (c) land use
   (d) improvements on the land
   (e) land division
   (f) environmental protection

   This exclusion does not apply to violations or the enforcement of these matters if notice of the violation appears in the public records at the policy date.

   This exclusion does not limit the coverage described in covered risk 14, 15, 16, 17 or 24.

2. The failure of your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the public records at the policy date.

3. The right to take the land by condemning it unless:

   (a) a notice of exercising the right appears in the public records at the policy date; or
   (b) the taking happened before the policy date and is binding on you if you bought the land without knowing of the taking.

4. Risks:

   (a) that are created, allowed or agreed to by you, whether or not they appear in the public records;
   (b) that are known to you at the policy date, but not to us, unless they appear in the public records at the policy date;
   (c) that result in no loss to you; or
   (d) that first occur after the policy date - this does not limit the coverage described in covered risk 7, 8.d, 22, 23, 24, or 25.

5. Failure to pay value for your title.

6. Lack of a right:

   (a) to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   (b) in streets, alleys or waterways that touch the land.

This Exclusion does not limit the coverage described in covered risk 11 or 18.

Exhibit F
Page 109

# EXHIBIT G

## ENVIRONMENTAL QUESTIONNAIRE
## AND DISCLOSURE STATEMENT

LOAN # _____

The undersigned, as owner or buyer of the Property described on Exhibit "A" attached hereto, is familiar with the operations presently conducted on the Property, has made a reasonably diligent inquiry into the former uses of the Property and hereby declares and certifies that to the best of its knowledge the following information is true and correct.

A response is required for each item.  Please note and continue answers on a separate sheet, if necessary.

## COMMERCIAL REAL ESTATE

1. Current/Former Uses of the Property:

A.  Provide dates for construction of current improvements and any improvements which have been demolished or removed.

B.  Description of current uses.

C.  Names of all owners since 1940.

D.  Names of previous occupants.

E.  Description of all previous uses since 1940.

**Exhibit G** Page 111

F.  Current and past uses of adjacent property.

_____

_____

_____

G.  Was the Property ever parceled differently?

(_____) Yes                    (__X__) No

Were there ever different addresses for the site?

(_____) Yes                    (__X__) No

If yes, please give full details.

_____

_____

_____

H.  Are there, or have there ever been any disposal facilities, dump sites or facilities involving hazardous waste within 2,000 feet of the site?

(_____) Yes                    (__X__) No

If yes, describe.

_____

_____

_____

2.  <u>Asbestos</u>

A.  Is there asbestos currently in any of the construction materials contained in the building?

(_____) Yes                    (__X__) No

If so, Where?

_____

**Exhibit G** Page 112

2

B.  If so, has a survey been conducted to assess the type, amount, location and condition of asbestos on the site?

(_____) Yes                    (___X___) No

If so, please attach a copy of any survey report.

C.  Have asbestos air samples been taken?

(_____) Yes                    (___X___) No

If so, what were the results?

_____
_____
_____

3.  Polychlorinated Biphenyls ("PCBs")

A.  Have PCBs been used in electrical transformers, capacitors or other equipment at the property?

(_____) Yes                    (___X___) No

B.  If so, please describe the use and quantity of PCBs used on the property.

_____
_____

4.  Fuel/Chemical Storage Tanks, Drums, and Pipelines.

A.  Are there any above ground or underground gasoline, diesel, fuel oil, chemical storage tanks, or other hazardous materials on the Property?

(_____) Yes                    (___X___) No

If so please describe substances stored and capacity of tank(s).

_____
_____

**Exhibit G** Page 113
3

B.  Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes                    (__X__) No

When was the most recent test?

_____

Results?

_____
_____

Provide an inventory of materials, quantity, age, construction material, and leak protection systems on each tank.

C.  Are any other chemicals stored on the Property in drums or other containers?

(_____) Yes                    (__X__) No

If so, please describe the substances, quantities stored, and types and conditions of container.

_____
_____
_____

D.  Have there been any spills, leaks, or other releases of chemicals on the Property?

(_____) Yes                    (__X__) No

If so, please describe the chemicals and quantities released, any cleanup measures taken, and the results of any soil or ground water samples performed to detect the presence of the chemicals spilled, leaked, or released on the Property.

_____
_____
_____

E.  Please attach copies of any permits or licenses pertaining to the use, storage, handling, or disposal of chemicals on the Property.

**Exhibit G**
4 **Page 114**

F. Are any of the tanks known to leak now or to have leaked in the past?

(_____) Yes          (__X__) No

5. <u>Water Discharges</u>

A. List all sources of waste water discharges to surface waters, ground waters, septic systems, or holding ponds.

None

B. List all sources of waste water discharges to public sewer systems and storm collection systems.

None

C. Please attach copies of any water discharge permits, licenses, or registration pertaining to operations on the Property.

6. <u>Air Emissions</u>

A. Describe air emissions from each source of air pollutants, including fuel burning equipment. Describe type of fuel burned.

N/A

B. Describe air pollution control equipment used to reduce emissions for each source of air emissions.

N/A

C. Are air emissions monitored?

(_____) Yes          (__X__) No

If so, please indicate frequency of monitoring and attach results.

D. Please attach copies of any air permits, licenses, or registrations pertaining to operations on the Property.

7. <u>Waste Disposal</u>

    A.  Describe the types of liquid wastes, other than waste water described above, and solid wastes generated at the Property.

_None_

    B.  Describe how the liquid and solid wastes generated at the Property are disposed.

_None_

    C.  Please attach copies of any waste disposal permits or licenses pertaining to operations on the Property.

SOIL CONTAMINATION

    A.  Have there been any spills, leaks or other releases of hazardous materials on the Property?

(_____) Yes                  (__X__) No

    If so, describe the materials and quantities released, any mitigation measures, and the results of soil or ground water samples performed.

    B.  Are there any known spills, leaks or other releases on adjacent sites?

(_____) Yes                  (__X__) No

    Is there evidence of contamination plumes moving onto the site from adjacent sites?

(_____) Yes                  (__X__) No

## AGRICULTURAL PROPERTY

If the property has been or is used for agricultural purposes, the following additional information should be provided.

    A.  Have pesticides, herbicides, or other agricultural chemicals been applied to the Property?

        (_____) Yes             (___X___) No

    If so, please describe the locations where such pesticides or chemicals were applied, the type of pesticides or chemicals applied in each area, and the results of any soil or ground water analyses performed to detect pesticides or chemicals used at the site.

_____

_____

    B.  Have pesticides, herbicides or other agricultural chemicals been mixed, formulated, rinsed, or disposed of on the Property?

        (_____) Yes             (___X___) No

    If so, please describe the locations where such pesticides were mixed, formulated, rinsed, or disposed, the type of pesticides or chemicals mixed, formulated, rinsed, or disposed of at each location, and the results of any soil or ground water analyses performed to detect pesticides or chemicals mixed, formulated, rinsed, or disposed at the site.

_____

_____

## INDUSTRIAL PROPERTY

If the Property has been or is used for industrial purposes, the following additional information should be provided:

    A.  Has the Property been used for disposal of any liquid or solid waste?

        (_____) Yes             (___X___) No

If so, describe the location of all disposal sites, the type of wastes disposed at each site, the results of any soil or groundwater samples taken in the vicinity of each site, and the manner in which each site not presently in use was closed.

_____

_____

_____

B.   Have evaporation or storage ponds been located on the Property?

(_____) Yes                         (___X___) No

If so, describe the location of all ponds, the type of wastes placed in each pond, the results of any soil or ground water samples taken in the vicinity of each pond, and the manner in which each pond not presently in use was closed.

_____

_____

_____

C.   Have waste water treatment facilities, such as acid neutralization vaults, been located on the Property?

(_____) Yes                         (___X___) No

If so, please describe the location of all facilities, the types of wastes treated in each facility, the results of any soil or ground water samples taken in the vicinity of each facility, and the manner in which each facility not presently in use was closed,

_____

_____

_____

**Exhibit G** Page 118

8

D.  Are there raw chemicals or waste chemical storage areas on the Property?

(_____) Yes                    (___X___) No

If so, please describe the location of all such areas, the type of products or wastes stored in each area, the amount of products or wastes stored in each area, the results of any soil or ground water samples taken in the vicinity of each area, and the manner in which each are not presently in use was closed.

_____
_____
_____

## STUDIES, REPORTS, CITATIONS, ENFORCEMENT

A.  Attach a copy of each environmental study, report, or assessment which has been performed on the Property's soil, air, or water conditions.

B.  Have any federal, state, or local agencies ever investigated cited or been involved on the Property for violations of any environmental law?

(_____) Yes                    (___X___) No

If so, describe in full.

_____
_____
_____

C.  Has any public agency listed the Property as a site requiring or qualifying for cleanup under any environmental law?

(_____) Yes                    (___X___) No

If so, describe in full

_____
_____
_____

**Exhibit G** Page 119

### ADJOINING PROPERTY

A.  Are there any of the above-referenced hazardous substances or pollutants present on adjoining properties or properties in the immediate area of the Property?

(_____) Yes                    (  X  ) No

Dated: _____05 — 29 — 08_____

Buyer: _____

_____

_____

Seller: _____

_____

_____

Attachment:

Exhibit "A" - Legal Description

# EXHIBIT H

# ✓NATIONS TITLE COMPANY
## —of California—
2001 East Gladstone, Unit F
Glendora, CA  91740 ● (888) 881-8650 ● Fax: (909) 542-3397

as Agent for
TransUnion Title Insurance Company

## PRELIMINARY REPORT

Regency Estates
718 West Wilson
Glendale, CA

Attn: Arleen

Title Order No.:         03006309-DB1
Reference No.:           0-735

Property Address:     718 West Wilson Avenue, Glendale, CA  91203
Borrower/Buyer:       Hovsep Boghoussian

*Vesting per Arleen:
HOvsep Derboghossian
a married man as his
sole and seperate
Property*

Nations Title Company of California hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in Exhibit "B" attached.  Copies of the Policy forms should be read.  They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the Exceptions and Exclusions set forth in the attached Exhibit "B" of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.  It is important to note that this Preliminary Report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of June 16, 2008 at 7:30 A.M.

✓Daniel Bruno
TITLE OFFICER

JUN. 16. 2008   4:40PM          RANK/SBA DIV                          NO. 7282   P. 3/18

Order No.: 03006309-DB1

## NOTICE

### TO BUYERS/SELLERS/BORROWERS

ALL MONIES/FUNDS WHICH YOU ARE REQUIRED TO DEPOSIT IN CONJUNCTION WITH AN ESCROW CLOSING MUST BY CALIFORNIA LAW*, BE DEPOSITED/HELD PRIOR TO DISBURSEMENT AS FOLLOWS:

1. WIRED FUNDS MAY BE DISBURSED ON THE SAME DAY AS THOSE FUNDS ARE DEPOSITED.

2. CASHIERS OR TELLER'S CHECKS MUST BE RECEIVED AND DEPOSITED ONE (1) BUSINESS DAY PRIOR TO THE DATE OF DISBURSEMENT.

3. ALL OTHER CHECKS, INDIVIDUAL, PARTNERSHIP, CORPORATE, AND OTHERWISE, MUST BE DEPOSITED AND HELD FOR A PERIOD OF THREE (3) TO SEVEN (7) BUSINESS DAYS PRIOR TO THE DATE OF DISBURSEMENT, DEPENDING ON ORIGIN.

4. "OFFICIAL CHECKS" IN AN AMOUNT LESS THAN $10,000.00 MAY NOT BE CONSIDERED GOOD FUNDS AND MAY BE SUBJECT TO THE SAME REQUIREMENTS IN ITEM 3 ABOVE.

Exhibit H Page 123

JUN. 16. 2008   4:40PM       BANK/SBA DIV                                  NO. 7282   P. 4/18

Order No.: 03006309-DB1

# Privacy Policy Notice

Privacy Notice (15 U.S.C. 6801 and 16 CFR Part 313):

We collect nonpublic personal information about you from information you provide on forms and documents and from other people such as your lender, real estate agent, attorney, etc. We do not disclose any nonpublic personal information about our customers to anyone, except as permitted by law. We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you. We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Page 3 of 17

**Exhibit H Page 124**

JUN. 16. 2008  4:40PM   BANK/SBA. DIV.                    NO. 7282   P. 5/18

Order No.: 03006309-DB1

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A Fee

Title to said estate or interest at the date hereof is vested in:

Remy Mazmanian, a Single Man

The land referred to in this Report is situated in the State of CALIFORNIA, County of Los Angeles and is described as follows:

### (See "Legal Description" Exhibit A Attached)

**Exhibit H** Page 125

JUN. 16. 2008  4:40PM    BANK/SBA. DIV                                    NO. 7282   P.  6/18

Order No.: 03006309-DB1

# Exhibit "A"
## Legal Description

All that certain real property situated in the City of Glendale, County of Los Angeles, State of California, described as follows:

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 52, Page 18 of Maps in the Office of the County Recorder of said County.

Assessor Parcel No(s).:        5639-004-029 ✓

Page 5 of 17

**Exhibit H**
**Page 126**

JUN. 16. 2008   4:40PM          BANK/SBA DIV                    NO. 7282   P. 7/16

Order No.: 03004300-DRI

# SCHEDULE B

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy would be those as shown on the following pages.

*Pay if assessed* 1. Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2008 - 2009 which are a lien not yet payable.

*Pay if due* 2. General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2007 – 2008:

| | |
|---|---|
| 1st Installment: | $4,890.62 Delinquent |
| Penalty: | $489.06 |
| Delinquent: | December 10, 2007 |
| 2nd Installment: | $4,890.62 Delinquent |
| Penalty: | $499.06 |
| Delinquent: | April 10, 2008 |
| Exemption: | None Shown |
| Code Area: | 0011689 |
| Assessor Parcel No.: | 5638-004-029 |

*Pay if assessed out* 3. The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

*Pay if assessed out* 4. Assessments, if any, for community facility districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts. Said assessments are collected with the county taxes.

*103.5* 5. Water rights, claims or title to water in or under said land, whether or not shown by the public records.

*IDR* 6. Covenants, conditions, and restrictions as set forth in an instrument recorded in Book 3547, Page 193, of Official Records, but omitting any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title 42 of the United States Code, of (b) relates to handicap, but does not discriminate against handicapped persons.

Note:  Section 12956.1 of the Government Code provides the following:  If this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.1 of the Government Code.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Page 6 of 17

**Exhibit H**
**Page 127**

JUN. 16. 2008  4:40PM       BANK/SBA. DIV                    NO. 7282   P. 8/18

Order No.: 03006309-DB1

## SCHEDULE B (CONTINUED)

Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

OUT COPY

7. An unrecorded lease, affecting the premises herein stated, executed by and between the parties named herein, for the term and upon the terms, covenants, conditions and provisions therein contained.

| | |
|---|---|
| Type of Lease: | Unrecorded Lease |
| Dated: | November 3, 1994 |
| Lessor: | Robert L. Hoskins and Devin Industries Inc., a California Corporation |
| Lessee: | Drilube Company, a California Corporation and Walter J. Fairfax, Jr. |
| Disclosed by: | Subordination Agreement |

OK

8. The Effect of an Instrument:

Recorded:   February 1, 1995 as Instrument No. 95-168692 of Official Records

OK COPY

9. An easement or lesser right,

For:      Pole lines
Affects:  The Southerly portion of said land

OUT

10. Rights of tenants in possession.

OUT

11. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $1,400,000.00 |
| Dated: | August 31, 2007 |
| Trustor: | Remy Mazmanian |
| Trustee: | Asset Foreclosure Services, a California Corporation |
| Beneficiary: | Bridgelock Capital, a California Corporation |
| Recorded: | September 5, 2007 as Instrument No. 2007-2060211 of Official Records |
| Loan No.: | None Shown |

**Exhibit H**
**Page 128**

JUN. 16. 2008   4:40PM    U  CANK/SBA DIV                              NO. 7282   P. 9/18

Order No.: 03006309-DB1

## SCHEDULE B (CONTINUED)

OUT 12.   Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $233,000.00 |
| Dated: | February 11, 2008 |
| Trustor: | Remy Mazmanian, a Single Man |
| Trustee: | JLC Investments, Inc., a California Corporation |
| Beneficiary: | Garegin Lusikian |
| Recorded: | February 15, 2008 as Instrument No. 2008-025478 of Official Records |
| Loan No.: | None Shown |

in per titu 13.   We will require a Statement of Information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matter which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

Parties:        All Parties

(Note: The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file. Please be sure said Statements are as complete as possible and signed by the respective parties. Unsigned Statements will not be acceptable.

Order No.: 03006309-DD1

# NATIONS TITLE COMPANY
—— *of California* ——
2001 East Glndstone, Unit 1'
Glendora, CA  91740 • (888) 8D1-8850 • Fox• (909) 542-3397

## WIRING INFORMATION REPORT

### PLEASE DIRECT WIRES TO:

COMERICA BANK – CALIFORNIA
2015 MANHATTAN BEACH BLVD,
REDONDO BEACH, CALIFORNIA 90278-1205

ACCOUNT NUMBER:        1893985315
ROUTING NUMBER:        121137522

TO CREDIT:             NATIONS TITLE COMPANY OF CALIFORNIA

PLEASE REFERENCE:      TITLE OFFICER: DANIEL BRUNO

TITLE ORDER NUMBER:    03006309

NO POLICY WILL BE ISSUED UNDER THIS ORDER UNTIL WE ARE FURNISHED WITH A
STATEMENT OF INFORMATION FROM ALL PARTIES SHOWN IN THIS REPORT AND ALL
NEW OWNERS, IF ANY.

DISBURSEMENT LAW:
ASSEMBLY BILL 512 (CHAPTER 598, STATUES OF 1989), WHICH ADDED SECTION 12413.1
TO THE INSURANCE CODE OF THE STATE OF CALIFORNIA WAS EFFECTIVE JANUARY 1,
1990. EXCEPT FOR FUNDS DEPOSITED BY WIRE TRANSFER, OTHER ELECTRONIC
PAYMENT, OR CASH, THIS LAW PROHIBITS ALL TITLE INSURANCE COMPANIES,
CONTROLLED ESCROW COMPANIES, AND UNDERWRITTEN TITLE COMPANIES FROM
DISBURSING FUNDS FROM AND ESCROW OF SUB-ESCROW ACCOUNT, UNTIL THE DAY
THESE FUNDS ARE MADE AVAILABLE TO THE DEPOSITOR PURSUANT TO PART 229 OF
TITLE 12 OF THE CODE OF FEDERAL REGULATIONS, (REG, CC). UNDER REG. CC, ITEMS
SUCH AS CASHIERS, CERTIFIED, OR TELLER'S CHECKS MAY BE AVAILABLE FOR
DISBURSEMENT ON THE BUSINESS DAY FOLLOWING THE BUSINESS DAY OF DEPOSIT;
HOWEVER, OTHER FORMS OF DEPOSITS MAY CAUSE EXTENTED DELAYS IN THE
CLOSING OF THE ESCROW.

NATIONS TITLE COMPANY OF CALIFORNIA WILL NOT BE RESPONSIBLE FOR ACCRUALS
OF INTEREST RESULTING FROM COMPLIANCE WITH THE DISBURSEMENT
RESTRICTIONS MANDATED BY THIS LAW.

**Exhibit H** Page 130

JUN. 16. 2008   4:41PM      U   ANK/SBA. DIV                                        NO. 7282   P. 13/18

EXHIBIT B

LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS

1. **CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or of area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land had been recorded in the public records at date of policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from coverage any taking which has occurred prior to date of policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at date of policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to date of policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or the estate of interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at date of policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE**

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims;
   (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;
   (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

REV. 10/92

**Exhibit H** Page 131

JUN. 16. 2008  4:41PM            RANK/SBA. DIV                          NO. 7282   P. 14/18

## EXHIBIT B (Continued)

### 2. AMERICAN LAND TITLE ASSOCIATION (ALTA) RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)

### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   * land use
   * improvements on the land
   * land divisions
   * environmental protection

   This Exclusion does not apply to violations or enforcement of these matters which appear in the Public Records at the Policy date. This Exclusion does not limit the Zoning coverage described in Items 12 and 13 of the Covered Risks.

2. The right to take the land by condemning it, unless:
   * a notice of exercising the right appears in the Public Records at the Policy Date,
   * the taking happened before the Policy Date and is binding on you if You bought the land without knowing of the taking.

3. Title Risks:
   * that are created, allowed, or agreed to by you
   * that are Known to You, but not to Us, on the Policy Date - unless they appear in the Public Records
   * that result in no loss to You
   * that first occur after the Policy Date - this does not limit the coverage the labor or material lien coverage in Item 8 of Covered Title Risks.

4. Failure to pay value for Your Title.

5. Lack of a right:
   * to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A, or
   * in streets, alleys, or waterways that touch your Land.

   This Exclusion does not limit the access coverage described in Item 5 of Covered Title Risks.

### EXCEPTIONS FROM COVERAGE

In addition to the Exclusions, you are not insured against loss, costs, attorneys' fees and expenses resulting from:

1. Someone claiming an interest in your land by reason of:
   A. Easements not shown in the public records
   B. Boundary disputes not shown in the public records
   C. Improvements owned by your neighbor placed on your land

2. If, in addition to a single family residence, your existing structure consists of one or more Additional Dwelling Units, Item 12 of Covered Title Risks does not insure you against loss, costs, attorneys' fees, and expenses resulting from:
   A. The forced removal of any Additional Dwelling Unit, or
   B. The forced conversion of any Additional Dwelling Unit back to its original use,

   If said Additional Dwelling Unit was either constructed or converted to use as a dwelling unit in violation of any law or government regulation.

REV. 10/92

**Exhibit H** Page 132

JUN. 16. 2008  4:41PM    ...ANK/SBA DIV                                    NO. 7282   P. 15/18

EXHIBIT B (Continued)

3. **AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92) WITH ALTA ENDORSEMENT - FORM 1 COVERAGE**

and

**AMERICAN LAND TITLE ASSOCIATION LEASEHOLD LOAN POLICY (10-17-92) WITH ALTA ENDORSEMENT - FORM 1 COVERAGE**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or locations of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from coverage any taking which has occurred prior to Date of policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to date of policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory liens for services, labor or materials, or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at date of policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at date of policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any statutory lien for services, labor or materials (or the claim or priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from the improvement or work related to the land which is contracted for and commenced subsequent to date of policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at date of policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as the result of the application of the doctrine of equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to purchaser for value or a judgment or lien creditor.

The above Policy forms may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

**EXCEPTIONS FROM COVERAGE**

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims;
   (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;
   (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

REV. 10/92

**Exhibit H**

JUN. 16. 2008   4:41PM    U  ANK/SBA. DIV                                NO. 7282   P. 16/19

EXHIBIT B (Continued)

**4. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)**
**and**
**AMERICAN LAND TITLE ASSOCIATION LEASEHOLD OWNER'S POLICY (10-17-92)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at date of policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at date of policy, but not excluding from coverage any taking which has occurred prior to date of policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at date of policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at date of policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to date of policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws, that is based on:
   (a) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgement or lien creditor.

The above Policy forms may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exception from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

**EXCEPTIONS FROM COVERAGE**

This Policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims;
   (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;
   (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

REV. 10/92

**Exhibit H** Page 134

JUN. 16. 2006   4:41PM      U  BANK/SBA. DIV                    NO. 7282   P. 17/18

EXHIBIT B (Continued)

B.  CALIFORNIA LAND TITLE ASSOCIATION HOMEOWNERS'S POLICY OF TITLE INSURANCE (6-2-98)

## EXCLUSIONS

In Addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of any law or government regulation.  This includes ordinances, laws and regulations concerning:

    (a)  building
    (b)  zoning
    (c)  land use
    (d)  improvements on the land
    (e)  land division
    (f)  environmental protection

    This exclusion does not apply to violations or the enforcement of these matters if notice of the violation appears in the public records at the policy date.

    This exclusion does not limit the coverage described in covered risk 14, 15, 16, 17 or 24.

2.  The failure of your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This exclusion does not apply to violations of building codes if notice of the violation appears in the public records at the policy date.

3.  The right to take the land by condemning it unless:

    (a)  a notice of exercising the right appears in the public records at the policy date; or
    (b)  the taking happened before the policy date and is binding on you if you bought the land without knowing of the taking.

4.  Risks:

    (a)  that are created, allowed or agreed to by you, whether or not they appear in the public records;
    (b)  that are known to you at the policy date, but not to us, unless they appear in the public records at the policy date;
    (c)  that result in no loss to you; or
    (d)  that first occur after the policy date - this does not limit the coverage described in covered risk 7, 8.d, 22, 23, 24, or 25.

5.  Failure to pay value for your title.

6.  Lack of a right:

    (a)  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    (b)  in streets, alleys or waterways that touch the land.

This Exclusion does not limit the coverage described in covered risk 11 or 18.

REV. 10/92

JUN. 16. 2008   4:41PM   BANK/SBA. DIV

NO. 7282   P. 18/18



REV. 10/92

Page 17 of 17

**Exhibit H**

**Page 136**

# EXHIBIT I

Exhibit I
Page 137

JUN. 26. 2008   4:03PM   ...BANK   NO. 1191   P. 2/5



**U.S.bank.**
Five Star Service Guaranteed

SBA Division
9918 Hibert Street
San Diego, CA 92131
858.886.4845
800.269.4309 toll free

## LENDER'S INSTRUCTIONS TO TITLE AND ESCROW

Date: June 17, 2008

Escrow Co.: Regency Estate Properties
Attn: Dita Shah
Address: 932 N. Brand Blvd.
City and State: Glendale, CA 91202

Title Co.: Nations Title Company of California
Attn: Daniel Bruno
Address: 2001 East Gladstone, Unit F
City and State: Glendora, CA 91740

Re:   Escrow No.: 0-783   Title Order No. 03006309-DB1
Borrower's Name: Hovsep Derboghossian dba HOVSEP DERBOGHOSSIAN COMPUTER SERVICES
Property Address: 718 West Wilson Avenue, Glendale, CA 91203
Building Purchase Price: $1,725,000.00

Dear Betsy and Cindy:

Funds will be wired in the amount of $1,313,200.00 to Nations Title Company of California for credit to buyer in the above referenced transactions.

The proceeds of our loan will be disbursed as follows:

| | |
|---|---|
| Funds to Escrow for the Real Property Purchase | $1,312,979.00 |
| Funds held by U.S. Bank National Association: Closing Costs (per the attached Billing Statement(s)) | $221.00 |
| Total Loan Amount: | $1,313,200.00 |

The borrowers are to come in with a minimum of $262,121.00. Our Bank received $1,313,200.00; therefore, the minimum amount needed will be $259,021.00, in cash, less any deposits made to escrow.

Transaction must close in accordance with the escrow instructions dated March 28, 2008. Any amendments to those instructions must be approved, in writing, by U.S. Bank National Association.

Any credits to buyer must be specifically approved, in writing, by U.S. Bank National Association (whether included in original escrow instructions or not).

Please collect and pay all title charges for 03006309-DB1 with Nations Title Company of California.



**Exhibit I** Page 138

ENCLOSED HEREWITH TO TITLE COMPANY:

1.   First Deed of Trust with Hazardous Certificate attached in the amount of $1,313,200.00, with title vested as Hovsep Derboghossian, a married man as his sole and separate property.

2.   Second SBA Fee Deferral Deed of Trust in the amount of $38,736.88 to be recorded in the County of Los Angeles as an accommodation only.

Any modifications, deletions, or additions to our documents require management approval from U.S. Bank SBA Division, in writing, prior to recording.

You are to collect recording fees associated with the above accommodation recording(s) and we are requesting Nations Title Company of California to record the above document(s) with our transaction, Title Order No. 03006309-DB1.

ESCROW/TITLE IS AUTHORIZED TO RECORD AND/OR USE THE ABOVE ITEMS FOR BENEFIT OF OUR BORROWER WHEN ESCROW/TITLE CAN INSURE THE FOLLOWING:

1.   ALTA Title Policy in the amount of $1,313,200.00 to be forwarded to us by Nations Title Company of California reflecting said Deed of Trust in a First lien position.

     Subject only to items numbered: 1 (Pay if assessed), 2 (Pay taxes due plus penalties), 3 (Pay if assessed) 4, (Pay if assessed) 5 (Issue endorsement 103.5) 6, 8, 9 (Please issue endorsement 103.1) as shown on preliminary title report dated June 16, 2008.

     All taxes must be paid current.

     In addition, please issue endorsements 100, 116 and a 111.5 for each title policy requested above.

2.   Title is to provide any supplements to the preliminary title report. All supplements, including any exceptions disclosed by an inspection or survey, must be approved by U.S. Bank National Association, prior to recording.

ADDITIONAL INSTRUCTIONS:

Please notify Lisa Long with escrow closing and recording confirmation.

PRIOR TO U.S. PRIOR TO U.S. BANK RELEASING LOAN PROCEEDS FOR THE CLOSING OF THIS TRANSACTION, ESCROW IS TO FAX (858-536-9371) A COPY OF THE CANCELLED CHECK FOR THE INITIAL DEPOSIT TO ESCROW AND COPIES OF ANY SUBSEQUENT DEPOSITS WHICH MUST BE IN THE FORM OF A CASHIER'S CHECK OR BANK OFFICIAL CHECK FROM THE BORROWER OR WIRE ADVICE FROM ESCROW'S BANK DOCUMENTING THE PROOF OF INJECTION AND ORIGIN OF FUNDS.



2

**Exhibit I**

**Page 139**

Within 72 hours from close of escrow, please forward a certified copy of the final Escrow Settlement Statement to the following address:

U.S. Bank National Association
Attn: Pamela Zupon
9918 Hibert Street, Third Floor
San Diego, CA 92131

Please forward the Title Policy, along with all endorsements, within 30 days of loan closing to the following address:

U.S. Bank National Association
Attn: The Closing Audit Department
9918 Hibert Street, Second Floor
San Diego, CA 92131

ANY DEVIATION OF THE TERMS SET FORTH ABOVE IS NOT ACCEPTABLE WITHOUT THE PRIOR WRITTEN APPROVAL OF U.S. BANK NATIONAL ASSOCIATION.

IF FOR ANY REASON YOU CANNOT COMPLY WITH ALL OF OUR INSTRUCTIONS AND RECORD THE DEED OF TRUST WITHIN THREE (3) DAYS OF THE DATE OF OUR CHECK OR WIRE, CALL Lisa Long at (858) 536-4545, EXT. 320 FOR FURTHER INSTRUCTIONS.

OUR COMMITMENT SHALL EXPIRE THIRTY (30) DAYS FROM THE DATE OF THIS DOCUMENT. NOT WITHSTANDING ANYTHING HEREIN TO THE CONTRARY, WE RESERVE THE RIGHT AT OUR OPTION TO CANCEL ALL INSTRUCTIONS AND RECALL PAPERS AND/OR REMITTANCE AT ANY TIME PRIOR TO YOUR COMPLIANCE WITH THESE INSTRUCTIONS.

Cordially,

Sonja Weston-Fryer
SBA Loan Processing Manager

ACKNOWLEDGE AND AGREE AS SET FORTH ABOVE:

_____          Daniel L. Brue
Signature of Title Officer          Printed Name of Title Officer

3

**Exhibit I**
**Page 140**

# EXHIBIT J

DEC-03-2009 15:05 From:                          To: ...                 P.2



# CCI

CCI Project Number: CC1102-1
June 20, 2008

US Bank
500 North Brand Blvd, #1960
Glendale, California 91203

**PHASE I ENVIRONMENTAL SITE ASSESSMENT**
Office Building 718 West Wilson Glendale, California
91203

Dear Sir/Madam:

CCI is pleased to submit our report describing the findings of the Phase I Environmental Site Assessment (ESA) for 718 West Wilson, Glendale, California 91203. This Phase I ESA was prepared in accordance with the American Society of Testing and Materials (ASTM) Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (ASTM Designation: E1527-05).

The purpose of the Phase I ESA was to identify, to the extent feasible, recognized environmental concerns in connection with the Property. This assessment included a Property reconnaissance, a survey of adjacent sites, interviews with informed persons, reviews of public records, an environmental database search report, geology and hydrogeology, and historical information, maps, and photographs.

It has been our pleasure in providing this Phase I ESA for your review. Should you have any questions concerning the information contained in the following report, please free to contact the undersigned at (213) 373-0159

Respectfully submitted,
**Conservation Consulting International**



David A. Jonas, REA
Project Manager

DEC-03-2009 15:05 From:                                     1193262430              P.3

# TABLE OF CONTENTS

PAGE

**1.0 SUMMARY** ..................................................................1
    1.1 SUMMARY OF FINDINGS ...........................................1
    1.2 CONCLUSIONS.......................................................2
**2.0 INTRODUCTION**.........................................................3
    2.1 OBJECTIVE ..........................................................3
    2.2 SCOPE OF SERVICES ..............................................3
    2.3 USER RELIANCE....................................................3
**3.0 USER PROVIDED INFORMATION** ...............................4
    3.1 TITLE RECORDS ....................................................4
    3.2 ENVIRONMENTAL LIENS OR ACTIVITY USE LIMITATIONS ......4
    3.3 SPECIALIZED KNOWLEDGE......................................4
    3.4 COMMONLY KNOWN OR REASONABLY ASCERTAINABLE INFORMATION..4
    3.5 VALUE REDUCTION FOR ENVIRONMENTAL ISSUES..............4
**4.0 PROPERTY RECONNAISSANCE** ..................................5
    4.1 LOCATION AND LEGAL DESCRIPTION .........................5
    4.2 PROPERTY DESCRIPTION ........................................5
    4.3 CURRENT PROPERTY USE........................................5
    4.4 HAZARDOUS MATERIALS ........................................5
    4.5 UNDERGROUND AND/OR ABOVEGROUND STORAGE TANKS ......6
    4.6 POLYCHLORINATED BIPHENYLS (PCBS's)....................9
    4.7 ASBESTOS CONTAINING MATERIALS (ACM's) ..............9
    4.8 LEAD-BASED PAINT...............................................9
    4.9 RADON GAS EVALUATION .......................................10
    4.10 POTABLE WATER .................................................10
    4.11 SEWAGE DISPOSAL ..............................................10
    4.12 SOURCES OF HEATING AND COOLING .......................10
    4.13 CURRENT USES OF THE ADJOINING SITES ..................10
**5.0 HISTORICAL REVIEW** ..............................................11
    5.1 CHRONOLOGY OF PROPERTY USE............................11
    5.2 AERIAL PHOTOGRAPH REVIEW ...............................14
    5.3 STREET DIRECTORY REVIEW ..................................14
    5.4 SANBORN FIRE INSURANCE MAP REVIEW ..................14
    5.5 TOPOGRAPHIC MAP REVIEW ..................................14
    5.6 OTHER HISTORICAL DOCUMENTS.............................14
    5.7 PREVIOUS ENVIRONMENTAL REPORTS .....................15
**6.0 RECORDS REVIEW** ..................................................16
    6.1 ENVIRONMENTAL DATABASE REPORT.......................16
**7.0 CONCLUSIONS** .......................................................17
**8.0 RECOMMENDATIONS**...............................................17

DEC-03-2009 15:05 From:                                    To                    P. 4

# 1.0  SUMMARY

This Phase I Environmental Site Assessment (ESA) was completed by CCI at the request of US Bank for 718 West Wilson, Glendale, Los Angeles County, California (Property). The Property location is shown on Figure I - Property Location Map. The Phase I ESA was conducted according to the guidelines of American Society for Testing and Materials (ASTM) Standard Practice of Environmental Site Assessments (E 1527-05).

## 1.1 SUMMARY OF FINDINGS

The purpose of the Phase I ESA was to identify, to the extent feasible, recognized environmental conditions in connection with the Property. This assessment included a Property and adjacent sites survey, historical research, reviews of public records, an environmental database search report, and research and interviews with informed persons.

The Property is approximately 8,738 square-feet in area and has been developed with one building totaling approximately 6,100 square-feet in size. The building is wood-framed with brick and stucco exterior walls. The building was developed on the Property sometime in 1936. The building is currently in use as an office building. The general area surrounding the Property consists of light industrial sites and residential neighborhoods.

The Property was developed approximately in 1936 with the rectangle-shaped building currently located on the northern portion of the Property. Businesses which have occupied the Property included a plumbing supply shop, a school bus company, an environmental consulting company, and a mortgage business.

Previous environmental concerns pertaining to the Property included underground storage tanks (USTs) and a clarifier. In 1969 five USTs were installed on the Property. Two of the USTs were removed from the Property in 1983. At this time, a 10,000-gallon UST was installed on the Property. The USTs were removed from the Property in 1995. During several subsurface investigations conducted on the Property between 1990 and 1999, petroleum hydrocarbon contamination was detected in the soils in the vicinity of the USTs locations. VOC contaminated soil and groundwater was also detected. In 1998 and 1999, remediation activities were conducted to cleanup the petroleum hydrocarbon contaminated soil on the Property. Remediation activities were completed in November 1999 and the Property received a no fUIther action letter in December 1999 from the City ofGlendale Environmental Management Center (CGEMC) pertaining to the USTs and associated remediation activities. During the subsurface investigations, it was concluded by others that the VOC contamination detected on the Property migrated from off-site sources. These conclusions were agreed with by the RWQCB which indicated at least twice in letters issued to the Property that there was no further need to investigate for VOCs at the Property.

A three-stage waste water clarifier was installed on the Property in 1967. The clarifier was located inside the Property building approximately in the northwest corner. Two soil borings were drilled in the vicinity of the clarifier in January 1993. Results' of the analysis indicated minor concentrations of heavy metals and VOCs in the soil. The concentrations were reported to be below action clean-up levels. The clarifier has since been closed in place by filling the clarifier with concrete.

DEC-03-2009 15:06 From:                              1  /93262430                    P.5/26

In March 2001, a letter was sent to the former Property owner requesting the a Chemical Storage and Use Questionaire be filled out relating to a chromium investigation being conducted by the RWQCB in the San Fernando Valley. The questionnaire was completed by BBL which indicated to the WQCB that chromium and other heavy metals were not used or stored by BBL. Requirements for further investigations on the Property related to the chromium investigation were not issued by the WQCB.

The south site to the Property (711 West Broadway) is occupied by the former Drilube Company (Drilube). Drilube conducted metal plating operations at the site from approximately 1959 to 2004. Subsurface assessments conducted on the former Drilube site have identified significant heavy metal contaminated soil and groundwater beneath the site. It has been determined that heavy metal impacted groundwater has migrated from the former Drilube site to the Property.

## 1.2 CONCLUSIONS

Previous environmental concerns pertaining to the Property include USTs and a clarifier. The USTs were removed from the Property in 1983 and 1995. Petroleum hydrocarbon impacted soil beneath the Property resulting from leaks from the USTs has since been remediated. The CGEMC issued a no further letter to the Property regarding the USTs/remediation in December 1999. The clarifier was closed in place by filling with concrete.

Heavy metal contaminated groundwater exists beneath the Property. It has been concluded that the heavy metal contaminated groundwater migrated to the Property from the south site of the Property. Drilube conducted metal plating operations on this site from 1959 to 2004. Subsurface assessments conducted on the former Drilube site have identified significant heavy metal contaminated soil and groundwater beneath the site. The remediation activities at the former Drilube site are currently being overseen by the United States Environmental Protection Agency (US EPA). Evidence was not found that the Property contributed to the heavy metal impacted groundwater beneath the Property.

Based on the results of our findings, CCI does not recommend additional assessment at this time.

**CCI**

2

**Exhibit J** Page 145

DEC-03-2009 15:07 From:                                                           1      №3262430            P.6/26

# 2.0  INTRODUCTION

US Bank CCI to conduct a Phase IESA of the Property located at 718 West Wilson, Glendale, Los Angeles County, California. This assessment was prepared in general accordance with ASTM Standard Practice of Environmental Site Assessments (E 1527-05).

## 2.1 OBJECTIVE

The objective of this Phase IESA was to perform an appropriate inquiry into the uses of the Property as outlined by the ASTM Standard Practice of Environmental Site Assessments (E 1527-05). The purpose of this assessment was to identify, to extent feasible, recognized environmental conditions (RECs) in connection with the Property that potentially have and/or may cause an adverse environmental impact to the Property.

## 2.2 SCOPE OF SERVICES

The scope of work for this assessment was in general accordance with the ASTM Standard Practice for Environmental Site Assessments (E 1527-05). These methodologies are described as representing good commercial and customary practice for conducting an ESA for the purpose of identifying recognized environmental conditions.

## 2.3 USER RELIANCE

This report may be distributed and relied upon by Resource Capital, its successors and assigns. Reliance on the information and conclusions of this report by any other person or entity is not authorized without the written consent of CCI. This report is not a legal opinion and does not offer warranties or guarantees.

Exhibit 09 Page 146

DEC-03-2009 15:07 From:                               To:   J3262438            P.7/26

# 3.0  USER PROVIDED INFORMATION

## 3.1 TITLE RECORDS

Recorded land title records and lien records were not provided to CCI by US Bank.

## 3.2 ENVIRONMENTAL LIENS OR ACTIVITY AND USE LIMITATIONS

Mr. Art Mazmanian, the current Property owner, is not aware of any environmental cleanup liens against the Property that are filed or recorded under federal, tribal, state or local law.

Mr. Art Mazmanian, the current Property owner, is not aware of any AULs, such as engineering controls, land use restrictions or institutional controls that are in place at the Property and/or have been filed or recorded in a registry.

## 3.3 SPECIALIZED KNOWLEDGE

Mr. Art Mazmanian, the current Property owner, indicated to CCI that USTs were removed from the Property in 1995, and that contaminated soil related to the USTs was subsequently remediated. Mr. Mazmanian indicated that the Property received closure for the USTs from the CGEMC.

## 3.4 COMMONLY KNOWN OR REASONABLY ASCERTAINABLE INFOIUvIATION

Mr. Art Mazmanian, the current Property owner, indicated to CCI that USTs were removed from the Property in 1995, and that contaminated soil related to the USTs was subsequently remediated. Mr. Mazmanian indicated that the Property received closure for the USTs from the CGEMC.

## 3.5 VALUE REDUCTION FOR ENVIRONMENTAL ISSUES

CCI was not informed by US Bank of any information pertaining to the relationship of the purchase price to the estimated fair market value of the Property that might indicate significant contamination exists.

DEC-03-2009 15:07 From:                                   T    93262430                P.8 26

# 4.0  PROPERTY RECONNAISSANCE

CCI performed a walking survey of the Property on June 20, 2008, accompanied by Mr. Art Mazmanian, the Property owner. The Property was observed for conditions and land uses that may have an affect on the environmental quality of the Property. CCI observed the Property for evidence of facilities such as aboveground and underground storage tanks, electrical transformers, ponds, pits, sumps, waste storage containers, drums or any other facilities where hazardous materials could be stored, disposed of, or dispensed. CCI also observed the Property for evidence of surface staining, stressed vegetation, and chemical odors which may be of concern regarding adverse environmental impacts to the Property. If conditions were observed that indicated potential environmental concerns, CCI marked their relative locations on a map drawn in the field (refer to Figure 2 - Property Map).

## 4.1 LOCATION AND LEGAL DESCRIPTION

The Property is located at 718 West Wilson, Glendale, Los Angeles County, California, and is legally described by its assessor's parcel number 5638-004-029.

## 4.2 PROPERTY DESCRIPTION

The Property is approximately 8,738 square-foot in area and has been developed with one building totaling approximately 6,100 square-feet in size. The building is wood-framed with brick and stucco exterior walls. The building was developed on the Property sometime in 1936. The interior of the building consists of a reception area, conference room, restrooms, an offices. Interior building materials observed included carpet, vinyl floor tiles, stone floor tiles, and finished drywall and texture materials. Mr. Mazmanian indicated that the Property building was remodeled to the current configuration in 2005. The interior of the building consisted of offices, restrooms, and an open warehouse/storage area prior to the remodel.

The building is located on the northern portion of the Property. The remaining area of the Property is developed with a concrete-paved parking lot. The Property and parking lot are accessible via a driveway off of Concord Street. The Property is secured by a six foot high wall which encloses the south and west perimeters of the Property. The east perimeter of the Property abuts the adjacent building to the east of the Property. Four groundwater monitoring wells were observed on the southern portion of the Property. Surface water flow on the Property is towards a storm drain located on the west perimeter of the Property in the vicinity of the driveway (Refer to Photographs 1 - 10, located in Appendix- Property Photographs).

## 4.3 CURRENT PROPERTY USE

The building is currently in use as an office building.

## 4.4 HAZARDOUS MATERIALS

Hazardous materials, other than common household cleaners, were not observed at the Property.

Exhibit U Page 148

DEC-03-2009 [illegible] From:                              [illegible]                  P.9/20

## 4.5 UNDERGROUND AND/OR ABOVEGROUND STORAGE TANKS

CCI did not observe evidence of current underground or aboveground storage tanks on the Property.

Historically, underground storage tanks (USTs) have operated on the Property. Five underground storage tanks (USTs) were installed on the Property in 1969. The USTs consisted of one 7,500-gallon gasoline UST, one 550-gallon gasoline UST, one 2,000-gallon diesel fuel UST, one 550-gallon diesel fuel UST, and one 500-gallon waste oil UST. In 1983, the two 550-gallon USTs were removed and a 10,000-gallon diesel fuel UST was installed.

In 1990, the City of Glendale Fire Department (FD) requested BBL to implement a Leak Detection Investigation and Tank Monitoring Program. Per the request, Jirsa Environmental Services (JES) drilled four soil borings on the Property. The borings were then completed as vadose zone monitoring wells. Results of the laboratory analysis of the soil samples indicated soils beneath the Property had been impacted by petroleum hydrocarbons suspected to be the result of leaks or overspills associated with the diesel fuel UST. Volatile organic compounds were also detected in the soil samples. The Regional Water Quality Control Board Los Angeles Region (RWQCB) reviewed the data and requested additional site assessment at the Property.

In January 1993, SEC Donahue, Incorporated (SEC), conducted a limited subsurface environmental assessment of the Property which was approved by the RWQCB. This assessment consisted of drilling seven soil borings on the Property to assess for the presence of petroleum hydrocarbon, solvents, and heavy metal contamination in the soil. Four soil boring were drilled in the vicinity of the USTs, two soil borings were drilled adjacent to the clarifier located inside the Property building, and one soil boring was drilled approximately in the northeast corner of the service yard. The soil borings were completed to depths between 20 feet and 60 feet bgs. Soil samples were collected at the near surface interval and subsequently at five-foot intervals to the maximum depth of the soil boring. Soil samples were analyzed immediately for total recoverable petroleum hydrocarbons (TRPH) by an on-site mobile laboratory. When soil samples were reported to contain non-detectable concentrations of petroleum hydrocarbons, drilling of the respective soil borings were discontinued. Additionally, a total of 61 soil samples were submitted to an analytical laboratory and analyzed for TRPH, volatile organic compounds (VOCs), total petroleum hydrocarbons as diesel (TPHd), total petroleum hydrocarbons as gasoline (TPHg), and pH. Soil samples collected from adjacent to the clarifier were also analyzed for heavy metals.

Results of the laboratory analysis indicated that the subsurface soils in the vicinity of the USTs had been impacted by TPHd, TPHg, and VOCs. SEC concluded that the contamination is possible due to surface spillages, USTs overfills, or product line leakage, and that the data suggests releases consisting primarily of diesel fuel. Results of the heavy metal analysis on the soil samples collected from adjacent to the clarifier indicated that heavy metals including hexavalent chromium were present. Generally, however, the reported concentrations, except for copper and zinc, were below typical background levels. PCE was detected in soil samples collected from each soil boring location.

Exhibit U  Page 149

DEC-03-2009 15:09 From:                                    .....82430                        P.10/26

In December 1993, El Capitan Environmental Services, Incorporated (El Capitan), installed three groundwater monitoring wells under the direction of the RWQCB. Monitoring well W-1 was installed approximately in the center of the service yard, monitoring well W-2 was installed on the east boundary of the Property (the Drilube facility, 711 West Broadway, which occupied the south of the Property), and monitoring W-3 was installed adjacent to the existing USTs on the Property. Analytical results of the soil and groundwater samples collected during this investigation indicated the presence of both TCE and PCE in the soil and groundwater. Groundwater collected from W-2 was observed to be yellow and was suspected to be contaminated with heavy metals. Upon reviewing the results of this investigation, the RWQCB requested that groundwater monitoring be performed quarterly for one year. Results of the four quarterly monitoring events indicated that the groundwater was contaminated with significant concentrations of PCE, TCE, and hexavalent chromium. Based on the analytical results, the groundwater flow direction in the area, and the visual observation of yellow groundwater, El Capitan suspected that the Drilube Company was an offsite source for the VOCs and heavy metals detected at the Property. The chemicals detected were not used on the Property by BBL, but have been documented to have been used at the Drilube facility. Additionally, VOCs and heavy metals have been detected in the soils beneath the Drilube facility.

In June 1995, Ami Adini & Associates removed four USTs and two dispensers from the Property. The four USTs consisted of one 500-gallon waste oil UST, one 7,500-gallon diesel fuel UST, one 2,000-gallon gasoline UST, and one 10,000-gallon diesel UST.

In 1996, A comprehensive investigation was conducted by EL Capitan in order to establish the horizontal and vertical extent of the TPH contamination. Based on the investigation, the TPH plume was defined to the southwest corner of the Property. The depth of the plume was defined to be between 8 feet bgs and 40 feet bgs.

Remediation activities commenced on the Property in the fall of 1998 and consisted of vapor extraction removal of volatile hydrocarbons and bioaugmentation of diesel contaminates through injection. The vapor extraction system was found to be ineffective and was converted to a bioventing system. In November 1999, closure sampling was conducted on the Property which consisted of two soil borings drilled in the center of the contamination plume. Results of the soil sampling indicated all soil samples except one were non-detect for total petroleum hydrocarbons as diesel (TPHd). A closure letter was issued to the Property on December 17, 1999, by the by the City of Glendale Environmental Management Center for the Property indicating "With the provisions that the information provided by this agency through the Closure Report prepared by Biotreatment Inc was accurate and representative of site's final condition and based on the State Water Resource Control Board's policy on cleanup of petroleum discharges at low risk sites, no further action related to the underground tank release is required at this time."

## Clarifier

A three-stage waste water clarifier was installed on the Property in 1967. The clarifier was located inside the Property building approximately in the northwest corner. Two soil borings were drilled in the vicinity of the clarifier during the limited subsurface environmental assessment of the Property conducted by SEC in January 1993. The soil samples collected from these two soil borings were analyzed for TRPH, VOCs, TPHg, and TPHd. TR.PH was detected in the two soil borings at a maximum concentration of 23 milligrams per kilogram (mg/kg or parts per million [ppm]). TPHg and TPHd were reported as non-detectable above laboratory ——— · ··

Minor concentrations of some VOCs including PCE were detected in soil samples collected from the two soil borings. Results of the Metals analysis indicated that copper and zinc were the only metals detected at concentrations above typical background levels. The clarifier has since been closed in place by filling the clarifier with concrete.

**Volatile Organic Compounds (VOCs)**

In 1990, four soil borings were drilled on the Property. Soil samples collected from the soil borings were reported to contain concentrations of VOCs. In 1993 , seven soil borings were drilled on the Property and the soil samples collected from the soil borings were reported to contain concentrations of VOCs. Additionally in 1993, three groundwater monitoring wells were installed on the Property. Analytical results of the groundwater samples collected from the monitoring wells indicated the presence of both TCE and PCE in the groundwater. The highest concentrations of PCE and TCE were detected in monitoring well W-2, which is located on the east portion of the Property near the boundary between the Property and the adjacent site to the east (Former Drilube Company). PCE and TCE were reported in the groundwater sample collected from W-2 at concentrations of 1,300 micrograms per liter (vg/L or parts per billion [ppb]) and 650 ppb. Three consecutive quarterly groundwater monitoring events were conducted in 1994 and 1995. Results of the monitoring events showed the presence of significant concentrations of PCE and TCE in the groundwater beneath the Property. The consultant performing the monitoring events, El Capitan, concluded that, based on the analytical results of the groundwater samples, the groundwater flow direction, and the visual observation of yellow color of the groundwater samples collected from W-2, the Drilube Company was suspected of being the source of contamination detected in the groundwater beneath the Property. Additionally, based on information provided by BBL, chlorinated solvents and heavy metals were not used on the Property by BBL.

In February 1995, El Capitan conducted a soil gas survey on the Property. The survey consisted of fifteen sampling locations with a total of twenty-two soil vapor samples collected. Thirteen of the sample locations were located on the Property and two were located inside the Drilube facility. The soil vapor samples were analyzed for twenty-three different VOCs including PCE and TCE. Results of the analysis indicated that most of the soil vapor samples had been impacted with VOCs, primarily PCE and TCE. The highest concentrations were found in the soil vapor samples collected from inside the Drilube facility. El Capitan concluded that the PCE and TCE vapor concentrations in the shallow vadose zone appear to originating from the eastern boundary of the Property and diminishing towards the western boundary, and that the direction of the VOC migration is from the east/southeast to the west/northwest.

A joint letter was issued by the RWQCB and the United States Environmental Protection Agency (U.S. EPA) to the Property on October 31, 1997 indicating that there was no further need to investigate for VOCs on the Property. However, in November 1999, two soil borings were drilled during the closure sampling activities associated with the USTs previously located on the Property. The soil samples collected from the two soil borings were reported to be non-detectable above

**CCI**

8

DEC-03-2009 15:09 From:                                    8193262430                P.12/26

laboratory reporting limits for all target VOC compounds analyzed. In January 2000, BTI submitted a report to the R\VQCB requesting regulatory closure for the Property pertaining to VOCs. The report outlined several reasons for the request including the BBL operations did not include VOCs, bioventing activities associated with the hydrocarbon remediation reduced the VOC contamination in the soil, the VOC contamination was found to be migrating from an off-site source, and results of the analysis of the soil samples collected in November 1999 indicating non-detectable concentrations of VOCs at the Property meets the requirements for closure by the RWQCB. On March 26, 2001, a letter was issued to the Property by the RVVQCB indicating that there was no further to need investigate for VOCs at the Property. Additionally, this letter requested the Property complete a Chemical Storage and Use Questionnaire relating to a chromium investigation being conducted by the RWQCB. The questionnaire was completed by BBL and indicated to the RWQCB that chromium was not stored or used by BBL on the Property. Requirements for further investigations on the Property related to the chromium investigation were not issued by the RWQCB.

## 4.6 POLYCHLORINATED BIPHENYLS (PCBs)

Electrical transformers, hydraulic equipment, capacitors, fluorescent light fixtures and similar electrical equipment may contain polychlorinated biphenyls (PCBs) in the hydraulic fluids and/or dielectric insulation liquids present within the unit. The federal Toxic Substances Control Act (TSCA) generally prohibits the domestic manufacture of PCBs after 1979. However there is a potential for equipment manufactured and/or constructed before that date to contain PCBs and current regulations do not require PCB containing equipment to be removed from service.

Transformers or other electric or hydraulic devices suspected of containing PCBs were not observed at the Property.

## 4.7 ASBESTOS CONTAINING MATERIALS (ACMs)

Suspected asbestos-containing materials (ACM) were not noted during the Property survey. The interior of the Property building was completed remodeled in 2005.

## 4.8 LEAD-BASED PAINT

Lead-based paint (LBP) is recognized as a potential health risk due to the known toxic affects of lead exposure, primarily through ingestion on the central nervous system, kidneys, and bloodstream. The risk of lead toxicity in LBP varies and based upon the condition of the paint and the year of its application. Paint applied in 1977 or later is not expected to contain lead. Survey and sampling of the paint around the Property for LBP was not conducted as part of this assessment.

Given the approximate 1936 construction date of the building, it is considered possible that LBP is present at the Property. However, the interior and exterior building paint is relatively new and in good condition. The building was remodeled in 2005 which included fresh paint. The potential LBP should not become a health hazard provided that the paint properly maintained and remains sealed. CCI was not contracted to perform sampling for LBP and does not recommend this work be conducted at this time.



DEC-03-2005 13:18 From:                                    1932024750                    P.13/26

## 4.9 RADON GAS EVALUATION

Radon is a colorless, tasteless radioactive gas that has been linked to possible increased risk of lung cancer. According to the United States Environmental Protection Agency (U.S. EPA), exposure to 4.0 peccaries of radon gas per liter of air (pCi/L) on a regular basis increases the risk of contacting lung cancer. CCI reviewed the California Department of Health Services (DHS) Radon Database for California. The DHS conducted over 16,000 individual radon tests throughout the State of California. The database groups the test results by zip codes. According to the database, the area of the Property does not typically exhibit concentrations of radon thought to be harmful to human health.

## 4.10 POTABLE WATER

Potable water is provided to the Property by the City of Glendale. Sampling and/or analysis of drinking water was not conducted as part of this assessment.

## 4.11 SEWAGE DISPOSAL

Sewage disposal is provided for the Property by the City of Glendale. CCI did not observe evidence of current disposal of sewage on the Property.

## 4.12 SOURCES OF HEATING AND COOLING

Heating and cooling energy is provided to the Property by Southern California Edison (SCE).

## 4.13 CURRENT USES OF THE ADJOINING SITES

The Property is located on the southeast corner of the intersection of West Wilson and Concord Street. West Wilson bounds the Property to the north followed by a parking lot and residential structures. Light industrial buildings are located on the surrounding areas to the east, south, and west of the Property. Concord Street bounds the Property to the west.

Exhibit 08    Page 153

DEC-03-2009-15:18 Fr....                                    193262438                    P.14/25

# 5.0   HISTORICAL REVIEW

The purpose of reviewing historical sources is to 'develop a history of the previous uses of the Property and surrounding areas in order to help identify the likelihood of past uses having led to recognized environmental conditions in connection with the Property. Historical sources reviewed by CCI for this Phase I ESA included aerial photographs, street directories, Sanborn Fire Insurance maps, and topographic maps and are summarized in the following sections.

## 5.1 CHRONOLOGY OF PROPERTY USE

1925    According to a Sanborn Fire Insurance Map, structures were not developed on the Property. Wilson Avenue was developed adjacent to the north of the Property and Concord Avenue was developed adjacent to the west of the Property. The sites adjacent to the south and east of the Property were undeveloped. An ice house was located on the site adjacent to the west of Concord Street and residential structures were developed on the sites adjacent to the north of Wilson Avenue.

1927    Based on a review of historical aerial photographs, the Property was undeveloped. Wilson Avenue was developed adjacent to the north of the Property followed by residential structures and undeveloped lots. Concord Street was developed adjacent to the west of the Property followed by a large, rectangular-shaped building, undeveloped land, San Fernando Road, and railroad tracks. The adjacent site to the south of the Property was undeveloped followed by Broadway and undeveloped land. The adjacent site to the east of the Property was undeveloped followed by residential structures and undeveloped lots.

1934    Based on a review of historical aerial photographs, the Property and surrounding areas were developed similar to that observed in the 1927 aerial photographs.

1939    Based on a review of historical aerial photographs, the Property was undeveloped. Wilson Avenue was developed adjacent to the north of the Property followed by residential structures. A commercial/industrial structure adjacent to the east of the Property followed by undeveloped lots and residential structures. The adjacent site to the south of the Property was undeveloped followed by Broadway and a small cluster of commercial/industrial structures. Concord Street bound the Property to the west followed by a large, rectangular-shaped structure, a parking lot, two small commercial buildings, San Fernando Road, and railroad tracks.

1944    According to a Sanborn Fire Insurance Map, structures were not developed on the Property. Wilson Avenue was developed adjacent to the north of the Property and Concord Avenue was developed adjacent to the west of the Property. A plumbing supply shop was located on the site adjacent to the west of Concord Street and residential structures were developed on the sites adjacent to the north of Wilson. A small airplanes parts manufacturing business was located on the adjacent site to the east of the Property. A plastic products manufacturing business was located on the adjacent site to the south of the Property.

Exhibit J  Page 154

DEC-03-2009 15:10 From:                                          19326243U                  P.15'26

1948    Based on a review of historical aerial photographs, the Property and surrounding areas
        were developed similar to that observed in the 1939 aerial photographs.

1954    Based on a review of historical aerial photographs, the Property a square-shaped structure
        was developed on the northern portion of the Property. The structure fits the footprint of the
        building currently developed on the Property. A small enclosure was located on the southeast
        corner of the Property. A wall marked the south and west boundaries of the Property. Wilson
        Avenue bound the Property to the north followed by residential structures. A
        commercial/industrial structure adjacent to the east of the Property followed by commercial/
        industrial structures and residential structures. An alleyway bound the Property to the south
        followed by a large commercial/industrial building, Broadway, and a small cluster of
        commercial/industrial structures. Concord Street bound the Property to the west followed by
        a large, rectangular-shaped structure, a parking lot, two small commercial buildings, San
        Fernando Road, and railroad tracks.

1958    Based on a review of historical aerial photographs, the Property and surrounding areas
        were developed similar to that observed in the 1954 aerial photographs.

1962    Based on a review of historical aerial photographs, the Property and surrounding areas
        were developed similar to that observed in the 1958 aerial photographs.

1966    A Certificate of Occupancy document reviewed at the City of Glendale Building Department
        indicated that the Property was owned by John L. Binzley and the Property was used as a bus
        garage.

1969    A permit was issued to the Property by the City of Glendale Fire Department Fire Prevention
        Bureau to operate a 7,500-gallon gasoline UST, a 550-gallon gasoline UST, a 2,000-gallon
        diesel fuel UST, a 550-gallon diesel fuel UST, and a waste oil UST on the Property.

1977    According to a Polk's City Directory, Western Tours Incorporated was listed at the Property
        address.

1983    An approved permit application was issued to the Property by the City of Glendale Fire
        Department Fire Prevention Bureau to remove two 550-gallon USTs and install one 10,000-
        gallon diesel fuel UST on the Property.

1987    An approved permit application was issued to the Property by the City of Glendale Fire
        Department Fire Prevention Bureau for the operation of one 10,000-gallon diesel fuel UST,
        one 7,500-gallon unleaded gasoline UST, one 2,000-gallon gasoline UST, and one 500-
        gallon oil UST on the Property.

1990    According to a Haine's Business Directory, Medi Script of California, and Western Tours
        Incorporated were listed at the Property address.

1995    A building permit was issued to Ruth Binzley by the City of Glendale Building Department
        for the removal of one 2,000-gallon leaded gasoline UST, one 7,500-gallon unleaded
        gasoline UST, one 10,000-gallon diesel fuel UST, and one 500-gallon waste oil UST.

**1997**    According to a Zoning Use Certificate reviewed at the City of Glendale Building Department, El Capitan Environmental Services, Incorporated, was located at the Property. The use of the Property was listed as "office/storage."

**1999**    A letter was issued to the Property by the City of Glendale Environmental Management Center indicating "with the provisions that the information provided to this agency through the Closure Report prepared by Biotreatment Incorporated as accurate and representative of the site's final condition and based on the State Water Resource Control Board's policy on cleanup of petroleum discharges at low risk sites, no further action related to the underground tank release is required at this time."

**2002**    According to a Zoning Use Certificate reviewed at the City of Glendale Building Department, Glenco Oil was located at the Property. The use of the Property was listed as "warehousing."

**2004**    Based on a review of historical aerial photographs, the Property and surrounding areas were developed similar to that observed during the site survey conducted for this Phase I ESA.

## 5.2 AERIAL PHOTOGRAPH REVIEW

Historical aerial photographs of the Property were reviewed for the years 1927, 1934, 1939, 1948, 1954, 1958, 1962, and 2004.

| Date | Source | Scale | Description |
|------|--------|-------|-------------|
| 1927 | Fairchild | 1" = 10,000' | Stereoscopic Aerial Photographs |
| 1934 | Fairchild | 1" = 10,000' | Stereoscopic Aerial Photographs |
| 1939 | Fairchild | 1" = 20,000' | Stereoscopic Aerial Photographs |
| 1948 | Fairchild | 1" = 500' | Stereoscopic Aerial Photographs |
| 1954 | Fairchild | 1" = 40,000' | Stereoscopic Aerial Photographs |
| 1958 | Fairchild | 1" = 20,000' | Stereoscopic Aerial Photographs |
| 1962 | Fairchild | 1" = 10,000' | Stereoscopic Aerial Photographs |

## 5.3 STREET DIRECTORY REVIEW

Historical business directories including city, cross reference, and telephone directories were reviewed, if available, for this Phase I ESA. City directories were available for the years 1965, 1967, 1972, 1977, and 1990. Western Tours Incorporated was listed at the Property address in the city directories dated 1965, 1967, 1972, and 1977. The 1977 city directory also listed Medi Script of California, and Western Tours Incorporated were listed at the Property address in the 1990 city directory.

## 5.4 SANBORN FIRE INSURANCE MAP REVIEW

Historical Sanborn Fire Insurance Maps were reviewed for the years 1925 and 1944. The 1925 and 1944 Sanborn Fire Insurance Maps did not identify structures on the Property.

## 5.5 TOPOGRAPHIC MAP REVIEW

Topographic maps were reviewed to document the prior uses of the Property and surrounding area. United States Geological Survey (USGS) produced maps were available for the years 1994. The topographic did not identify structures on the Property.

## 5.6 OTHER HISTORICAL DOCUMENTS

CCI reviewed the building permit history for the Property at the City of Glendale Building Department. According to the information reviewed, a building permit was issued in 1965 for the construction of a one-story, 3,760 square-foot addition to the existing building.

DEC-03-2009

26

The addition consisted of offices. A 1966 Certificate of Occupancy document indicated the Property was in use as a warehouse. In 1995 A building permit was issued to the Property for the removal of one 2,000-gallon leaded UST, one 7,500-gallon unleaded gasoline UST, one 10,000-gallon diesel fuel UST, and one SOD-gallon waste oil UST. A 1997 Zoning Use Certificate document indicated the Property use as office/storage. A 2002 Zoning Use Certificate document indicated the Property use as warehousing.

## 5.7 PREVIOUS ENVIRONMENTAL REPORTS

CCI reviewed several previous environmental reports for the Property at the City of Glendale Environmental Management Center (EMC). Please refer to Section 4.5 for a summary of the information reviewed.

**CCI**

15

**Exhibit J** **Page 158**

# 6.0   RECORDS REVIEW

## 6.1 ENVIRONMENTAL DATABASE REPORT

Environmental First Search provided a list of sites within designated distances of the Property that are listed by regulatory agencies. Environmental First Search has also provided a map of these sites, which can be found in Appendix D - Environmental Database Report.

| SUMMARY OF FEDERAL, STATE, AND TRIBAL DATABASE FINDINGS | | | |
|---|---|---|---|
| Regulatory Database | Minimum Search Distance | Property Listed | # of Sites Listed |
| Federal National Priority List (NPL) | 1 mile | No | 1 |
| Federal Delisted NPL | 1 mile | No | 0 |
| Federal Comprehensive Environmental Response, Compensation, and Liability Informaton System (CERCLIS) List | 1/2 mile | No | 4 |
| Federal CERCLIS No Further Remedial Action Planned (NFRAP) | 1/2 mile | No | 5 |
| Federal Resource Conservation and Recovery Act (RCRA) Generators | 1/4 mile | Yes | 24 |
| Federal RCRA Corrective Action Facilities (CORRACTS) | 1 mile | No | 1 |
| Federal RCRA Treatment, Storage, and Disposal Facilities (TSD) | 1/2 mile | No | 0 |
| Federal Institutional Control/Engineering Control Registry | 1/2 mile | No | 1 |
| Federal Emergency Response Notification System (ERNS) List | Property | No | --- |
| State and Tribal Leaking Underground Storage Tank (LUST) Sites | 1/2 mile | Yes | 5 |
| State and Tribal Underground Storage Tank (UST) Sites | 1/4 mile | Yes | 20 |
| State and Tribal Voluntary Cleanup Sites | 1/2 mile | No | 0 |
| Brownfields Sites | 1/2 mile | No | 0 |
| SLIC | 1/2 mile | No | 0 |
| State and Tribal Landfill Sites | 1/2 mile | Yes | 16 |
| HAZNET | 1/2 mile | No | 2 |
| EM1 | Property | Yes | --- |
| | Property | No | |

DEC-03-2009

P3262450

P.20/26

# 7.0  CONCLUSIONS

We have performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM E 1527 of 718 West Wilson, Glendale, Los Angeles County, California (APN 5638-004-029), the Property. Any exceptions to, or deletions from, this practice are described in Section 10.0 of this report. This Phase I ESA has revealed no evidence of recognized environmental conditions in connection with the Property except for the following:

- Previous environmental concerns pertaining to the Property include USTs and a clarifier. The USTs were removed from the Property in 1983 and 1995. Petroleum hydrocarbon impacted soil beneath the Property resulting from leaks from the USTs has since been remediated. The CGEMC issued a no further letter to the Property regarding the USTs/remediation in December 1999. The clarifier was closed in place by filling with concrete.

- Heavy metal contaminated groundwater exists beneath the Property. It has been concluded that the heavy metal contaminated groundwater migrated to the Property from the southeast of the property, located at 711 W. Broadway. Drilube conducted metal plating operations on this site from 1959 to 2004. Subsurface assessments conducted on the former Drilube site have identified significant heavy metal contaminated soil and groundwater beneath the site. The remediation activities at the former Drilube site are currently being overseen by the United States Environmental Protection Agency (US EPA). Evidence was not found that the Property contributed to the heavy metal impacted groundwater beneath the Property.

# 8.0  RECOMMENDATIONS

Based on the sight investigation and the research of records, CCI does not find the existence of an environmental condition that should be a cause of concern for the subject property.

**CCI**

17

# EXHIBIT K



**TransUnion**

## LOAN POLICY OF TITLE INSURANCE
### Issued by
### TRANSUNION TITLE INSURANCE COMPANY
16700 Valley View Ave, Suite 275
La Mirada CA  90638
800-334-8885 toll free
714-452-1300 direct
714-339-4546 fax

**Policy Number:** 501-121-007214

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TRANSUNION TITLE INSURANCE COMPANY, a California corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i)   forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii)  failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv)  failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v)   a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

**In Witness Whereof,** TRANSUNION TITLE INSURANCE COMPANY has caused this policy to be signed and sealed by its duly authorized officers as of Date of Policy shown in Schedule A.

**TRANSUNION TITLE INSURANCE COMPANY**

BY: _____
President

ATTEST: _____
Secretary

**Exhibit K**
Page 162

## COVERED RISKS-CONT.

9. The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage
   (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
   (b) failure of any person or Entity to have authorized a transfer or conveyance;
   (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
   (d) failure to perform those acts necessary to create a document by electronic means authorized by law;
   (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;
   (f) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
   (g) a defective judicial or administrative proceeding.
10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.
11. The lack of priority of the lien of the Insured Mortgage upon the Title
    (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either
       (i) contracted for or commenced on or before Date of Policy; or
       (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and
    (b) over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.
13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title
    (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
    (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
       (i) to be timely, or
       (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.
14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
     (i) the occupancy, use, or enjoyment of the Land;
     (ii) the character, dimensions, or location of any improvement erected on the Land;
     (iii) the subdivision of land; or
     (iv) environmental protection;
     or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of (i) the amount of the principal disbursed as of Date of Policy; (ii) the amount of the principal disbursed subsequent to Date of Policy; (iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance; (iv) interest on the loan; (v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law; (vi) the expenses of foreclosure and any other costs of enforcement; (vii) the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title; (viii) the amounts to pay taxes and insurance; and (ix) the reasonable amounts expended to prevent deterioration of improvements; but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e) "Insured": The Insured named in Schedule A.

(i) The term "Insured" also includes

(A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

(B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

(C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(D) successors to an Insured by its conversion to another kind of Entity;

(E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2) if the grantee wholly owns the named Insured, or

(3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

(F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

(ii) With regard to (A), (B), (C), (D) , and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f) "Insured Claimant": An Insured claiming loss or damage.

(g) "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.

(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l) "Title": The estate or interest described in Schedule A.

(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as Insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as Insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

### 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

### 5. DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions ~~~~ ~~~~ st, to institute and prosecute any action or proceedi ~~~~ ~~~~ ther act that in

its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)  Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6.  DUTY OF INSURED CLAIMANT TO COOPERATE

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage.  All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

    (i)  To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

    (ii)  To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

    When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

    (i)  to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy.  In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

    (ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

    Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 8.  DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)  The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

    (i) the Amount of Insurance,

    (ii) the Indebtedness,

    (iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

    (iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

    (i)  the Amount of Insurance shall be increased by 10%, and

    (ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)  In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)  In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9.  LIMITATION OF LIABILITY

(a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11. PAYMENT OF LOSS**
When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**
(a) The Company's Right to Recover
Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.
If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.
(b) The Insured's Rights and Limitations
(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.
(ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors
The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a) The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations

(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13. ARBITRATION**
Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable

matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15. SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16. CHOICE OF LAW; FORUM**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17. NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 5700 Valley View Ave, Suite 275, La Mirada CA 90638, Ph: (714) 034-8885

TU321
ALTA Loan Policy
(6/17/06)

**Exhibit K** Page 167

# SCHEDULE A

Name and Address of Issuing Agent:

Nations Title Company of California
12901 Norwalk Blvd. Suite 200
Norwalk, CA  90650

File No.:             03006309-DB1                          Policy No.: 501-121-007214

Loan No.:          DERBOGHOSSIAN                      Amount of Insurance: $1,313,200.00

Address Reference:  716-718 West Wilson Avenue, Glendale, CA  91203

Date of Policy:    June 27, 2008 at 8:00 A.M.                     Premium: $ 1,299.24

1.       Name of Insured:

         U.S. BANK N.A.

2.       The estate or interest in the Land that is encumbered by the Insured Mortgage is:

         A Fee

3.       Title is vested in:

         HOVSEP DERBOGHOSSIAN, A MARRIED  MAN AS  HIS SOLE AND SEPARATE PROPERTY

4.       The Insured Mortgage and its assignments, if any, are described as follows:

         DEED  OF TRUST  given to secure the original amount shown below, and any other amount payable under the terms thereof.

         Amount:             $1,313,200.00
         Dated:              NONE SHOWN
         Trustor:            HOVSEP DERBOGHOSSIAN
         Trustee:            U.S. BANK N.A.
         Beneficiary:        U.S. BANK N.A.
         Recorded:           JUNE 27, 2008
         Instrument  No.:    08-1147427, OF OFFICIAL RECORDS

5.       The Land referred to in this policy is described as follows:

         See Schedule C attached hereto and made a part hereof.

---

ALTA Loan Policy 2006 – 6/06                                                        Page I

Exhibit K Page 168

Policy No.: 501-121-007214                                          Order No.: 03006309-DB1

## SCHEDULE A (CONTINUED)

6.      This policy incorporates by reference those ALTA endorsements selected below:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 4-06 | Condominium | ☑ | 9-06 | Restrictions, Encroachments, Minerals |
| ☐ | 4.1-06 | | ☐ | 13.1-06 | Leasehold Loan |
| ☐ | 5-06 | Planned Unit Development | ☐ | 14-06 | Future Advance–Priority |
| ☐ | 5.1-06 | | ☐ | 14.1-06 | Future Advance–Knowledge |
| ☑ | 6-06 | Variable Rate | ☐ | 14.3-06 | Future Advance–Reverse Mortgage |
| ☐ | 6.2-06 | Variable Rate–Negative Amortization | ☑ | 22-06 | Location. The type of improvement is a MULTIPLE FAMILY RESIDENCE/COMMERCIAL PROPERTY, and the street address is as shown above. |

☐      8.1-06   Environmental Protection Lien. Paragraph b refers to the following state statute(s):


Countersigned:                              **TransUnion Title Insurance Company**

By: _____
        **Validating Officer**

                                             By: _____
                                                     **Authorized Signatory**

Policy No.: 501-121-007214

Order No.: 03006309-DJB1

# SCHEDULE B-I

# EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B – Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

## PART I

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2008 - 2009 which are a lien not yet payable.

2.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

3.  Assessments, if any, for community facility districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts. Said assessments are collected with the county taxes.

4.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

5.  Covenants, conditions, and restrictions as set forth in an instrument recorded in Book 3547, Page 193, of Official Records, but omitting any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title 42 of the United States Code, of (b) relates to handicap, but does not discriminate against handicapped persons.

    Note: Section 12956.1 of the Government Code provides the following: If this document contains any restrictions based on race, color, religion, sex, familial status, marital status, disability, national origin, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.1 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

    Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

6.  An easement or lesser right,

    For:            Pole lines
    Affects:        The Southerly portion of said land

7.  Rights of tenants in possession.

8.  A lien for Notice of Lien in favor of United States Environmental Protection Agency

    Against:        Remy Mazmanian
    Amount:         None Shown
    Recorded:       March 7, 2008
    Instrument No.: 2008-0401128, of Official Records

### End of Schedule B-I – Part I

---

Policy issued by TransUnion Title Insurance Company                **Exhibit K** Page 170

Policy No.: 501-121-007214                                           Order No.: 03006309-DB1

# SCHEDULE B-II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

## PART II

1.   DEED OF TRUST TO SECURE AN INDEBTEDNESS IN THE AMOUNT SHOWN BELOW, AND ANY OTHER OBLIGATIONS SECURED THEREBY:

| | |
|---|---|
| AMOUNT: | $38,736.88 |
| DATED: | NONE SHOWN |
| TRUSTOR: | HOVSEP DERBOGHOSSIAN |
| TRUSTEE: | U.S. BANK N.A. |
| BENEFICIARY: | U.S. BANK N.A. |
| RECORDED: | JUNE 27, 2008 AS INSTRUMENT NO. 08-1147428, OF OFFICIAL RECORDS |

2.   A LEASE, AFFECTING THE PREMISES HEREIN STATED, EXECUTED BY AND BETWEEN THE PARTIES NAMED HEREIN, FOR THE TERM AND UPON THE TERMS, COVENANTS AND CONDITIONS THEREIN PROVIDED.

| | |
|---|---|
| TYPE OF LEASE: | MEMORANDUM OF LEASE |
| LESSOR: | HOVSEP DERBOGHOSSIAN |
| LESSEE: | REMY MAZMANIAN DBA PIONEER LANDING GROUP |
| RECORDED: | JUNE 27, 2008 AS INSTRUMENT NO. 08-1147429, OF OFFICIAL RECORDS |

3.   THE LIEN OR CHARGE OF SAID LEASE WAS CONDITIONALLY SUBORDINATED TO THE LIEN OR CHARGE OF THE DEED OF TRUST REFERRED TO IN ITEM NUMBER 4 OF SCHEDULE A, BY A NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT.

| | |
|---|---|
| DATED: | JUNE 20, 2008 |
| EXECUTED BY: | REMY MAZMANIAN DBA PIONEER LANDING GROUP |
| RECORDED: | JUNE 27, 2008 AS INSTRUMENT NO. 08-1147430, OF OFFICIAL RECORDS |

**End of Schedule B-II – Part II**

Policy issued by TransUnion Title Insurance Company

**Exhibit K  Page 171**

Policy No.: 501-121-007214

Order No.: 03006309-DB1

# SCHEDULE C

All that certain real property situated in the City of Glendale, County of Los Angeles, State of California, described as follows:

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 52, Page 18 of Maps in the Office of the County Recorder of said County.

APN: 5638-004-029

# EXHIBIT L

Exhibit L Page 173

LAW OFFICES

## LABOWE, LABOWE & HOFFMAN, LLP

A LIMITED LIABILITY PARTNERSHIP OF AN INDIVIDUAL AND PROFESSIONAL CORPORATIONS

RONALD B. LABOWE
·RICHARD W. LABOWE*
MARK S. HOFFMAN*
ERIKA L. MANSKY

*A PROFESSIONAL CORPORATION

1831 WEST BEVERLY BOULEVARD
SECOND FLOOR
LOS ANGELES, CALIFORNIA 90026-5746
(213) 250-9800

MAILING ADDRESS
POST OFFICE BOX 28428
LOS ANGELES, CALIFORNIA 90026-0428
FACSIMILE (213) 975-1148

IN REPLY REFER TO:

January 29, 2009

08-2209

Nations Title Company of California
12901 Norwalk Blvd.
Suite 200
Norwalk, CA 90650

Attention:   Bridgette Fodor, Advisory Title Officer

Re:   **Real Property located at 716-718 West Wilson Avenue, Glendale, CA 91203**
**Title Order No.:   03006309-DB1**
**Policy No. :   501-121-007214**
**Our Client:   U.S. Bank, N.A.**

Dear Ms. Fodor:

Per our conversations of January 27, 2009, this firm has been retained by US Bank, N.A. ("Bank") with regard to the loan it made secured by a first position Deed of Trust against the above-reference property.  As I explained to you, the Lender's Instructions to Title and Escrow dated June 17, 2008 was specific concerning which exceptions shown on your Preliminary Title Report dated June 16, 2008 would be permitted in order to utilize the Bank's funds.  A copy of said instructions letter is enclosed.  The June 16, 2008 Preliminary Title Report did not disclose a Notice of Lien in favor of the United States Environmental Protection Agency ("USEPA").  However, when the Policy was finally issued earlier this month, it contained as an exception on Schedule B-1 of a lien for Notice of Lien in favor of the USEPA recorded March 7, 2008 (item 8 on said Policy).  U.S. Bank would not have committed funds and made the loan to Hovsep Derboghossian in the sum of $1,313,200.00 if it knew that a policy of insurance would include such a lien.

Furthermore, the Lender's Instructions to Title and Escrow, which contained the limited exception to title that U.S. Bank would accept, was acknowledged and agreed to in writing by the Title Officer Daniel Bruno on behalf of Nations Title Company of California.

As to the e-mail exchange you provided me dated June 26, 2008 to and from Lisa Long at U.S. Bank concerning exception item 13, it is the position of U.S. Bank that the consent had to do with item 13 on the June 16, 2008 Preliminary Title Report - the requirement of a Statement of Information, which is consistent with the referenced

**Exhibit L** Page 174

Nations Title Company of California
Attention:          Bridgette Fodor, Advisory Title Officer
January 29, 2009
Page 2


Preliminary Title Report in the Lender's Instructions dated June 17, 2008.  U.S. Bank
would not have knowingly made a loan secured by potentially contaminated real estate.

Accordingly, demand is hereby made upon Nations Title Company of California for
immediate payment in the principal sum of $1,313,200.00 plus interest and accrued
costs in exchange for which the U.S. Bank will assign, without recourse, all of its rights,
title and interest in the subject loan to Nations Title Company of California.

Please respond to the undersigned within one (1) week of the date of this letter.

Very truly yours,

LABOWE, LABOWE & HOFFMAN, LLP


Richard W. Labowe
RWL:lg
Enclosure
cc:     U.S. Bank, N.A.

Exhibit L

# EXHIBIT M

# shulman bunn LLP

## ATTORNEYS

Stephanie J. Shulman                    June 8, 2009                    Richard A. Bunn

**Via Facsimile and U.S. Mail**

Richard Labowe, Esq.
Labowe, Labowe & Hoffman, LLP
1631 West Beverly Boulevard
Second Floor
Los Angeles, CA 90026-5746

Re:    Claim Tender
       Title Order No. 03006309-DB1
       Policy No. 501-121-007214
       Insured: U.S. Bank

Dear Mr. Labowe:

I have been retained by TransUnion Title Insurance Company to provide a coverage opinion in connection with your claim tender on behalf of U.S. Bank under the above referenced policy of title insurance.

I have reviewed the following documents:

1) Your claim letter dated January 29, 2009;
2) Preliminary Report dated June 16, 2008 provided by you to TransUnion;
3) Preliminary Report dated May 7, 2008 issued by Nations Title Company;
4) TransUnion's claim acknowledgment letter and request for the loan file;
5) TransUnion's second request for a copy of the loan file in letter dated March 4, 2009;
6) Nations Title Company title file #3006309;
7) The property chain of title;
8) The insured Deed of Trust;
9) Notice of Default recorded November 3, 2008;
10) The recorded EPA lien;
11) The ALTA Loan Policy issued to U.S. Bank.

I have been informed that a copy of the loan file was provided to TransUnion and that it does not contain a facsimile cover sheet for the PR dated June 16, 2008. The copy of this PR in the bank's file does appear to have been sent via facsimile, as the US Bank facsimile number appears at the top of the PR.

Richard Labowe, Esq.
June 6, 2009
Page 2

The claim tender involves item #13 of the Preliminary Report (PR) dated May 7, 2008 which is a Notice of Lien in favor of the United States Environmental Protection Agency recorded March 7, 2008, Instrument No. 2008-0401128.

This Notice of Lien is excepted from coverage in Schedule B-1 **EXCEPTIONS FROM COVERAGE** Part I Item 8.

While the Lender's Instructions dated June 17, 2008 do not identify item #13 as a lien that the lender would agree to take subject to, on June 26, 2008, Lisa Long, SBA loan processor e-mailed the title company that it was ok to leave item #13 in the title policy.

You have provided TransUnion with a PR dated June 16, 2008. This PR shows an item #13 that is not a defect, lien or encumbrance on title, but rather a note that the title company will require a Statement of Information from the parties in order to complete the report. Nations Title has informed TransUnion that no such PR exists in its system.

There are numerous indicia of fraudulent alterations on this PR. The May 7 PR was e-mailed; the June 16 PR was sent via facsimile and there is no facsimile cover sheet or other evidence as to the sender in the lender's loan file. The June 16 PR is not a first and probably not even a second generation document; it is of very poor quality. The type set of the date on the face page and the number 13 on page 8 do not match the type set of the May 7 PR and there are the telltale markings of whiteout or tape over in both of these areas on the report. All correspondence, including Supplemental Reports, generated by Nations Title refers to the May 7 PR. The Owner's Title Affidavit notarized on June 26, 2008 refers to the May 7 PR. Amended or Updated PRs issued by Nations are identified as such on the face page of the PR. The June 16 PR does not state that it is an amended or updated report. In addition, there was no Supplement Report issued by Nations that #13, the environmental lien, would not be shown on the final policy. Supplemental Reports were issued for items 7, 8, 10 & 14.

Further, the e-mail from Nations regarding item #13 references "3006309-DB/SUPPLEMENT NEEDED." There is no reason why the title company would need to supplement for inclusion in the policy a notation regarding the necessity for a Statement of Information. A reading of item #13 should have alerted US Bank and further inquiry should have been made.

The June 16 PR was not issued by Nations and is an altered version of the actual PR that was issued by Nations on May 7, 2008 that reflect the terms and conditions, exclusions and exceptions upon which TransUnion agreed to insure US Bank. It appears the June 16 PR was created in furtherance of a fraud on the title company and the lender.

**Exhibit M Page 178**
P. 003

Richard Labowe, Esq.
June 6, 2009
Page 3

  Based on the fact that the Policy of Title Insurance issued to US Bank excepts the Notice of Lien in favor of the United States Environmental Protection Agency based on the only PR issued by Nations Title, TransUnion respectfully denies the insured's claim.   This coverage decision was made after an investigation of the facts and the documents provided by US Bank through your office. However, if there are facts or documents that the insured has that have not been provided and, therefore, not considered in making this decision that you believe may impact the coverage decision, please let us know and we will be happy to re-consider this denial.

  Pursuant to regulations promulgated by the Department of Insurance, you are entitled, should you believe the denial of the claim you have submitted is wrongful, to submit the matter for review to the Department of Insurance at the following address:

    State of California
    Department of Insurance
    Claims Service Bureau
    300 South Spring Street, South Tower
    Los Angeles, CA 90013
    Telephone No.: 800-927-4357

Sincerely,

SHULMAN BUNN LLP

Stephanie Y. Shulman
Attorney at Law

SJS:kji

cc: Dawn Weller

# EXHIBIT N

F NO. 1323   P. 3

# LEASE

### (General Form)

**1. PARTIES:**

This Lease is made and entered into this _____14th_____

by and between _____Hovsap Derboghossian_____ of _____June_____ 192008

(hereinafter referred to as "Landlord") and _Remy Mazmanian dba_

**2. PREMISES:** _____Pioneer Lending Group_____ (hereinafter referred to as "Tenant").

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, on the terms and conditions hereinafter set forth, that certain real property and the building and other improvements located thereon situated in the City of _Glendale_ , State of _____California_____ , commonly known as _718 West Wilson Avenue, Glendale, CA 91203_ and described as _a portion of a larger office building consisting of approximately 2,500 s.f. of improved office space_

(said real property is hereinafter called the "Premises").

**3. TERM:**

The term of this Lease shall be for _____three years_____

and ending on _____July 14, 2011_____ commencing on _____July 15, 2008_____

**4. RENT:**

Tenant shall pay to Landlord as rent for the Premises, the sum of _four thousand five hundred_

($_____4,500_____) dollars per month, in advance on the first day of each month during the term hereof. Rent shall be payable without notice or demand and without any deduction, off-set, or abatement in lawful money of the United States to the Landlord at the address stated herein for notices or to such other persons or such other places as the Landlord may designate to Tenant in writing.

**5. TAXES:**

(a) Real Property Taxes.

Landlord shall pay all real property taxes and general assessments levied and assessed against the Premises during the term of this Lease.

(b) Personal Property Taxes.

Tenant shall pay prior to the delinquency all taxes assessed against and levied upon the trade fixtures, furnishings, equipment and other personal property of Tenant contained in the Premises.

**6. UTILITIES:**

Tenant shall make all arrangements and pay for all water, gas, heat, light, power, telephone and other utility services supplied to the Premises together with any taxes thereon and for all connection charges.

**7. ALTERATIONS AND ADDITIONS:**

Tenant shall not, without the Landlord's prior written consent, make any alterations, improvements or additions in or about the Premises.

**8. HOLD HARMLESS:**

Tenant shall indemnify and hold Landlord harmless from and against any and all claims arising from Tenant's use or occupancy of the Premises or from the conduct of its business or from any activity, work, or things which may be permitted or suffered by Tenant in or about the Premises including all damages, costs, attorney's fees, expenses and liabilities incurred in the defense of any claim or action or proceeding arising therefrom. Except for Landlord's willful or grossly negligent conduct, Tenant hereby assumes all risk of damage to property or injury to person in or about the Premises.

**9. ASSIGNMENT AND SUBLETTING:**

Tenant shall not voluntarily or by operation of law assign, transfer, sublet, mortgage, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises without Landlord's prior written consent which consent shall not be unreasonably withheld.

**10. DEFAULT:**

It is agreed between the parties hereto that if any rent shall be due hereunder and unpaid, or if Tenant shall default in breach any other covenant or provision of the Lease, then the Landlord, after giving the proper notice required by law, may re-enter the Premises and remove any property and any and all persons therefrom in the manner allowed by law. The Landlord may, at his option, either maintain this Lease in full force and effect and recover the rent and other charges as they are due or. In the alternative, terminate this Lease. In addition, the Landlord may recover all rentals and any other damages and pursue any other rights and remedies which the Landlord may have against the Tenant by reason of such default as provided by law.

**11. SURRENDER:**

On the last day of the term of this Lease, Tenant shall surrender the Premises to Landlord in good condition, broom clean, ordinary wear and tear and damage by fire and the elements excepted.

**12. HOLDING OVER:**

If Tenant, with the Landlord's consent, remains in possession of the Premises after expiration or termination of the term of this Lease, such possession by Tenant shall be deemed to be a tenancy from month-to-month at a rental in the amount of the last monthly rental plus all other charges payable hereunder, and upon all the provisions of this Lease applicable to such a month-to-month tenancy.

WOLCOTTS FORM 692—LEASE—ORIGINAL—Rev. 9-61a
(price class 3)

This standard form is intended for the typical situations encountered in the field indicated. However, before you sign, read it, fill in all blanks, and make whatever changes are appropriate and necessary to your particular transaction. Consult a lawyer if you doubt the form's fitness for your purpose and use.

© WOLCOTTS, Inc.

NO. 7323   P. 4

13. **BINDING ON SUCCESSORS AND ASSIGNS:**
   Each provision of this Lease performable by Tenant shall be deemed both a covenant and a condition. The terms, conditions and covenants of this Lease shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, successors and assigns.

14. **NOTICES:**
   Whenever under this Lease a provision is made for any demand, notice or declaration of any kind, it shall be in writing and served either personally or sent by registered or certified United States mail, postage prepaid, addressed at the addresses as set forth below:

TO LANDLORD AT: <u>Hovsep Derboghossian</u>

<u>718 W. Wilson Ave.</u>

<u>Glendale, CA 91203</u>

TO TENANT AT: <u>Remy Mazmanian</u>

<u>716 W. Wilson Avenue</u>

<u>Glendale, CA 91203</u>

Such notice shall be deemed to be received within forty-eight (48) hours from the time of mailing, if mailed as provided for in this paragraph.

15. **WAIVERS:**
   No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provisions.

16. **TIME:**
   Time is of the essence of this Lease.

N/A

The parties hereto have executed this Lease on the date first above written.

LANDLORD:                                    TENANT:

By: _____        By: _____
    Hovsep Derboghossian                      Remy Mazmanian

**Exhibit N** Page 182

# EXHIBIT O

*Nations*

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

U.S. Bank National Association,
a national banking association
9918 Hibert Street, Suite 301
San Diego, CA 92131



06/27/08

20081147430

*5638-4-29*
3006309

Space Above This Line For Recorder's Use

## SUBORDINATION, ATTORNMENT AND
## NON-DISTURBANCE AGREEMENT
## (NO SUBTENANT)

NOTICE:  THIS SUBORDINATION OF LEASE RESULTS IN THE LEASEHOLD
ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY
THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.

THIS AGREEMENT, made this **20th** day of **June, 2008** by and between
the following parties is based upon the recitals set forth.

### PARTIES:

A.    "Owner" **Hovsep Derboghossian** is the owner of that real property
located at **718 West Wilson Avenue,** Glendale, CA 91203, APN No. **5638-004-029,**
and more particularly described in attached **Exhibit "A"** (hereinafter the "Real
Property") which is improved as a **commercial building.**
B.    "Lender"    U.S. Bank National Association, which made a loan to
Owner which is secured by a deed of trust/mortgage encumbering the Real Property.
C.    "Tenant" **Remy Mazmanian dba Pioneer Landing Group** is a tenant of
Owner pursuant to a written lease dated **June 14, 2008.** Tenant occupies that portion
of the Property described as **718 West Wilson Avenue, Glendale, CA 91203.**
### RECITALS

1.    Lender has made a loan to Owner for, among other things, the purchase
of the Real Property, which loan is secured by a Deed of Trust/Mortgage encumbering
the Real Property.  As a condition of the loan, Lender required that the Deed of
Trust/Mortgage be, and remain, superior to any other interest in or encumbrance upon
the Real Property.

2.    Owner, as landlord, has executed the Lease in favor of Tenant.  The
interest of Tenant under the Lease is reflected in that Memorandum of Lease recorded
June 27, 2008 as Document No. ____ in the Official Records of the ____ Los
Angeles, State of **California.**  Owner and Tenant agree that the Lease **Exhibit C**

08-1147429

**Page 184**

interests of Owner and Tenant under the Lease, shall be and shall remain subordinate to the interests of Lender under the Deed of Trust/Mortgage on the terms and conditions set forth in this Agreement.

3.     The parties agree that Lender would not have made the loan to Owner which is secured by, among other things, the Deed of Trust/Mortgage without the subordination of the interests of Tenant in the Real Property so that such interests are junior and inferior to the interests of Lender under the Deed of Trust/Mortgage.

# AGREEMENT

NOW, THEREFORE, in consideration of the mutual benefits accruing to the parties hereto and other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, and in order to induce Lender to make the loan above referred to, it is hereby declared, understood and agreed as follows:

1. The Deed of Trust/Mortgage securing a note in favor of Lender, and any renewals, modifications, amendments or extensions thereof, shall unconditionally be and remain at all times a lien or charge on the Real Property prior and superior to the Lease, to the leasehold estate created thereby and to all rights and privileges of Tenant or its successors thereunder, and said Lease, the leasehold estate created thereby together with all rights and privileges of Tenant thereunder are hereby subjected, and made subordinate, to the lien or charge of the Deed of Trust/Mortgage in favor of Lender.

2. This agreement shall be the whole and only agreement with regard to the subjection and subordination of the Lease and the leasehold estate created thereby together with all rights and privileges of Tenant thereunder to the lien or charge of the Deed of Trust/Mortgage in favor of Lender above referred to and shall supersede and cancel, but only insofar as would affect the priority between the Lease and the Deed of Trust/Mortgage hereinbefore specifically described, any prior agreements as to such subjection or subordination, including, but not limited to, those provisions, if any, contained in the Lease above described, which provide for the subjection or subordination of said Lease and the leasehold estate created thereby to a deed or deeds of trust or to a mortgage or mortgages.    Tenant declares, agrees and acknowledges that:

(a) Lender in making disbursements pursuant to any loan or escrow agreements, between Owner and Lender for the disbursement of the proceeds of Lender's Loan, is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds and any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part; and

(b) Tenant intentionally and unconditionally subjects and subordin' above described, the leasehold estate created thereby together with all rights and privileges of Tenant thereunder in favor of the lien or charge upon said land of the

Exhibit C Page 185

Deed of Trust/Mortgage in favor of Lender above referred to and understands that in reliance upon, and in consideration of, this subjection and subordination specific loans and advances are being and will be made and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this subjection and subordination.

3. **Non-Disturbance Agreement:** Despite the subordination under the above, Tenant's peaceful and quiet possession of the Leased Premises shall not be disturbed and Tenant's rights and privileges under the Lease shall not be diminished by Lender's exercise of its rights or remedies under the Deed of Trust and any related loan documents, provided that Tenant:

(a) is not in default in the payment of the rent or additional rent or in the performance of any of the other material terms, covenants, or conditions of the Lease that Tenant is required to perform (beyond any period given Tenant under the Lease to cure such default);

(b) has not canceled or terminated the Lease (without regard to whether landlord or Tenant is then in default under the Lease), nor surrendered, or abandoned the Leased Premises;

(c) has not made any advance payment of rent or additional rent (except as specifically required by the terms of the Lease); and

(d) has complied with any direction of Lender to make payments of rent directly to Lender pursuant to rights of Lender to such rents under the Deed of Trust/Mortgage.

4. Tenant shall not be named or joined in any foreclosure, trustee's sale, or other proceeding to enforce the Deed of Trust/Mortgage and/or the Loan Documents unless such joinder shall be legally required to perfect the foreclosure, trustee's sale, or other proceeding. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

5. Attornment

(a)     If Lender shall succeed to Owner's interest in the Real Property or the Leased Premises by foreclosure of the Deed of Trust/Mortgage, by deed in lieu of foreclosure, or in any other manner, Tenant shall be bound to Lender under all the terms, covenants and conditions of the Lease for the balance of its term with the same force and effect as if Lender were the landlord under the Lease. Tenant shall be deemed to have full and complete attornment to, and to have established direct privity between Tenant and:

(i) Lender when in possession of the Real Property or the Leased

**Exhibit O** Page 186

(ii) a receiver appointed in any action or proceeding to foreclose the Deed of Trust;

(iii) any party acquiring title to the Real Property or the Leased Premises; or

(iv) any successor to landlord.

(b) Tenant's attornment is self-operating, and it shall continue to be effective without execution of any further instrument by any of the parties to this Agreement or the Lease. Lender agrees to give Tenant written notice If Lender has succeeded to the interest of the landlord under the Lease. Subject to section 6, the terms of the Lease are incorporated into this Agreement by reference.

(c) If the interests of landlord under the Lease are transferred by foreclosure of the Deed of Trust, deed in lieu of foreclosure, or otherwise, to a party other than Lender ("Transferee"), in consideration of, and as condition precedent to, Tenant's agreement to attorn to any such Transferee, Transferee shall be deemed to have assumed all terms, covenants, and conditions of the Lease to be observed or performed by landlord from the date on which the Transferee succeeds to landlord's interests under the Lease; provided that the liability of any Transferee to Tenant under the terms of the Lease shall be limited in the same manner as Lender's liability is limited under section 6.

(d) If the interests of landlord under the Lease are transferred by foreclosure of the Deed of Trust, deed in lieu of foreclosure, or otherwise, the Transferee shall have the right to collect any due, but unpaid, obligations owing under the Lease, including any accrued, but unpaid rent

6.   Lender as landlord.   If Lender shall succeed to the interest of landlord under the Lease, Lender shall be bound to Tenant under all the terms, covenants and conditions of the Lease, and Tenant shall, from the date of Lender's succession to the landlord's interest under the Lease, have the same remedies against Lender for breach of the Lease that Tenant would have had under the Lease against landlord; provided, however, that despite anything to the contrary in this Agreement or the Lease, Lender or any Transferee, as successor to the landlord's interest, shall not be:

(a) liable for any act or omission of any previous landlord (including Owner), provided that the foregoing shall not be construed to limit Tenant's right to possession of the Leased Premises for the entire term of the Lease, as extended, on the terms and conditions of the Lease;

(b) subject to any offsets or defenses that Tenant might have had against any previous landlord (including Owner);

(c) liable for any security deposit not received by Lender, or bound by any rent or additional rent that Tenant may have paid for more than one month any previous landlord (including Owner);

**Exhibit O   Page 187**

(d) bound by an amendment or modification of the Lease made without Lender's written consent, which consent shall not be unreasonably withheld or delayed, so long as Tenant pays to Lender a reasonable amount to defer the costs, including attorney's fees, incurred in response to a request for such consent;

(e) bound by any covenant to undertake or complete any construction of the Real Property or the Leased Premises, or any portion of them.

Lender shall be liable under the Lease only during such time as it is the owner of the Real Property and the landlord under the Lease. Upon Lender's transfer of the Real Property, or such portion of the Real Property as encompasses the Leased Premises, Lender shall be released and exonerated from any liability under the Lease for any acts or omissions occurring after such transfer and Tenant agrees to look solely to the transferee of Lender for performance of the obligations of the landlord under the Lease. Tenant further agrees that it will, within 60 days of notice of the transfer of Lender's interest in the Real Property, provide Lender with a list of all claims that exist against Lender as a result of its status as landlord. Failure to specify a claim in a timely manner shall forever bar tenant from bringing such claim against Lender.

7. Notice of Default, Right To Cure. Tenant agrees concurrently to give Lender a copy of any written notice of any default given by Tenant to landlord under the Lease. Tenant agrees that, before it exercises any of its rights or remedies under the Lease, Lender shall have the right, but not the obligation, to cure the default within the same time given landlord in the lease to cure the default, plus an additional thirty (30) days, or if no time period is given to landlord in the Lease to cure, then within a reasonable time. If any such asserted default constitutes a legal basis for Tenant to cancel its obligations under the Lease, Tenant agrees that the Lease shall not be canceled or terminated until Lender shall have had a reasonable period of time within which to (a) obtain possession of the Real Property or the Leased Premises, and (b) cure such default. Tenant also agrees to use its best efforts to give Lender notice of any material casualty damage to the Leased Premises.

8. Assignment of Rents.    If Owner defaults in its performance of the terms of the Deed of Trust/Mortgage, Tenant agrees to recognize the Assignment of Rents made by Owner to Lender and shall pay to Lender, as assignee, from the time Lender gives Tenant written notice that Owner is in default under the terms of the Deed of Trust/Mortgage Deed of Trust/Mortgage, the rents under the Lease, but only those rents that are due or that become due under the terms of the Lease after written notice by Lender. Payments of rents to Lender by Tenant under the assignment of rents upon landlord's default shall continue until the first of the following occurs:

(a) No further rent is due or payable under the Lease;

(b) Lender gives Tenant notice that Owner's default under the Deed of Trust/Mortgage has been cured and instructs Tenant that the rents shall thereafter be payable to landlord; or

(c) The lien of the Deed of Trust/Mortgage has been foreclosed and the purchaser at the foreclosure sale (whether Lender or a Transferee) gives Tenant written notice of the foreclosure sale. On giving written notice, the purchaser shall succeed to landlord's interests under the Lease, after which time the rents and other benefits due landlord under the Lease shall be payable to the purchaser as the owner of the Mortgage Premises

9.  Tenant's Reliance.  Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with section 9 to the same extent as if such rents were paid directly to landlord. Any dispute between Lender (or Lender's Transferee) and landlord as to the existence of a default by landlord under the terms of the Deed of Trust, the extent or nature of such default, or Lender's right to foreclosure of the Deed of Trust, shall be dealt with and adjusted solely between Lender (or Transferee) and landlord, and Tenant shall not be made a party to any such dispute (unless required by law).

10. Lender's Status.   Nothing in this Agreement shall be construed to be an agreement by Lender to perform any covenant of the landlord under the Lease unless and until it obtains title to the Real Property or the Leased Premises by means of judicial foreclosure, or deed in lieu of foreclosure, or by power of sale, Property or the Leased Premises under the terms of the Loan Documents. Lender shall not be deemed a "mortgagor in possession" by virtue of its exercise of its rights to the rents or any other right under this Agreement.

11. Cancellation of Lease.   Tenant agrees that it will not cancel, terminate, or surrender the Lease, except at the normal expiration of the Lease term or as provided in the Lease, or enter into any agreement, amendment, or modification of the Lease except any agreement, amendment, or modification contemplated by or provided by the terms of the Lease unless Lender gives its prior written consent.

12. Limited Waiver of Due on Sale: To the extent the Deed of Trust/Mortgage contains a "due on sale" clause which would give Lender the right to declare Tenant's obligation to Lender due and payable, Lender waives such "due on sale" clause for purposes of the Lease. This waiver is a one time waiver and does not obligate Lender to any other waiver of the "due on sale" clause.

13. General Terms:

a.  This Agreement shall become effective only upon the execution by all of the parties hereto.

b.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  The provisions of this Agreement shall be binding upon any guarantor of landlord's obligations under the lease.

c.  Tenant acknowledges that it is relying solely on its decision a of its own legal counsel and other consultants in entering into this Agreement, and that neither the Bank/Lender nor any of its respective

employees, agents, contractors, attorneys, accountants or other representatives have provided any advice to Tenant in connection with this Agreement, any of its provisions or any of the transactions contemplated herein, or regarding any legal, financial, tax or other impact this Agreement may have to Tenant.

d. Each Signatory shall execute any and all documents and perform any and all acts reasonably necessary or appropriate to consummate the terms and conditions set forth in this Agreement, provided, however, that this provision does not require any party to agree to provisions which are not part of the agreement.

e. All representatives, warranties, covenants, agreements, terms and conditions made herein will survive the execution of this Agreement and all transactions contemplated hereunder.

f. The descriptive headings of the several sections of this Agreement are inserted for convenience and will not be deemed to affect the meaning or construction of any of the provisions hereof.

g. The parties agree that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement. The terms of this Agreement shall be interpreted consistent with the Loan Documents and the Lease, except as specifically modified by the terms set forth herein.

h. The defined terms in this Agreement will apply equally to both the singular and the plural forms of the terms defined. Whenever the context may require, any pronoun will include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" when used in this Agreement will be deemed to be followed by the phrase "without limitation" The words "approval" and "notice" when used in this Agreement will be deemed to be preceded by the word "written." All references to "Exhibit" or "Exhibits" in this Agreement mean the exhibits attached hereto, the terms and conditions of which are made a part hereof. All references to "Section" or "Sections" in this Agreement mean the applicable section of this Agreement unless otherwise specified. To the extent applicable, the term "landlord" shall refer to a "lessor" or similarly situated person and the term "tenant" shall refer to a lessee or similarly situated person.

i. This Agreement constitutes the entire agreement between the parties hereto with respect to the priority of the Lease and the obligations of Lender as landlord under the Lease, and supersedes any other agreements, negotiations, communications, understandings and commitments whether written or oral, relating thereto. This Agreement may be modified only by a writing signed by all parties to this Agreement.

**Exhibit O** Page 190

j.  If any one or more of the provisions contained in this Agreement for any reason shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

k.  Time is of the essence in the execution and performance of this Agreement and each of its provisions.

l.  This Agreement shall be interpreted, construed and governed by the laws of the state set forth in the Promissory Note, if any, and if not so set forth, of the state set forth in the Deed of Trust/Mortgage. Any litigation arising from or relating to this Agreement shall be filed and prosecuted in a state or federal court located in the City of San Diego, County of San Diego, State of California.

m.  In the event of any litigation or other action to construe, interpret or enforce this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' and expert witness fees and costs.

n.  All notices to be given under this Agreement shall be in writing and either: (a)   Sent by priority overnight delivery by means of a nationally recognized overnight courier which provides for online (Internet) tracking of packages, in which case notice shall be deemed delivered one (1) business day after deposit with such courier, or (b)   By   telecopy   or similar means, if a copy of the notice is also sent by priority overnight delivery by means of a nationally recognized overnight courier which provides for online (Internet) tracking of packages, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated reflecting the accurate transmission of the notice and the copy is also delivered.

Notice shall be given to the following persons on behalf of the parties and shall be deemed complete only if given to all the designated individuals:

Bank:        Nancy Arden
             VP – Portfolio
             SBA Division
             U. S. Bank National Association
             9918 Hibert Street, 2nd Floor
             San Diego, CA  92131
             Tel: 858-536-4545, ext. 348
             Fax: 858-877-4568

**Exhibit O  Page 191**

Owner:        **Hovsep Derboghossian**
              **645 West California Avenue**
              **Glendale, CA 91203**

Tenant:       **Remy Mazmanian dba Pioneer Landing Group**
              **718 West Wilson Avenue**
              **Glendale, CA 91203**

NOTICE:  THIS SUBORDINATION OF LEASE CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR LEASE TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

Lender
**U.S. Bank National Association**                       Owner: **Hovsep Derboghossian**

By: _____                           By: _____
    Authorized Signor                                       **Hovsep Derboghossian**

**Tenant: Remy Mazmanian dba Pioneer Landing
Group**

By: _____
    **Remy Mazmanian**

**(ALL SIGNATURES MUST BE NOTARIZED AND ACKNOWLEDGEMENTS ATTACHED)**

**Exhibit O** Page 192

## Exhibit "A"

Lot 17 of Tract No. 4531, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 52, Page 18 of Maps in the Office of the County Recorder of said County.

Asssesor's Parcel No. 5638-004-029

State of California

County of San Diego

On  June 25 2008 before me, Andrea Doris Fritsch, Notary Public personally appeared Denni Northway who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Andrea Doris Fritsch_

(Seal)

ANDREA DORIS FRITSCH
Commission # 1794217
Notary Public - California
San Diego County
My Comm. Expires Nov. 9, 2012

**Exhibit O**
**Page 194**

## ACKNOWLEDGMENT

State of California
County of LOS Angeles

On June 25, 2008 before me, Arleen Bedrossian, A Notary Public

(here insert name and title of the officer)

personally appeared HOVSEP Derboughossian

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Arleen Bedrossian



ARLEEN BEDROSSIAN
Commission # 1788432
Notary Public - California
Los Angeles County
My Comm. Expires Jul 22, 2011

(Seal)

**Exhibit O**
**Page 195**

## ACKNOWLEDGMENT

State of California
County of Los Angeles

On June 25, 2008 before me, Arleen Bedrossian, A Notary Public
(here insert name and title of the officer)

personally appeared Remy Mazmanian

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Arleen Bedrossian_

ARLEEN BEDROSSIAN
Commission # 1769462
Notary Public - California
Los Angeles County
My Comm. Expires Aug 22, 2011

(Seal)

Exhibit O
Page 196

# ACKNOWLEDGMENT

State of California
County of _Los Angeles_

On _June 25, 2008_ before me, _Arleen Bedrossian (Notary Public)_
personally appeared _Hagsep   Derboghossian_
(here insert name and title of the officer)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Arleen Bedrossian_

(Seal)